McMORAN, O'CONNOR BRAMLEY & BURNS, PC
Ramshorn Executive Centre
2399 Highway 34
Bldg. D Suite D-1
Manasquan, New Jersey 08736
(732) 223-7711
Attorneys for Defendants,
Michael Fitzgerald and Teri O'Connor

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN CURLEY,<br><br>               Plaintiff,<br><br>                  vs.<br><br>MONMOUTH COUNTY BOARD OF CHOSEN FREEHOLDERS; SERENA DIMASO, in her individual and official capacity as Monmouth County Chosen Freeholder; THOMAS ARNONE,  in his individual and official capacity as Monmouth County Chosen Freeholder; GARY RICH,  in his individual and official capacity as Monmouth County Chosen Freeholder; LILLIAN BURY, in her individual and official capacity as Monmouth County Chosen Freeholder; MICHAEL FITZGERALD, ESQ.,  in his individual and official capacity as County Counsel; and TERI O'CONNOR, in her individual and official capacity as County Administrator,<br><br>             Defendants. | Civil Action No. 3:17-12300-BRM-TJB<br><br><br>          **Civil Action**<br><br>**CERTIFICATION OF MICHAEL F. O'CONNOR, ESQ.** |

     **MICHAEL  F.  O'CONNOR,  ESQ.**,  of  full  age  and  duly  sworn,

certifies the following:

1

1.    I am a shareholder in McMoran O'Connor Bramley & Burns, PC, counsel for defendants Michael Fitzgerald, Esq. and Teri O'Connor in the captioned matter. I am one of the attorneys responsible for handling this matter.   I respectfully submit this certification in support of defendants' motion to dismiss the amended complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Procedure 12(b)(6).

2.    Attached hereto as Exhibit A is a true and accurate copy of the opinion in *Curley v. Monmouth County Board of Chosen Freeholders*, 2018 WL 3574880 (D.N.J. July 25, 2018).

3.    Attached hereto as Exhibit B is a true and accurate copy of the opinion in *Falat v. County of Hunterdon*, Civil Case No. 12-6804 (FSH)(MAH), 2014 WL 6611493 (D.N.J. Nov. 21, 2014).

4.    Attached hereto as Exhibit C is a true and accurate copy of the opinion in *Killion v. Coffey*, 2016 WL 5417193 (D.N.J. 2016)

5.    Attached hereto as Exhibit D is a true and accurate copy of the opinion in *Johnson v. Bally's Atlantic City*, 2005 WL 2141269 (3d Cir. Sept. 7, 2005).

6.    Attached hereto as Exhibit E is a true and accurate copy of the opinion in *Redfield v. City of Jersey City*, Civ. No. 86-3869, 1989 WL 4956 (D.N.J. Jan. 23, 1989).

The foregoing statements made by me are true and accurate to the best of my knowledge. I am aware that if any of the foregoing statements by me are willfully false, I am subject to punishment.

_Michael F. O'Connor_

MICHAEL F O'CONNOR

Dated: September 13, 2018

# EXHIBIT A

KeyCite Blue Flag – Appeal Notification
Appeal Filed by CURLEY v. MONMOUTH COUNTY BOARD OF
CHOSE, ET AL, 3rd Cir., August 28, 2018
2018 WL 3574880
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

John CURLEY, Plaintiff,
v.
MONMOUTH COUNTY BOARD OF CHOSEN
FREEHOLDERS, et. al. Defendants.

Civil Action No. 3:17-cv-12300-BRM-TJB
|
Signed 07/25/2018

**Attorneys and Law Firms**

Angelo Joseph Genova, Genova Burns LLC, Newark, NJ,
Lawrence Bluestone, Genova Burns LLC, Jersey City,
NJ, for Plaintiff.

Jonathan Testa, O'Donnell McCord PC, Morristown, NJ,
Bruce P. McMoran, Michael Francis O'Connor,
McMoran O'Connor & Bramley,Manasquan, NJ, for
Defendants.

**OPINION**

BRIAN   R.   MARTINOTTI,   UNITED   STATES
DISTRICT JUDGE

*1 Before this Court are: (1) John Curley's ("Cu rley")
Motion to Hold Defendants Monmouth County Board of
Chosen Freeholders ('the Board"), Serena DiMaso
("DiMaso"), Thomas Arnone ("Arnone"), Gary Rich
("Rich"), Lillian Burry ("Burry"), Michael Fitzgerald,
Esq. ("Fitzgerald"), Teri O'Connor ("O'Connor")
(together, "Defendants") in Contempt (ECF No. 8);[1] (2)
the County Defendants' Motion to Dismiss for Lack of
Jurisdiction and for Failure to State a Claim (ECF No.
26); and (3) Fitzgerald and O'Connor's Motion to
Dismiss (ECF No. 32). All motions are opposed. (ECF

Nos. 24 and 43.) Pursuant to Federal Rule of Civil
Procedure 78(a), the Court heard oral argument on April
30, 2018. For the reasons set forth below, the County
Defendants' Motion to Dismiss for Lack of Jurisdiction is
**DENIED**, but their Motion to Dismiss for Failure to State
a Claim is **GRANTED** (ECF No. 26); Fitzgerald and
O'Connor's Motion to Dismiss is **GRANTED** (ECF No.
32); and Curley's Motion to Hold Defendants in
contempt is **GRANTED** (ECF No. 8).

**I. BACKGROUND**

**A. Factual Background**
For the purposes of the motions to dismiss only, the Court
accepts the factual allegations in the Complaint as true
and draws all inferences in the light most favorable to
plaintiff. See Phillips v. Cty. of Allegheny, 515 F.3d 224,
228 (3d Cir. 2008). The Court also considers any
"document integral to or explicitly relied upon in the
complaint." In re Burlington Coat Factory Sec. Litig., 114
F.3d 1410, 1426 (3d Cir. 1997).

**1. The Parties**

Curley is an elected Freeholder on the Board. (Am.
Compl. (ECF No. 7) ¶ 13.) He was elected by the citizens
of Monmouth County (the "County") to serve for three
terms totaling, to date, approximately eight years. (Id. ¶
29.) His term is set to expire on December 31, 2018. (Id.)
Curley has also been the Deputy Director of the Board
since 2016. (Id. ¶ 30.) According to local media reports,
Curley is "nominally a Republican, [and] has a fierce
independent streak that has at times angered fellow
Republicans but has served county residents well." (Id. ¶
2 (quoting Asbury Park Press's October 28, 2015
endorsement in the 2015 Freeholder election in
Monmouth County).) Curley alleges he "has been a
persistent and regular advocate of positions that have run
contrary to the Republican political establishment on the
Board, and in the County's party leadership, and has been
unafraid to challenge the purported majority view of the
Freeholders." (Id. ¶ 3.) Throughout his tenure, Curley was
provided an office for and has employed confidential

aides to assist him in fulfilling his functions as a Freeholder. (*Id.* ¶ 42.)

The Board "is the body politic of the County, which has been delegated both legislative and executive functions by the State pursuant to N.J. Stat. Ann. [§] 40:20-1 et seq., and as specified in the Monmouth County Administrative Code (the 'Code')". (*Id.* ¶ 14.) DiMaso, Burry, Rich, and Arnone are also Freeholders on the Board. (*Id.* ¶¶ 15-18.) Fitzgerald is the appointed counsel for the Board. (*Id.* ¶ 19.) He "was appointed in 2016 as the County Counsel to be the chief legal advisor to the Board for a three-year term." (*Id.* ¶ 31.) O'Connor has been the appointed County Administrator for the Board since 2010. (*Id.* ¶ 32.)

### 2. The Investigation

**\*2** In June 2017, O'Connor and Fitzgerald retained the Honorable Mary Catherine Cuff, P.J.A.D. (ret.) (the "Investigator") to investigate a complaint by an unknown woman alleging Curley made a sexist remark in public during the May 2017 Bradley Beach Memorial Day Parade. (*Id.* ¶¶ 44, 51, 53; *see* Investigator's Report (ECF No. 2) at 1, 5-6.) The Investigator interviewed multiple witnesses, including DiMaso and Curley, who was interviewed with his attorney present. (ECF No. 2 at 19-22.) Curley alleges the investigation was initiated without the approval of the Board and that the Investigator was also retained without the Board's approval. (ECF No. 7 ¶¶ 51-52.) The investigation lasted approximately five months. (*Id.* ¶ 53.) Ultimately, the investigation resulted in the issuance of a report (the "Report"), which was released to Fitzgerald on October 13, 2017. (*Id.* ¶ 54.) Section I of the Report, "Statement of Allegations," contains the substance of the interviews; Section II contains a statement of law governing sexual harassment in the workplace; Section III contains the Investigator's conclusions on the credibility of the statements made during the interviews, and Section IV contains the Investigator's recommendations. (ECF No. 2.) The Investigator found credible many of the allegations that Curley made sexist remarks about women. (*Id.*) Therefore, she concluded Curley's alleged conduct could support an inference of sex discrimination or hostile work environment. (*Id.* at 46.)

### 3. The Board Censures Curley

On November 26, 2017, Fitzgerald sent the Freeholders a copy of the Report. They noticed and held a special meeting of the Board to be held in Executive Session for November 29, 2017, "where the Freeholders would discuss the Report and Fitzgerald and O'Connor would present recommendations to act on the Report." (ECF No. 7 ¶¶ 60-62.) Curley arrived with counsel for the Executive Session, but Fitzgerald informed him "he could not attend the meeting at its start to make a statement, since he was a 'target.' " (*Id.* ¶¶ 62-63.) When Curley's counsel informed Fitzgerald he wanted to put his objections to the proceeding on the record, Fitzgerald threatened to call the County Sheriff to remove Curley from the meeting. (*Id.* ¶ 64.) At the meeting, Curley "requested that DiMaso recuse herself given that she was ... one of the complainants" or that Curley and DiMaso both be recused. (*Id.* ¶¶ 69-70.) Both requests were denied. (*Id.*) Eventually, Curley was permitted to speak but was cautioned "that he was not permitted to speak about or address the merits of the Report." (*Id.* ¶ 65.) Curley, in lieu of speaking, presented a letter and memorandum, drafted by his counsel, setting forth his position. (*Id.* ¶ 71.) Curley's counsel was denied access to the Executive Session. (*Id.* ¶ 68.) The Executive Session was not conducted on the record–instead, handwritten notes were taken that have yet to be provided to Curley. (*Id.* ¶¶ 66-67.)

After the Executive Session, O'Connor and Fitzgerald met with Curley and his attorney. (*Id.* ¶ 74.) They explained that Curley is barred from entering the Hall of Records, where the Board conducts its business, unless he was conducting County business, and that Curley could not have any contact with County employees, including his aide, until a special meeting and subsequent public session was held on December 4, 2017, to consider the following: (1) updating, expanding, and reinforcing the Monmouth County policy on prohibiting workplace discrimination and harassment; and (2) a resolution to censure Curley (the "Censure Resolution"). (*Id.* ¶¶ 75, 77, 81-90.) Curley alleges O'Connor and Fitzgerald made these decisions without vote or approval of the Board. (*Id.* ¶ 76.) Fitzgerald indicated Curley and his counsel would be allowed to attend the December 4 meeting and would be allowed to question the investigator, but not confront the witnesses. (*Id.* ¶ 79.) The above restrictions on Curley remained in place for two days, during which time, on November 30, 2017, Curley worked at the Hall of Records in order to "fulfill[ ] his duties as an elected Freeholder". (*Id.* ¶ 86.)

### 4. Curley's Federal Complaint, Application for a Temporary Restraining Order, and Motion for a Preliminary Injunction

On December 1, 2017, Curley filed his initial Complaint with an Order to Show Cause seeking Temporary Restraints and a Preliminary Injunction, to prevent Defendants from proceeding with the Censure Resolution on December 4, 2017, and to provide Curley with access to his office and confidential aide. (ECF No. 1 and ECF No. 7 ¶ 91.) On that same day, the Court held a telephone conference, where the parties ultimately agreed to adjourn the special meeting from December 4 to December 8, 2017. In addition, Defendants agreed to provide Curley with access to the Hall of Records. (ECF No. 7 ¶ 92.)

*3 On December 4, 2017, the parties appeared before the Court and agreed that Curley would withdraw his Motion for Temporary Restraints and allow the special meeting to go forward on December 8. (Id. ¶¶ 93-94.) The Court also ordered that the Report and Curley's counsel's objections to it would remain sealed. (ECF No. 6.)

### 5. December 8, 2017 Executive Session

On December 7, 2017, Defendants' outside counsel notified Curley that at the December 8 Executive Session: (1) the Investigator would give a presentation; (2) Curley would have thirty minutes to present comments, submissions, or statements "individually or through counsel"; and (3) the other Freeholders would have thirty minutes to present their comments, submissions, and statements. (ECF No. 7-1, Ex. E at 10.) At the Executive Session, Curley elected not to speak, and his counsel spoke on his behalf. (ECF No. 7 ¶ 97.) DiMaso attended the Executive Session and the deliberations after all presentations. (Id. ¶ 101.) Also present were Arnone, Rich, and Burry. (Id. ¶ 102.)

### 6. December 8, 2017 Public Session

After deliberating at the Executive Session, the Freeholders conducted the Public Session. (Id. ¶ 103.) At the Public Session, the Board took public comment, voted on, and approved the following resolutions: (1) to update, expand, and reinforce the Monmouth County policy on

prohibiting workplace discrimination and harassment; and (2) to censure Curley. (Id. ¶¶ 81, 106, 117.) The resolution to censure Curley expresses disapproval of his remarks but imposes no punishment on him. (ECF No. 7-1, Ex. F at 13-21.)

At the Public Session, Defendants allegedly read the Censure Resolution of Curley, which directly quoted and paraphrased the Report, "notwithstanding the Court's order that the Report remain under seal." (ECF No. 7 ¶¶ 107-08.) During the reading of the Censure Resolution, "a member of the public interrupted Defendants' counsel to inform the Freeholders that quoting passages from the Report violate[d] the Court's sealing order." (Id. ¶ 109.) When Curley's counsel was permitted to speak, he also objected to the reading of the sealed Report to the public. (Id. ¶ 112.)

### 7. Monmouth County Republican Committee Email

On December 13, 2017, the Chairman of the Monmouth County Republican Committee sent an email to the Monmouth County Republic Headquarters, quoting from the Report and criticizing Curley "for pursuing his rights in courts and for hiring a 'Democratic State committee lawyer.' " (Id. ¶¶ 118-19.) The email concluded that Curley "should not run for re-election on the Republican line in 2018." (Id. ¶ 120.)

### B. Procedural Background

On December 1, 2017, Curley filed an initial Complaint against Defendants with an Order to Show Cause seeking Temporary Restraints and a Preliminary Injunction. (ECF No. 1.) On December 4, 2017, Curley withdrew his Application for Temporary Restraints, and the Court, with all counsels' consent, ordered the Report sealed. (ECF No. 4.) On December 22, 2017, Curley filed an Amended Complaint, alleging twelve counts against Defendants in their individual and official capacities: (1) two violations of his due process under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) two violations of his due process under Article I, Paragraph I of the New Jersey Constitution; (3) declaratory judgment; (4) retaliation for protected free speech under the First Amendment, pursuant to § 1983; (5) retaliation for protected free speech under Article I, Section I, Paragraph

6 of the New Jersey State Constitution; (6) a violation of the Speech or Debate Clause of Article I, Section 6, Clause 1 of the U.S. Constitution; (7) a violation of the Speech or Debate Clause of Article IV, Section 4, Paragraph 9 of the New Jersey State Constitution; (8) Conspiracy to Violate Constitutional Rights, § 1985; (9) violation of local government ethics law; and (10) defamation. (*See* ECF No. 7.)

*4 On December 22, 2017, Curley filed a Motion to hold Defendants in contempt for violating the Court's December 4, 2017 Order to keep the Report sealed ("Order to Seal"). (ECF No. 8.) On February 1, 2018, the County Defendants filed a Motion to Dismiss for Lack of Jurisdiction based on immunity and Motion to Dismiss for failure to state a claim. (ECF No. 26.) On February 15, 2017, Fitzgerald and O'Connor filed a Motion to Dismiss. (ECF No. 32.) All motions are opposed. (ECF Nos. 21 and 44.) On April 30, 2018, the Court heard Oral Argument on both motions and provided the parties with an opportunity to file supplemental summation briefs after the argument. On May 7, 2018, Defendants submitted supplemental briefs. (ECF Nos. 51 and 52.) These were taken into consideration below.[2]

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) mandates the dismissal of a case for "lack of subject-matter jurisdiction." An assertion of Eleventh Amendment immunity is a challenge to a district court's subject-matter jurisdiction. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction.") (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984) ). Typically, when jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuading the court that subject-matter jurisdiction exists. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). However, because "Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense," and therefore, a party asserting Eleventh Amendment immunity bears the burden of proving its applicability. *Christy v. Pa. Turnpike Comm.*, 54 F.3d 1140, 1144 (3d Cir. 1994); *see also Carter v. City of Phila.*, 181 F.3d 339, 347 (3d Cir. 1999).

When evaluating a Rule 12(b)(1) motion to dismiss, a court must first determine whether the motion attacks the complaint as deficient on its face, or whether the motion attacks the existence of subject-matter jurisdiction in fact, apart from any pleadings. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). If the motion consists of a facial attack, the court "must accept the complaint's allegations as true," *Turicentro v. Am. Airlines*, 303 F.3d 293, 300 n.4 (3d Cir. 2002), and "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d at 891). However, if the motion involves a factual attack, "the court may consider evidence outside the pleadings." *Gould*, 220 F.3d at 176 (citing *Gotha v. United States*, 115 F.3d 176, 178-79 (3d Cir. 1997) ). Here, the Motion to Dismiss for lack of jurisdiction is a facial attack, because the Defendants assert they are immune from Curley's claims as pled. Therefore, on this question of immunity, the Court's review is limited to the allegations in the Complaint, which the Court must accept as true and view in the light most favorable to Curley.

### B. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a ... motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

*5 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.' " *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

While as a general rule, a court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any " 'document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

#### C. Contempt
"Courts have inherent power to hold parties in civil contempt in order to enforce compliance with any order of the court or to compensate for losses or damages." *U.S. v. Ciampitti*, 669 F. Supp. 684, 687 (D.N.J. 1987) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ). The Court also has the authority to impose sanctions "if a party or its attorney ... fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Rule 16(f)(2) further allows:

> Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's

> fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 16(f)(2). "To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *John T. ex rel. Paul T. v. Delaware Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003) (citation omitted).

## III. DECISION

#### A. Subject Matter Jurisdiction
The County Defendants argue this Court lacks subject matter jurisdiction because Curley's claims present non-justiciable political questions. (ECF No. 26-1 at 12-17.) Specifically, the County Defendants argue "the political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations reserved for the legislative and executive branches of government." (*Id.* at 14.) The County Defendants argue:

> First, Freeholder Curley's lawsuit inextricably relates to the County Freeholder's discretionary judgment in how best to respond to an internal work-place complaint against a policymaking official.

> Second, Freeholder Curley's claims lack judicially discoverable and manageable standards for resolving the issue, as the entirety of this case relates to creating, updating, and changing internal policies and procedures in the County workplace in relation to high-ranking policymakers; and how the County Freeholders are responsible for not only implementing, but also complying with same.

\*6 ....

Finally, it is impossible for the Court to resolve this case or grant Freeholder Curley his requested relief without expressing a lack of respect for the County Freeholders. Finding the censure improper would require an invasion into the Freeholder Defendants ['] internal legislative proceedings.

Curley v. Monmouth County Board of Chosen Freeholders, Slip Copy (2018)

*(Id.* at 14, 16.)

Curley argues "[b]ecause this case involves a challenge to a local legislative body and not a coordinate branch of the Federal Government, the political question doctrine standards are plainly not met." (ECF No. 43 at 11.) The Court agrees.

"The political question doctrine like standing, mootness and ripeness places constitutional and prudential limits on the power of the federal courts to adjudicate certain kinds of claims." *In re Nazi Era Cases Against German Defendants Litig.*, 129 F. Supp. 2d 370, 374 (D.N.J. 2001). "The political question doctrine is 'primarily a function of the separation of powers[,]' " where "[t]he judiciary properly refrains from deciding controversies that the Constitution textually commits to another political branch, as wells [sic] as cases that lack judicially manageable standards." *McMahon v. Gen. Dynamics Corp.*, 933 F. Supp. 2d 682, 694 (D.N.J. 2013). Claims that implicate the government's foreign policy may pose political questions. *In re Nazi Era Cases Against German Defendants Litig.*, 129 F. Supp. 2d at 374 (citing U.S. Const. art. II, § 2).

"Notwithstanding ample litigation, the Supreme Court has only rarely found that a political question bars its adjudication of an issue." *McMahon*, 933 F. Supp. 2d at 694. Indeed, "the application of the political question doctrine is not absolute." *In re Nazi Era Cases Against German Defendants Litig.*, 129 F. Supp. 2d at 374. In fact, "[a] question presented to this Court for decision is properly deemed political when its resolution is committed by the Constitution to a branch of the Federal Government other than this Court." *Elrod v. Burns*, 427 U.S. 347, 351 (1976). Therefore, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' " *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962) ); *Larsen v. Senate of Com. of Pa.*, 152 F.3d 240, 246 (3d Cir. 1998). Because this case involves challenges to a local state legislative body and not a branch of the Federal Government, the political question doctrine does not apply. Accordingly, the County Defendants' Motion to Dismiss on this ground is **DENIED.**

**B. The Speech or Debate Clause**
Defendants argue they are entitled to immunity under the Speech or Debate Clause of Article 1 Section 6 of the United States Constitution for the investigation into

Curley's conduct and the Censure Resolution because they are elected officials or the staff of elected officials. (ECF No. 26-1 at 18 and ECF No. 33 at 29.) Curley argues the Speech or Debate Clause does not immunize Defendants' conduct because it is outside the legislative process. (ECF No. 43 at 25-27.)

**\*7** The Speech or Debate Clause provides: "The Senators and Representatives ... for any Speech or Debate in either House ... shall not be questioned in any other Place." U.S. Const., art. I, § 6, cl. 1. It affords absolute immunity to state legislators for their legislative activities. *Youngblood v. DeVeese*, 352 F.3d 836, 839 (3d Cir. 2003), *as amended* (Feb. 11, 2004). "[L]ocal legislators, like federal and state legislators, are absolutely immune from liability for their legislative activities." *In re Montgomery Cty.*, 215 F.3d 367, 376 (3d Cir. 2000).

"To be legislative, however, the act in question must be both substantively and procedurally legislative in nature." *Id.* "An act is substantively legislative if it involves policy-making of a general purpose or line-drawing." *Id.* (citation omitted). "It is procedurally legislative if it is undertaken by means of established legislative procedures." *Id.* (citation omitted). The Supreme Court:

> has defined the sphere of legitimate legislative activities to include activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matter which the Constitution places within the jurisdiction of either House."

*Youngblood*, 352 F.3d at 840 (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972) ). The Court has found the following are considered legislative: voting for a resolution, *Powell v. McCormack*, 395 U.S. 486, 504–05 (1969); subpoenaing and seizing property and records for a committee hearing, *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 507 (1975) and *Dombrowski v. Eastland*, 387 U.S. 82, 84–85 (1967); preparing investigative reports, *Doe v. McMillan*, 412 U.S. 306, 313 (1973); addressing a congressional committee, *Gravel*, 408 U.S. at 616; and speaking before the legislative body in session, *Johnson*, 383 U.S. at 184–85.

However, the Speech or Debate Clause does not encompass "everything 'related of the due functioning of the legislative process.' " *Youngblood*, 352 F.3d at 840 (quoting *United States v. Brewster*, 408 U.S. 501, 513 (1972) ). "Immunity does not extend to acts that are casually or incidentally related to legislative affairs but

not a part of the legislative process itself." *Id.* (citation omitted). The Third Circuit has denied immunity where an employee was fired for mis- and malfeasance because it was a "personnel decision that does not involve general policy making" and therefore, was not legislative in substance. *In re Montgomery Cty.*, 215 F.3d at 377.

Here, the County Defendants admit this was not a legislative act. (ECF No. 26-1 at 27.) In their Moving Brief they argue Curley has not sufficiently pled a Due Process claim because the Censure Resolution "is merely an expression of the Freeholder Defendants' opinion[,] ... "[w]hile an ordinance is a 'distinctively [ ] legislative act,' a resolution 'is simply an expression of opinion or mind concerning some particular time or business coming within the legislative body's official cognizance.' " (*Id.*) Defendants cannot have it both ways. Because they admit the Censure Resolution was not a legislative act, the Court finds Defendants are not entitled to absolute immunity under the Speech or Debate Clause.

## C. Constitutional Claims

### 1. Due Process Claims (Counts 1-4)

*8 In Counts 1 through 4 of the Amended Complaint, Curley alleges his due process rights were violated under the Fourteenth Amendment, the New Jersey Constitution and/or the New Jersey Civil Rights Act ("NJRCA"). (ECF No. 7 at 22-27.) Specifically, Curley alleges he was deprived of a protected property interest because Defendants deprived him of unrestricted access to his office, denied him access to his aide for a period of two days, censured him without due process, and denied him of a protected interest in his reputation without due process. (*Id.*)

The Court finds Curley has failed to sufficiently allege Defendants deprived him of any property interest or right protected by the Due Process Clause. The Fourteenth Amendment of the Constitution prohibits "a state from depriving persons of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process" she must demonstrate she had a life, liberty, or property interest and that the procedures available to her did not provide her with "due process of law." *Alvin v. Suzuki*, 227 F.3d

107, 116 (3d Cir. 2000) (emphasis added). In evaluating a procedural due process claim, the Court must first determine "whether the asserted individual interests are encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." *Id.* (citation omitted); *accord Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (citation omitted). Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*

Once a court determines that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. *Id.* (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ). "This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citations omitted). The Constitution requires the opportunity to be "granted at a meaningful time and in a meaningful manner." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (citation omitted).

"[P]ersonnel decisions short of termination do not constitute a deprivation of a property interest under the due process clause of the [F]ourteenth [A]mendment." *Ferraro v. City of Long Branch*, 23 F.3d 803, 807 (3d Cir. 1994). In *Ferraro*, the Third Circuit found there was no constitutional violation where a complaint does not allege: (1) an employee was "discharged actually or constructively, [ (2) ] his salary and benefits were not affected adversely ..., [3] [he was] not strip[ped] of his job title, and [4] he was not transferred to a different agency." *Id.* Moreover, courts have found elected officials "hold[ ] no property right in [their] elected positions or in [their] ability to carry out the functions of that position." *Dillaplain v. Xenia Cmty. Sch. Bd. of Educ.*, No. 13-104, 2013 WL 5724512, at *6 (S.D. Ohio Oct. 21, 2013). The Supreme Court has established that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or liberty secured by the due process clause." *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) ); *Biener v. Calio*, 361 F.3d 206, 216 (3d Cir. 2004). "[P]ublic offices are mere agencies or trusts, and not property as such and ... the nature of the relation of a public officer to the public is inconsistent with either a

property or a contract right." *Carson v. Vernon Twp.*, No. 09-6126, 2010 WL 2985849, at *12 (D.N.J. July 21, 2010) (citations omitted).

*9 In Counts 1 and 2 of his Amended Complaint, Curley does not allege Defendants discharged him actually or constructively, deprived him of his salary, excluded him from Board meetings, or prevented him from voting on Board matters. Instead, he merely complains he was deprived of unrestricted access to his office and access to his aide for two days, which he alleges he is entitled to based on "custom and tradition." (ECF No. 7 ¶¶ 125, 134.) These alleged interests do not constitute deprivations of property interest under the Fourteenth Amendment. Indeed, Curley concedes he was able to perform his official duties despite his restrictions. In fact, on November 30, 2017, Curley worked at the Hall of Records "fulfilling his duties as an elected Freeholder." (ECF No. 7 ¶ 86.)

Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll.*, 408 U.S. at 577. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* Curley pleads no existing rules or independent sources of law that secure these types of property interests. Accordingly, Curley has failed to state a claim as to Counts 1 and 2. Accordingly, Counts 1 and 2 are **DISMISSED**.

Counts 3 and 4 of the Amended Complaint allege Defendants deprived Curley of a constitutionally protected interest in his reputation without due process by providing the Report to the Board and censuring him. The Third Circuit has held that "an individual does not have a protected interest in reputation alone." *Thomas v. Indep. Twp.*, 463 F.3d 285, 297 (3d Cir. 2006). "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). This is referred to as the "stigma-plus" test. *Id.* In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest. *Codd v. Velger*, 429 U.S. 624, 628 (1977). The creation and dissemination of the false

and defamatory impression is the "stigma," and the termination is the "plus." *Hill*, 455 F.3d at 236. To satisfy the "stigma" prong of the test, it must be alleged that the purportedly stigmatizing statements: (1) were made publicly and (2) were false. *Dee v. Borough of Dunmore*, 549 F.3d 225, 235 (3d Cir. 2008) (citation omitted).

Curley has alleged Defendants defamed him by accusing him of making sexually explicit remarks. He alleges Defendants made these accusations publicly–in a Public Session. He further alleges the statements are false. Therefore, his Amended Complaint adequately alleges the "stigma" prong of the "stigma-plus" test. However, he has not satisfied the "plus" prong. That is, putting aside the question of stigma, Curley has not shown deprivation of some additional right or interest. Curley suggests he satisfies the "plus" requirement because "his chances of electoral success" or running for re-election are harmed. (ECF No. 43 at 22.) Curley offers no case law to support his contention that these allegations are sufficient, and Defendants counter that Curley has failed to present evidence of any injury other than the perceived harm to his reputation. The Court agrees.

*10 In *Hill*, the Third Circuit concluded "that a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." 455 F.3d at 238. However, *Hill* is distinguishable because it involved the sufficiency of the allegations on a motion to dismiss where the plaintiff adequately stated a claim based on constructive or actual termination–neither of which is alleged here. Moreover, the Court in *Hill* analyzed cases with factual scenarios more lenient to plaintiffs than here that nonetheless did not satisfy the "plus" requirement. *Id.* (holding that, in employment context, "plus" factor not met in cases where plaintiffs were suspended with pay, reprimanded and disciplined but not suspended, had duties changed, or lost volunteer position); *see also Sturm v. Clark*, 835 F.2d 1009, 1012–13 (3d. Cir. 1987) (rejecting reputation claim where attorney was not denied opportunity to see or pursue clients held in custody and despite allegation that defendants characterized her as "disruptive and unprofessional" to the detriment of her practice). Here, Curley's only alleged harm is his speculation that his chances for reelection may be harmed.

Application of New Jersey state-specific due process case law warrants the same conclusion. In New Jersey, "[w]here a person's good name or reputation are at stake because of what the government is doing to that person ... sufficient constitutional interests are at stake[ ]" such that

the inquiry looks for "a protectible interest in reputation without requiring any other tangible loss." *Doe v. Poritz*, 662 A.2d 367, 418-419 (N.J. 1995). The inquiry, however, remains fact-intensive, *id.*, and reputational harm must be more than *de minimis*. *In re L.R.*, 3729 A.2d 463, 472 (N.J. Super. Ct. App. Div. 1999) (stating that lenient state standard "does not mean that a liberty interest is implicated anytime a governmental agency transmits information that may impugn a person's reputation"). The cases on which Curley relies are distinguishable by the interests and harm at stake.

In *Grodjesk v. Jersey City Medical Center*, the Court found the "censure by the [hospital's] executive committee [ ] unquestionably damaged plaintiffs' reputation and their professional standing as oral surgeons." 343 A.2d 489, 500 (N.J. Super. Ct. Ch. Div. 1975). The plaintiffs were censured by the executive committee of the medical-dental staff for "writing to agencies and persons outside the hospital family before judgment was made by them or their peers and also for use by them of patient records obtained improperly." *Id.* at 411. The censure caused them to be "injured in their business, reputation, profits and professional standing." *Id.* In *Poritz*, the Court repeated that a heightened sex offender designation "inflicts a greater stigma than that resulting from the conviction for a sex offense, when there is no such classification" because one's "liberty interest is more significant" when "prior undisclosed criminal history and his new classification become [publicly] known." 662 A.2d at 420. Curley, by contrast, presents no evidence of endangered livelihood or societal ostracization. Indeed, he only speculates that his chances for reelection may be harmed and fails to supply competent evidence of this. *Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15- 2028, 2017 WL 3821469, at *5 (D.N.J. Aug. 31, 2017) (concluding that because the plaintiff presented "no evidence of endangered livelihood or societal ostracization" and "only speculate[d] that her re-election [was] casually connected to the Censure and fail[ed] to supply competent evidence of her diminished community standing" she filed to plead she was deprived of due process). In fact, regardless of his alleged speculations, he has decided to seek re-election to a fourth term as an independent. *Id.* Reputational harm must be more than *de minimis*. *Id.* Accordingly, Curley has failed to sufficiently plead he was deprived of a constitutionally protected interest in his reputation without due process. Counts 3 and 4 are **DISMISSED**.

### 2. Qualified Immunity and First Amendment Retaliation Claims (Counts 6 and 7)

\*11 In Counts 5 and 6 of the Amended Complaint, Curley alleges Defendants violated his First Amendment rights by retaliating against him for his "statements and conduct as a Freeholder expressing his political views." (ECF No. 7 ¶ 169.) Defendants argue Curley's First Amendment retaliation claims against them fail to properly state a claim, otherwise they are entitled to qualified immunity as to those claims. (ECF No. 26-1 at 28 and ECF No. 33 at 34.) Curley argues he has sufficiently alleged a violation of his First Amendment rights and therefore, Defendants are not entitled to qualified immunity. (ECF No. 43 at 29.)

To determine whether a public official is entitled to qualified immunity, courts first determine whether the official violated a constitutional right, and then ask whether the right was clearly established at the time of the violation. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ). The Third Circuit has interpreted the phrase "clearly established" to mean "some but not precise factual correspondence" between relevant precedents and the conduct at issue, and that "[a]lthough officials need not predict[t] the future course of constitutional law, they are required to relate established law to analogous factual settings." *Ryan v. Burlington Cty.*, 860 F.2d 1199, 1208–09 (3d Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989) (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139, 144 (3d Cir. 1984) ). The essential inquiry is whether a reasonable official in the defendant's position at the relevant time "could have believed, in light of clearly established law, that [his or her] conduct comported with established legal standards." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 797 (3d Cir. 2000) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989), *cert. denied*, 493 U.S. 1044 (1990) ).

Qualified immunity affords government officials considerable protection from liability, as it "protects all but the plainly incompetent or those who knowingly violate the law." *Saucier*, 533 U.S. at 205 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ). A plaintiff seeking to overcome qualified immunity need not cite "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[Q]ualified immunity [is] defeated if an official '*knew or reasonably should have known* that the action he took ... would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury."

*Harlow v. Fitzgerald*, 457 U.S. 800, 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975) ).

To determine whether a public official is entitled to qualified immunity, courts first determine whether the official violated a constitutional right. Therefore, the Court begins its analysis by looking to whether a constitutional right was violated. To plead a claim for First Amendment retaliation, a plaintiff must allege:

> (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.

*Willson v. Yerke*, 604 F. App'x 149, 151 (3d Cir. 2015) (citation omitted). "To be actionable as a general matter, the alleged retaliatory conduct must have had more than a de minimis impact on the plaintiff's First Amendment rights." *Id.* "Where the alleged misconduct relates to the statements or action of elected officials, the threshold is particularly high." *Id.*

\*12 In *Bond v. Floyd*, the Supreme Court observed "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." 385 U.S. 116, 135–36 (1966). The Third Circuit in *Werkheiser v. Pocono Township* also found that "nothing in *Bond* ... suggests the Court intended for the First Amendment to guard against every form of political backlash that might arise out of the everyday squabbles of hardball politics" and that "the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties." 780 F.3d 172, 181 (3d Cir. 2015); *see also Camacho v. Brandon*, 317 F.3d 153, 166 (2d Cir. 2003) (Walker, J., concurring) ("[C]ourts should intervene in only the most severe cases of legislative retaliation for the exercise of First Amendment rights, thereby allowing ample room for the hurly burly of legislative decision making."); *cf. Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006) (finding sufficient evidence to support a First Amendment retaliation claim where the City Council President had a Council member arrested and removed from a meeting for speaking out against the Council President). Courts have declined to find that verbal reprimands or defamatory remarks adversely affect a plaintiff's exercise of his First

Amendment rights. *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) ("[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.").

The Court finds Curley has failed to sufficiently plead Defendants violated his First Amendment rights. Curley does not set forth the specific political statements or any conduct that is allegedly constitutionally protected, nor does he allege retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights. Curley argues his pleadings are sufficient to deter a person of ordinary firmness from exercising his constitutional rights because he pled limited access to his office, restricted access to his aide for two days, and that he was censured. The Court does not agree. As stated in *Werkheiser* "the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties *only when the retaliation interferes with their ability to adequately perform their elected duties.*" 780 F.3d at 181 (3d Cir. 2015) (emphasis added). Curley admits in his Amended Complaint he worked at the Hall of Records during his alleged restricted access "fulfilling his duties as an elected Freeholder." (*Id.* ¶ 86.) Moreover, censure resolutions expressing disapproval with no punishment are *de minimis* and are not constitutional violations. *See Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15- 2028, 2017 WL 3821469, at \*6 (D.N.J. Aug. 31, 2017) (noting a censure "is mere [a] de minimis criticism, accusation[ ], or reprimand insufficient to deter a person of ordinary firmness from exercising constitutional rights and, hence, does not run afoul [of] federal and state rights to free speech."); *Page v. Braker*, No. 06-2067, 2007 WL 432980, at \*3 (D.N.J. Jan. 31, 2007) (finding the censure resolution "was *de minimis* and did not rise to the level necessary to constitute a First Amendment violation" because it was a "mere showing of disapproval, expressed by a councilman's colleagues, and lacking any real force or punishment"). Accordingly, Counts 6 and 7 of Curley's Amended Complaint are **DISMISSED** for failure to state a claim and because Defendants are entitled to qualified immunity.

### 3. Speech or Debate Clause (Counts 8 and 9)

Count 8 and 9 of Curley's Amended Complaint alleges Defendants violated his rights under the respective

Speech or Debate Clauses of the United Stated and New Jersey Constitution. (ECF No. 7 at 30-32.) Curley argues the Speech or Debate Clause precluded the Censure Resolution. (*Id.*) Defendants contend the Speech or Debate Clause does not confer on a plaintiff a private right of action for retaliation based on protected speech. (ECF No. 26-1 at 21 and ECF No. 33 at 35.) Moreover, they note they have not sued Curley. (ECF No. 26-1 at 21 and ECF No. 33 at 34.) Curley argues "he does not seek to create a private cause of action based on the Speech or Debate Clause, but rather seeks declaratory and injunctive relief regarding the attempt to use his clearly immunized legislative speech as a basis for punitive measures, in plain violation of that provision." (ECF No. 43 at 32.)

**\*13** Defendants cite no authority for their proposition that the Speech or Debate Clause does not confer on a plaintiff a private right of action. Nonetheless, the Court finds it lacks jurisdiction over Counts 8 and 9 because there is no Article III case or controversy. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.' " *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008) ).

Article III "standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ).

As in *Spokeo*, "[t]his case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." *Id.* (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998) ). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Id.* (citations omitted). "Particularization is necessary to establish injury in fact, but it is not sufficient.

An injury in fact must also be 'concrete.' " *Id.* "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (explaining that "[w]hen we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term – 'real,' and not 'abstract' "). "Concreteness, therefore, is quite different from particularization." *Id.*

In *McLeod*, thirty-three plaintiffs who signed releases requested declaratory judgment that the releases were not knowing and voluntary, even though the employer had not threatened or attempted to enforce the ADEA waiver. *McLeod*, 856 F.3d at 1163, 1166-67. The court held:

> An Article III case or controversy may exist where a private party threatens an enforcement action that would cause an imminent injury. Here, though, the former employees do not plead that General Mills threatens any enforcement of the ADEA claim waiver, let alone enforcement that would cause them imminent injury. Instead, they request a declaration of their rights under a hypothetical set of facts. They want to know their legal rights if, in the future, General Mills asserts that the waivers of their substantive ADEA rights were "knowing and voluntary" under § 626(f)(3).

*Id.* at 1166. The court further concluded "[n]o Article III case or controversy arises when plaintiffs seek 'a declaratory judgment as to the validity of a defense' that a defendant 'may, or may not, raise' in a future proceeding." *Id.* at 1167 (quoting *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) ). Defendants have not sued Curley for the alleged speech that is protected by the Speech or Debate Clause. Accordingly, Defendants' motions to dismiss Counts 8 and 9 are **GRANTED**.

### 4. Conspiracy to Violate Constitutional Rights (Count 10)

**\*14** Count 10 of Curley's Amended Complaint alleges "Defendants conspired to violate [his] rights secured by the First and Fourteenth Amendments to the Unites States Constitution." (ECF No. 7 ¶ 186.) Fitzgerald and

Curley v. Monmouth County Board of Chosen Freeholders, Slip Copy (2018)

O'Connor argue "[b]ecause plaintiff fails to allege that [D]efendants 'conspired' against him because of protected status, such as race, and alleges a conspiracy among members of the same local government, Count Ten should be dismissed." (ECF No. 33 at 35.) The County Defendants argue Curley fails to state a cognizable claim for civil conspiracy because Curley:

> has not identified the conspirators by name or even alleged facts [from] which one could infer the existence of a conspiratorial agreement. Nor has [Curley] alleged specific facts: (1) sufficient to support a conspiracy motivated by a class-based discriminatory animus *i.e.* discriminatory intent; (2) showing that any of these Defendants agreed to violate Freeholder Curley's rights through witness intimidation in any federal and/or state proceeding or investigation; (3) of overt acts committed by the purported co-conspirators in furtherance of the conspiracy; and/or (4) showing actual knowledge by any of the Defendants of the illegal conspiracy to commit a civil rights violation prior to it occurring.

(ECF No. 26-1 at 34.) The County Defendants further argue Curley cannot maintain a conspiracy claim against them because they are considered a single entity that cannot conspire with itself. (*Id.* at 35.) Curley alleges he accidently captioned Count 10 as a conspiracy under 42 U.S.C. § 1985, but actually pled a general civil conspiracy claim under New Jersey law and requests the Court to interpret the claim as such or provide him a chance to replead. (ECF No. 43 at 30.)

The Court finds Curley intended to plead a conspiracy claim under 42 U.S.C. § 1985 because it is not only mentioned in the caption of Count 10 but Count 10 also alleges "Defendants conspired to violate [his] rights secured by the *First and Fourteenth Amendment to the United States Constitution*." (ECF No. 7 ¶ 186 (emphasis added).) Because Curley admits he has not properly pled a conspiracy claim under 42 U.S.C. § 1985, it is DISMISSED. To the extent Curley intended to plead a general civil conspiracy claim under New Jersey law, he may file a second amended complaint to reflect that.

### D. Local Government Ethics Law N.J. Stat. Ann. § 40A:9-22.1, *et. seq.* (Count 11)

Count 11 of Curley's Amended Complaint alleges DiMaso, Arnone, Rich, and Burry—the remaining Freeholders excluding himself—violated the Local Government Ethics Law, N.J. Stat. Ann. § 40A:9-22.1 to –22.25 (the "Ethics Law") by participating in the Executive Session and making public comment on and voting for the Censure Resolution at the Public Session. (ECF No. 7 ¶¶ 190-204.) The County Defendants argue the Ethics Law does not apply to this matter because Curley alleges the Freeholders have a "personal interest" in the Censure Resolution for no other reason than that they were "mentioned" in the Report. (ECF No. 26-1 at 41.) Moreover, they argue Curley "provides no foundation, basis or support in fact or law to claim the Freeholders' interest in the subject Censure Resolution was not one shared with the common members of the public." (*Id.* at 42.) Curley argues he has properly alleged DiMaso had a direct personal interest and the remaining Freeholders, who were also mentioned in the Report, have an indirect personal interest. (ECF No. 43 at 38.)

The Ethics Law sets minimum ethical standards by which local government officers must act. Specifically, N.J. Stat. Ann. § 40A:9-22.5 states: "No local government officer or employee or member of his immediate family shall have an interest in a business organization or engage in any business, transaction, or professional activity, which is in substantial conflict with the proper discharge of his duties in the public interest." "The determination [of] whether a particular interest is sufficient to disqualify a board member is necessarily factual in nature and depends upon the circumstances in each case." *Gunthner v. Planning Bd. of Borough of Bay Head*, 762 A.2d 710, 714 (N.J. Super. Ct. Law. Div. 2000).

*15 "An actual conflict of interest is not the decisive factor, nor is 'whether the public servant succumbs to the temptation,' but rather whether there is a potential for conflict." *Wyzykowski v. Rizas*, 626 A.2d 406, 413 (N.J. 1993) (citations omitted). "A conflicting interest arises when the public official has an interest not shared in common with the other members of the public." *Id.* In other words, "[t]here cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions." *LaRue v. Township of East Brunswick*, 172 A.2d 691, 698 (N.J. Super. Ct. App. Div. 1961).

The Court agrees with the County Defendants that Curley has not sufficiently pled they violated the Ethics Law.

Indeed, Curley "provides no foundation, basis or support in fact or law to claim the Freeholders' interest in the subject Censure Resolution was one not shared with the common members of the public." (ECF No. 26-1 at 42.) Curley has failed to plead there are "desires tugging the official[s] in opposite directions." *LaRue*, 172 A.2d at 698. Accordingly, County Defendants Motion to Dismiss Count 11 is **GRANTED**.

### E. Defamation (Count 12)

Count 12 of Curley's Amended Complaint alleges "[t]he Report contains numerous false and unsubstantiated allegations against [Curley]." (ECF No. 7 ¶ 207.) Defendants argue Curley's defamation claim is premature because he did not wait six months to file the claim from the date notice of claim was received. (ECF No. 26-1 at 39 and ECF No. 33 at 35.) In the alternative, they argue Curley fails to state a claim for defamation. (ECF No. 26-1 at 36-39 and ECF No. 33 at 36-40.) Curley admits he did not comply with the New Jersey Tort Claims Act ("TCA") six-month waiting period prior to filing his defamation claim. (ECF No. 43 at 36-38.) Nevertheless, Curley argues "New Jersey courts have recognized a practical exception to that requirement when the claimant substantially complied with the notice requirement, there would be no prejudice to the state entity, and the 'interests of efficiency and judicial economy' counsel against dismissal." (ECF No. 43 at 36 (quoting *Guerrero v. City of Newark*, 522 A.2d 1036, 1041 (N.J. Super. Ct. App. Div. 1987).)

The TCA states that "[n]o action shall be brought against a public entity or public employee under [the TCA] unless the claim upon which it is based shall have been presented in accordance with the procedures set forth in this Chapter." N.J. Stat. Ann. § 59:8–3. Specifically, a claimant must sign and file a notice of tort claim ("Notice of Claim") with the public entity within 90 days from accrual of the cause of action. *Id.* § 59:8–8.2 After the Notice of Claim is filed, a plaintiff *must* wait six months before filing suit against the public entity or employee in an appropriate court. *Id.* (emphasis added). Curley admits he has not complied with the six-month waiting period (Curley filed his Notice of Claim on December 22, 2017, therefore the six-month period expires on June 22, 2018) and because keeping the claim would not promote efficiency or save judicial resources, since the Court has dismissed the rest of Curley's claims and provided him with opportunity to replead by August 24, 2018 (after the six-month period), Defendants' motions to dismiss Curley's defamation claim are **GRANTED**.

### F. Declaratory Judgment (Count 5)

Count 5 of Curley's Amended Complaint requests declaratory relief. (ECF No. 7 ¶¶ 153-67.) Specifically, it "seeks a declaration that Defendants' 'investigation' was ultra vires because it was taken without an authorization of the Board." (ECF No. 43 at 11.)

**\*16** The Declaratory Judgment Act provides that a Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The express language of the declaratory judgment statute and fundamental principles of standing under Article III of the Constitution limit this power to actions that present a "case or controversy." *Cutaiar v. Marshall*, 590 F.2d 523, 527 (3d Cir. 1979). The "actual controversy" requirement refers to the case or controversy requirement of Article III. *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1336 (3d Cir. 2007). In *Teva Pharmaceuticals*, the Third Circuit stated that standing in the declaratory judgment context requires:

> that the dispute be "definite and concrete, touching the legal relations of the parties having adverse legal interests"; and that it be "real and substantial" and "admit[] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ). The court noted, "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation omitted).

"The statute creates a remedy only; it does not create a basis of jurisdiction, and does not authorize the rendering of advisory opinions." *Cutaiar*, 590 F.2d at 527. Moreover, "a party requesting a declaratory judgment must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Lattaker v. Rendell*, 269 F. App'x 230, 233 (3d Cir. 2008) (internal quotations omitted). Because the Court finds Curley's Amended Complaint fails to sufficiently plead any cause of action, much less allege that there is "a substantial likelihood that [he] will suffer

injury in the future," *id.* at 233, Curley's declaratory judgment claim (Count 5) is **DISMISSED**.

### G. Contempt Motion

Curley argues this Court should hold Defendants in contempt or issue sanctions against them because they directly quoted and paraphrased from the sealed Report in a public session meeting on December 4, 2017. (ECF No. 9.) Defendants argue: (1) no valid court order existed; (2) they have absolute immunity under the Speech or Debate Clause for the Censure Resolution; (3) that Curley's interpretation of the Order restricts their First Amendment rights to speak on matter of policy and public concern; (4) Curley did not comply with Local Civil Rule 5.3 and thus cannot maintain an action for contempt; and (5) that Curley comes to this Court with unclean hands. (ECF No. 24.) At Oral Argument and in their Supplemental Summations Brief, Fitzgerald and O'Connor argue they should not be held in contempt or subject to sanctions because they did not disclose the Report or make any public statement that quoted the Report at the public session. (ECF No. 51 at 2.) "Their mere presence at the December 8, 2017 public session at which the Board of Chosen Freeholders passed the censure resolution and read it aloud could not establish contempt even if a binding and enforceable sealing order was in place." (*Id.*)

The Court has already found Defendants are not entitled to absolute immunity under the Speech or Debate Clause for the Censure Resolution. Therefore, that argument is without merit. As to Defendants' second argument—that the Order restricts their First Amendment rights—such argument cannot be challenged in a contempt proceeding. *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990) (finding a "right to free speech does not immunize [one] from liability for engaging in proscribed conduct. Insofar as [the defendant] asserts that the TRO was an unreasonable time, place, and manner restriction on his speech, the validity of the order may not be collaterally challenged in a contempt proceeding for violating the order"); *Solis v. Koresko*, No. 09-988, 2016 WL 4536438, at *6 (E.D. Pa. Aug. 31, 2016), *aff'd sub nom., Sec'y United States Dep't of Labor v. Koresko*, No. 16-3806, 2018 WL 1446397 (3d Cir. Mar. 23, 2018) ("A fundamental principle of the legal system is that all orders and judgments of courts must be complied with promptly. If a person to whom a judge directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. A private determination that an order is incorrect, or even unconstitutional, may still result in contempt even

if [that person's] private determination is later proven correct in the courts") (citations omitted). As such, this argument is also without merit.

*17 Next, Defendants argue Curley comes to this Court seeking contempt with unclean hands because he has also released portions of the Report. (ECF No. 24 at 24-25.) However, Defendants point to no instance in which Curley revealed a portion of the Report after the Court ordered it sealed to anyone other than this Court or the parties involved.

Lastly, Defendants argue, absent compliance with Local Civil Rule 5.3 and *Pansy*, Curley cannot maintain an action for contempt because the Order to Seal is not valid. (ECF No. 24 at 16-17 (citing *Pansy v. Boro of Stroudsberg*, 23 F.3d 772 (3d Cir. 1994) ).) It is well settled that there is "a common law public right of access to judicial proceedings and records." *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). Therefore, a party seeking to seal a document must demonstrate "good cause" exits to overcome the presumption favoring a public right of access. *Goldenberg v. Indel, Inc.*, No. 09-5202, 2012 WL 15909, at *1 (D.N.J. Jan. 3, 2012) (citing *Securimetrics, Inc. v. Iridian Technologies, Inc.*, No. 03-4394, 2006 WL 827889, at *2 (D.N.J. Mar. 30, 2006) ). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." *Pansy*, 23 F.3d at 786 (citing *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984) ). In *Pansy*, the Third Circuit held "that whether an order of confidentiality is granted at the discovery stage or another stage of litigation, including settlement, good cause must be demonstrated to justify the order." *Pansy*, 23 F.3d at 786. Courts, not the parties, "should scrutinize every such agreement involving the sealing of court papers and [determine] what, if any, of them are to be sealed, and it is only after very careful, particularized review by the court that a Confidentiality Order may be executed." *Id.*

Motions to seal are governed by Local Civil Rule 5.3. Under Local Civil Rule 5.3(c)(2), a party moving to seal must describe with particularity: "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available."

As a threshold matter, the parties agreed the Report would remain sealed, because if released to the public would cause Curley serious injury. Sealing the Report was

consented to by all parties in this litigation, including Defendants, on December 4, 2017, to protect Curley from the disclosure of information that could harm his reputation or cause serious injury because it contained sensitive information regarding a sexual harassment investigation. It contained not only sensitive information about Curley but alleged victims. Indeed, after reading Curley's brief for Temporary Restraining Order and Motion for Preliminary Injunction and hearing the parties' concerns during the in-person and telephone conference, the Court found sealing the Report was necessary prior to ordering it to remain sealed on December 4. (ECF Nos. 4, 6, and 42.)

In addition, the Order to Seal is valid. As demonstrated above, the Court has jurisdiction to hear this matter. Even though the Order was made orally on the record and confirmed in a minute entry after the parties consented to it, it is valid. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1543 n.7 (11th Cir. 1993) ("Oral orders are just as binding on litigants as written orders; the consequences for violating an oral order are the same as those for violating a written order."). Therefore, the Order is proper and binding.

**\*18** At oral argument, the County Defendants further argued that the Order to Seal was limited to "[p]ortions of the [R]eport that strictly were based on the investigation alone ... [n]ot allegations that led to the investigation." (Draft Oral Arg. Tr. (ECF No. 49) 2:19-21.) However, the Order does not make that distinction or provide for any exceptions. Instead, the Order unambiguously states the Report is "to remain sealed." (ECF No. 4.) Moreover, on the record the Court stated, "[t]he [R]eport and rebuttal, Docket No. 2 on the docket, will remain sealed." (ECF No. 42 4:15-15.) Again, no exceptions were entered.

As a result, sanctions are appropriate in this matter against the County Defendants. The Court will not impose sanctions against Fitzgerald and O'Connor because their mere presence at the December 8 public session is not sufficient. However, the County Defendants do not deny

they have revealed portions of the contents of the Report and cannot at this point undo what has been done. Therefore, the Court will impose monetary sanctions. The Third Circuit has approved the issuance of monetary sanctions for "the cost of bringing the violation to the attention of the court" as part of the damages suffered by the prevailing party. *Robin Woods Inc. v. Woods*, 28 F.3d 396, 400 (3d Cir. 1994). Therefore, the Court finds attorneys' fees are appropriate in this matter for the cost it took to bring this violation to the Court's attention. Curley shall file within 30 days of the entry of the accompanying order an affidavit pursuant to Local Rule 54.2 to recover the requested fees. Defendants will have fourteen days of receipt of the affidavit to respond. Accordingly, Curley's Motion for Contempt and Sanctions is **GRANTED** as to the County Defendants and limited to attorneys' fees.

## IV. CONCLUSION

For the reasons set forth above: (1) Curley's Motion to Hold Defendants in contempt (ECF No. 8) is **GRANTED** as to the County Defendants, but limited to attorneys' fees and Curley shall file within 30 days of the entry of the accompanying order an affidavit pursuant to Local Rule 54.2 in order to recover the requested fees; (2) the County Defendants' Motion to Dismiss for Lack of Jurisdiction is **DENIED**, but their Motion for Failure to State a Claim is **GRANTED** (ECF No. 26); and (3) Fitzgerald and O'Connor's Motion to Dismiss is **GRANTED** (ECF No. 32). Curley may file an amended complaint addressing all deficiencies by no later than August 24, 2018. Failure to file an amended complaint will result in the case being dismissed with prejudice.

**All Citations**

Slip Copy, 2018 WL 3574880

Footnotes

1    Defendants Monmouth County Board of Chosen Freeholders, DiMaso, Arnone, Rich, and Burry will jointly be referred to as the "County Defendants." DiMaso, Arnone, Rich, and Burry will jointly be referred to as "Freeholder Defendants."

2    Notably, after Oral Argument, Curley announced he would seek re-election to a fourth term as an independent.

Curley v. Monmouth County Board of Chosen Freeholders, Slip Copy (2018)

End of Document

© 2018 Thomson Reuters  No claim to original U.S. Government Works.

# EXHIBIT B

Falat v. County of Hunterdon, Not Reported in F.Supp.3d (2014)

KeyCite Yellow Flag - Negative Treatment
Distinguished by Finnemen v. SEPTA, E.D.Pa., July 25, 2017
2014 WL 6611493
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

John FALAT, Jr., et al., Plaintiffs,
v.
The COUNTY OF HUNTERDON, et al.,
Defendants.

Civil Case No. 12–6804 (FSH)(MAH).
|
Signed Nov. 20, 2014.
|
Filed Nov. 21, 2014.

**Attorneys and Law Firms**

Jane A. Greenfogel, Office of the NJ Attorney General, Trenton, NJ, Jennifer Marino Thibodaux, Kevin W. Weber, Peter J. Torcicollo, Gibbons, PC, Newark, NJ, William J. Courtney, Law Offices of William J. Courtney, Flemington, NJ, for Plaintiffs.

Thomas B. Hanrahan, Thomas B. Hanrahan & Associates, LLC, River Edge, NJ, Howard B. Mankoff, Marshall, Dennahey, Warner, Coleman & Goggen, PC, Roseland, NJ, Eric L. Harrison, Methfessel & Werbel, PC, Edison, NJ, for Defendants.

*OPINION*

HOCHBERG, District Judge.

*1 This matter comes before the Court upon motions to dismiss by Defendants Edmund DeFilippis,[1] Kenneth Rowe (Docket No. 63) and Defendants the County of Hunterdon, Matthew Holt, George Melick, William Mennen, Erik Peterson, Ronald Sworen, Robert Walton, and Cynthia Yard (Docket No. 64). The Court has reviewed the submissions of the parties and considers the motion pursuant to Federal Rule of Civil Procedure 78.

## I. BACKGROUND OF THE INSTANT MOTION

Plaintiffs are Deborah Trout and Michael Russo, the former Sheriff and Undersheriff of Hunterdon County, as well as John Falat, Jr., a former employee of the Hunterdon County Sheriff's Office. They allege that Defendants—various local public officials—retaliated against Plaintiffs Trout and Russo for bringing civil lawsuits against the County. Defendants contend that the alleged retaliation, if it happened at all, occurred between 2008 and 2010, which would be untimely based on a two-year statute of limitations.

Plaintiffs initially filed a twenty-count Complaint against sixteen named individuals and entities on August 2, 2012 in New Jersey Superior Court, Hudson County. Defendants removed the action to this Court on October 24, 2012. After motions to dismiss were filed by a number of Defendants, Hon. Stanley Chesler, U.S.D.J., dismissed several of the causes of action with prejudice and several without prejudice, allowing Plaintiffs to replead certain claims against some of the Defendants. Judge Chesler's Opinion and Order were clear directions to Plaintiff to rely on "specific factual allegations to support each of [their] claims," "articulating precisely which claims each Plaintiff is making against whom" rather than asserting "impermissibly vague group pleading." Plaintiffs filed an Amended Complaint against the twelve remaining Defendants. Defendants again moved to dismiss.[2] Following reassignment of the case to the undersigned, this Court ordered Plaintiffs to state each "[s]pecific cause of action for violation of the Constitution under § 1983 or § 1985" and to "state individually by each Defendant named in each Count that alleges a federal constitutional rights violation, the paragraph number of the Amended Complaint that sets forth the asserted factual grounds for each claim."

### (a) Plaintiffs' Lawsuits and Alleged Retaliation

Between 2008 and 2010, Plaintiff Trout was the Sheriff of Hunterdon County, Plaintiff Russo was an Undersheriff and Plaintiff Falat was an investigator for the Sheriff's Office. A decade before Plaintiffs took office, Undersheriff Russo and Sheriff Trout brought civil lawsuits against the County. Specifically, in 1998, Plaintiff Trout—then a sheriff's officer—sued the Hunterdon County Freeholders based on purported violations of the New Jersey Law Against Discrimination ("NJ LAD") and the New Jersey Conscientious Employee Protection Act ("CEPA"). (Am.Compl.¶ 20). Similarly, in

1995 Plaintiff Michael Russo filed an action pursuant to 42 U.S.C. § 1983 against the Freeholders and the Hunterdon County Sheriff's Office. (Am.Compl.¶ 18). Plaintiffs have not pled the facts underlying these actions with any particularity. Both actions settled. (Am.Compl.¶ 21).

*2 In 2007, Plaintiff Trout announced her candidacy for the Office of the Sheriff of Hunterdon County. (Am.Compl.¶ 22). She won the election, serving as Sheriff between 2008 and 2010. (Am.Compl.¶ 40). From the beginning of her campaign until she left office, Plaintiffs Trout and Russo allege that Defendants wrongfully discriminated against them in retaliation for their earlier lawsuits, and retaliated against Trout's subordinates for assisting in her campaign. (Am.Compl.¶ 24).

The Amended Complaint includes a list of different purported acts of retaliation by different public officials, as follows: Plaintiffs claim that Defendant County Counsel DeSapio and the Freeholder Defendants demanded that Plaintiff remove pictures of herself in County insignia from her political website in 2007, (Am.Compl.¶¶ 25, 26); they claim Defendant Freeholder Melick allegedly stated, "I can't believe the bitch won," and "[t]he bitch sued us and we're not going to make it easy for her," after Plaintiff Trout's 2007 election victory, (Am.Compl.¶ 29); they claim Defendant DeSapio allegedly instructed Plaintiff Trout not to hire Plaintiff Russo as Undersheriff, stating he "was a 'problem' [because Russo] had previously sued the county," and Defendant Freeholder Melick allegedly demanded that Plaintiff Trout "get rid of [Russo] immediately ... [because] he sued the County and you need to get rid of him," (Am.Compl.¶¶ 32, 38); Plaintiffs claim that the Freeholder Defendants allegedly reviewed Plaintiff Trout's proposed appointments to subordinate positions in the Sheriff's Office, "demanded resumes, organizational charts and job descriptions ... demands [that] were never made of any prior newly elected Hunterdon County Sheriff," and "refused to pass a resolution acknowledging" Plaintiff Trout's selection of subordinates or approving back pay for them, (Am.Compl.¶¶ 34, 39, 50, 52, 55); they complain that all Defendants purportedly "refused to permit access [sic] the Sheriff's Trust Fund," "interfered with the hiring of office employees," refused to allow Plaintiff "to relocate [her office] to the newly renovated Historic Courthouse," and refused to renew annual contracts, (Am.Compl.¶¶ 131–135); Plaintiffs claim that Defendant County Administrator Yard allegedly "limit[ed] [Plaintiff Trout's] ... number of unclassified appointments she could make within her budget" and ordered that no public department

could "perform work for the Sheriff's Department without Yard's consent," (Am.Compl.¶¶ 47, 133); they claim that the Freeholder Defendants purportedly passed resolutions that "systematically discriminate[d] and retaliate[d] against Plaintiff by cutting her budget in amounts disproportionate to other County budgets" in 2008 and 2009, (Am.Compl.¶¶ 57, 101); and they claim that "[D]efendant Melick filed an ethics charge against Plaintiff Trout with the New Jersey ELEC concerning an alleged campaign impropriety," (Am.Compl.¶ 88).

### (b) Hunterdon County Prosecutor's Office Investigation

*3 Plaintiffs contend that Defendants' actions culminated in the Prosecutor's Office investigating and arresting Plaintiffs. The Amended Complaint alleges that unnamed Defendants "began corresponding with the Hunterdon County Prosecutor's Office seeking to involve them in an investigation" of Plaintiffs for "non-compliance with the County's hiring policies." (Am.Compl.¶¶ 44, 46) (internal quotation marks omitted). In 2008, the Prosecutor's Office sent a letter to Plaintiffs seeking copies of all hiring policies and documentation "to ensure that the manner in which candidates for [Sheriff's Office] were hired comports with sound law enforcement practices." (Am.Compl.¶ 59). Plaintiff Trout claims that she then received a grand jury subpoena in 2008 to supply "[a]ll employment application and forms, resumes, letters of reference, background investigation reports ... Arrest Reports, Investigation Reports" and other documentation for specific new hires. (Am.Comp.¶ 64). Additionally, unnamed Defendants purportedly "disclosed ... confidential Grand Jury information and/or confidential investigations" to the press, resulting in newspaper articles about an investigation of Plaintiff Trout. (Am.Compl.¶¶ 71, 74, 75).

On July 29, 2008, Plaintiff Falat claims he was stopped by Defendants Detectives Rowe and DeFilippis, searched, and arrested for "false swearing ... on his employment application," at which time Defendants purportedly "tried to entice Falat into providing them with information concerning Plaintiffs Trout and Russo." (Am.Compl.¶¶ 76, 81, 84). Additionally, Plaintiffs allege that Defendants provided an e-mail to the prosecutor's office which an unspecified person obtained "illegally and improperly" by breaking into "Russo's e-mail account." (Am.Compl.¶ 84). On December 22, 2008, the Prosecutor's Office executed search warrants on the Hunterdon County Sheriff's Office and Plaintiff Falat's residence, and frisked Plaintiffs Trout, Russo and Falat. (Am.Compl.¶¶ 92, 93). In March 2010, a grand jury indicted Plaintiffs on a total of 43 criminal counts, (Am.Compl.¶ 187), and on

May 7, 2010 the Hunterdon County Prosecutor's Office unsealed the indictments of Plaintiffs Trout, Russo and Falat, (Am.Compl.¶ 109), at which time Plaintiffs were arrested, (Am.Compl.¶ 187). After the arrests, the Freeholder Defendants allegedly passed resolutions requesting that Plaintiffs take a leave of absence and authorizing an audit to verify Sheriff's Office financial accounts. (Am.Compl.¶ 111). In August 2010, the New Jersey Attorney General's Office assumed control of the criminal case against Plaintiffs from the Hunterdon County Prosecutor's Office, reviewed the indictments, and dismissed the indictments against Plaintiffs without prejudice on August 23, 2010. (Am.Compl.¶¶ 117, 118, 122).

#### (c) Alleged Retaliation After Dismissal of the Indictments

After the indictments were dismissed, Plaintiffs allege three instances of purported retaliation, set forth below:

> *4 • "On August 12, 2010 ... Defendant George Melick sent a letter on Hunterdon County letterhead to [the Governor] and copies of said letter to numerous other individuals questioning as to why the case had been moved from the Hunterdon County Prosecutor's Office to the Attorney General's Office ... [Melick] indicated that in his 32 years of service on the Board of Chosen Freeholders, he had served with six (6) different Sheriffs, 'all of which had conducted themselves, to a certain of [sic] degree, in a manner that challenged the public's trust.['] ... Defendant Melick asked the Governor to investigate the reassignment of the cases ... [and] copied this letter to various politicians and news papers...." (Am.Compl.¶¶ 118–120).

> • "On Tuesday September 7, 2010, Freeholder Director William Mennen, at a regular freeholder meeting, stated, with regards to the dismissal of all charges, 'This body sat back out of respect and protocol' ... 'attempting to allow the Criminal Justice system to do its job' ... [Now] 'it is incumbent upon the freeholder board to administratively review the allegations.' " (Am.Compl.¶ 125).

> • "It was reported in various newspaper articles that on Tuesday August 2, 2011 at a regularly scheduled freeholder meeting, the Freeholders, with the consent and knowledge of Defendants DeSapio and Yard, began making derogatory remarks and comments about Plaintiffs. In this public session, the Freeholders disclosed materials and discussed issues that constituted an unwarranted invasion of the

Plaintiffs' individual privacy, including personal material relating to insurance programs and information relating to the Plaintiffs' personal and family circumstances which they knew should not have been disclosed publicly." (Am.Compl.¶ 127).

These are the only incidents alleged to have occurred after August 2, 2010. The Amended Complaint does not allege that the Freeholders initiated an administrative investigation. Nor does the Amended Complaint state who made the alleged derogatory remarks, what those remarks were, or how the remarks are attributable to any of the Defendants.

Plaintiffs also state, without any further factual averrals, that "[t]hese acts of harassment, discrimination and retaliation continued until the filing of this Complaint" and that the "retaliatory actions against Plaintiff Russo ... continues to date." (Am.Compl.¶¶ 41, 43). The Amended Complaint does not identify any additional alleged act of harassment.

The Amended Complaint continues to assert that this conduct was part of a conspiracy: the Defendants "conspired with the other Defendants ... to harass, discriminate and/or retaliate against Plaintiffs Trout and Russo for exercising their [constitutional] right[s] ..."; and "Defendants Rowe, DeFillippis [sic], DeSapio, the Defendant Freeholders, Yard, Simon, John Does 1–20 and ABC Corporations 1–20 had numerous conversations concerning Plaintiffs and her appointments in the Hunterdon County Sheriff's Office. These communications were part of a concerted effort to retaliate, harass and discriminate against Plaintiffs, prevent them from exercising their State and Federal civil rights and retaliate against them for their activities." (Am.Compl.¶¶ 41, 61). The Amended Complaint does not state when such purported agreement was made, the purpose of such agreement, or the circumstances under which any Defendant purportedly agreed.

## II. STANDARD

*5 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) ("[S]tating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the

required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (internal quotations omitted).

When considering a motion to dismiss under *Iqbal*, the Court must conduct a two-part analysis. "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009) (internal citations and quotations omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 129 S.Ct. at 1949 (internal quotations and alterations omitted).

### III. DISCUSSION

Plaintiffs have had ample opportunity to state clearly the factual basis of each cause of action asserted, and have been admonished to do so more than once. Plaintiffs' initial Complaint was dismissed by Judge Chesler, who ordered Plaintiffs to "furnish the Court with a Complaint that clearly spells out which individual plaintiffs are making what legal claims against whom and set forth the specific factual allegations to support each of those claims." (Docket No. 28). In response, Plaintiffs filed a 78-page Amended Complaint asserting a protracted list of 42 U.S.C. § 1983 claims, without clarifying the specific constitutional wrong asserted. Plaintiffs were again ordered to identify specific factual allegations and to submit a chart listing the specific federal causes of action Plaintiffs intended to assert, as well as the Defendants against whom Plaintiffs sought to assert each cause of action. The Court finds that any causes of action that Plaintiffs failed to specifically assert-as required by Court Order—have been abandoned.

Based on the chart that Plaintiffs submitted and the Amended Complaint, Plaintiffs assert the following causes of action:

(1) "NJ LAD/Gender Discrimination";

(2) "Hostile Work Environment";

(3) "First And Fourteenth Amendments 42 U.S.C. § 1983," specifically based on a purported: (A) "Equal Protection Violation [of the] 14th Amendment"; and (B) "Free Speech Violations Of 1st Amendment";

*6 (4) "Conspiracy Under § 1983, § 1985 And The New Jersey Constitution," specifically based on: (A) "Retaliating Against Trout For Appointing Russo And Falat In Violation Of Her Equal Protection Rights Under The 14th Amendment"; and (B) "Retaliating Against Trout And Russo For Their Prior Lawsuits In Violation Of Their Free Speech Rights Under The 1st Amendment";

(5) "New Jersey Constitution/Civil Rights Act";

(6) "Retaliation";

(7) "Constructive Discharge";

(8) "Aider And Abettor Liability As To Individual Defendants";

(9) "Respondeat Superior";

(10) "Official Policy"; and

(11) "Malicious Prosecution." (Docket No. 57).

Despite Judge Chesler's ruling, which dismissed with prejudice certain claims in their entirety as well as certain claims as asserted against particular Defendants, Plaintiffs persist in reasserting some of these already-dismissed claims. For instance, the Court's March 19, 2013, Order "dismissed with prejudice as against all Defendants" Plaintiffs' equal protection claims. Yet Plaintiffs purport to assert a claim based on the Equal Protection Clause of the Fourteenth Amendment. (Docket No. 57; Am. Compl. ¶¶ 149, 153). Similarly, Plaintiffs argue that "Plaintiffs Trout And Russo can state a claim under the New Jersey Law Against Discrimination against [all twelve Defendants] because each Defendant discriminated against the Plaintiffs." But Judge Chesler clearly and explicitly held that Plaintiffs' NJ LAD claim was dismissed with prejudice against all Defendants except the County. Plaintiffs did not seek reconsideration of any of Judge Chesler's rulings within the time limits set forth by this Court's Local Rules. "The doctrine of the law of the case ... limits relitigation of an issue once it has been decided." *In re Cont'l Airlines, Inc. .,* 279 F.3d 226, 232 (3d Cir.2002). The Court will not tolerate Plaintiffs' attempt to revive these causes of action in the Amended Complaint; these claims remain dismissed.[1] Counsel is admonished to respect all prior court rulings, regardless of which judge entered such ruling.

Thus, the remaining counts include: (a) free speech claims under the First Amendment; (b) a conspiracy claim asserted pursuant to 42 U.S.C. § 1985(3); (c) a malicious prosecution claim under the Fourth Amendment against the individual Defendants; and (d) state law claims under the New Jersey Constitution, a state law malicious prosecution claim, and a claim under NJ LAD for discrimination, hostile work environment, retaliation, and constructive discharge. These remaining causes of action are addressed below.

**(a) First Amendment Retaliation Claims**
Defendants assert that the First Amendment claims are untimely because the August 2, 2012, Complaint was filed more than two years after the alleged violations. The parties agree that the applicable limitations period for Plaintiffs' § 1983 claim is two years. *See O'Connor v. City of Newark,* 440 F.3d 125, 126–27 (3d Cir.2006) (finding that Section 1983 actions in New Jersey must be brought "within two years of accrual of the cause of action."). The limitations period begins at "the time when the plaintiff knows or has reason to know of the injury which is the basis of the § 1983 action." *Genty v. Resolution Trust Grp.,* 937 F.2d 899, 919 (3d Cir.1991).

*7 Plaintiffs concede that events before August 2, 2010, occurred outside the limitations period, but assert that they remain viable under the "continuing violation doctrine." A court may dismiss an untimely claim where the face of the complaint demonstrates that the continuing violation doctrine does not apply. *See Cowell v. Palmer Twp.,* 263 F.3d 286, 295 (3d Cir.2001) (affirming 12(b)(6) dismissal); *Budzash v. Howell Twp.,* 451 F. App'x 106, 109 (3d Cir.2011) (finding dismissal warranted where plaintiff invoked the continuing violation doctrine, but "the complaint facially show[ed] noncompliance with the limitations period and the affirmative defense clearly appear[ed] on the face of the pleading.").

*(1) Application of Continuing Violation Doctrine To Otherwise Untimely Acts*
Plaintiffs Russo and Trout each allege that, during their employment at the Sheriff's Office, Defendants retaliated against them for exercising First Amendment rights. They claim that all conduct from 2007 to 2010 is timely because "[t]he objectionable conduct began when Trout was elected in November of 2007 and continued, unabated, through the end of Trout's term on December 31, 2010. All of the complained-of conduct is timely pursuant to the continuing violation doctrine." (Pls.'

Opp'n Br. 39). They offer no facts nor legal analysis beyond this formulaic incantation of the "continuing violation" legal label.

Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.,* 927 F.2d 1283, 1295 (3d Cir.1991). However, the doctrine only applies to a series of "acts which are not individually actionable but [must] be aggregated to make out" a claim. *O'Connor,* 440 F.3d at 127. In other words, the continuing violation doctrine does not preserve "discrete acts, which are individually actionable ... [These claims] must be raised within the applicable limitations period or they will not support a lawsuit." *Id.* at 127 (citing *AMTRAK v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan,* 536 U.S. at 114. These separate events are actionable at the time they occur and "cannot be resurrected by being aggregated and labeled continuing violations." *O'Connor,* 440 F.3d at 129. On the other hand, incidents "constituting a hostile work environment are part of one unlawful employment practice" and may be actionable under the continuing violation doctrine, although otherwise outside of the limitations period. *Morgan,* 536 U.S. at 118.

Every act of retaliation in response to a plaintiff's exercise of a First Amendment right is a discrete and individually actionable event. *See O'Connor,* 440 F.3d at 128 ("[The] rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims. First Amendment retaliation claims are always individually actionable, even when relatively minor."). Accordingly, "First Amendment retaliation claims are not subject to the 'continuing violations' exception to the statute of limitations." *Myers v. Cnty. of Somerset,* 515 F.Supp.2d 492, 501 n. 1 (D.N.J.2007) *aff'd,* 293 F. App'x 915 (3d Cir.2008); *Toscano v. Borough of Lavallette,* Civ. No. 04–4412, 2006 WL 1867197, at *2 n. 3 (D.N.J. June 30, 2006) (same). Here, for all of Plaintiffs' retaliation claims, "each of the challenged incidents was individually actionable as a First Amendment retaliation claim when it occurred." *Livingston v. Borough of McKees Rocks,* 223 F. App'x 84, 89, n. 3 (3d Cir.2007). Moreover, a review of the Amended Complaint shows that all acts of alleged retaliation occurring between 2007 and August 2, 2010 were discrete events, individually actionable at the time they occurred. It is apparent from the face of Plaintiffs' Amended Complaint that these claims have "not been

*Falat v. County of Hunterdon, Not Reported in F.Supp.3d (2014)*

brought within the statute of limitations." *Cito v. Bridgewater Twp. Police Dep't,* 892 F.2d 23, 25 (3d Cir.1989) (internal quotation marks omitted).

*8 Remarkably, when put on notice and given the opportunity to brief the continuing violation theory, Plaintiffs offered no legal argument to support the application of the continuing violation doctrine to their First Amendment claims and avoid the effect of the limitations bar. Plaintiffs were given ample notice of Defendants' statute of limitations argument and opportunities to support their invocation of the continuing violation doctrine with additional factual averrals and legal analysis, but they have not done so. Plaintiffs have not genuinely contested that all instances of purported First Amendment retaliation before August 2, 2010, are untimely. These claims are dismissed.

*(2) Whether Plaintiffs Have Alleged Retaliation Within the Limitations Period*
Plaintiffs contend that several acts of purported retaliation occurred within the limitations period: on August 12, 2010, Defendant Melick allegedly sent a letter to the Governor implying that Plaintiff Trout acted "in a manner that challenged the public's trust" and asked the Governor to examine why the County prosecutor had been removed from investigating Plaintiffs, (Am.Compl.¶ 119); on September 7, 2010, Plaintiffs claim that Freeholder Mennen called for the Freeholders to administratively review the charges against Plaintiffs after dismissal, allegedly stating: "This body sat back out of respect ... [for] the Criminal Justice system ... [but now] it is incumbent upon the freeholder board to administratively review the allegations [against Plaintiffs]," (Am.Compl.¶ 125); on August 2, 2011, during a Freeholders meeting, unnamed individuals made "derogatory remarks and comments about Plaintiffs," revealing personal matters like family circumstances and insurance programs, (Am.Compl.¶ 127); and that "[t]hroughout ... Trout's term as Sherriff [sic] Defendants ... refused to permit access the Sherriff's [sic] Trust Fund (STF)." (Am.Compl.¶ 131). For all of these acts, Defendants contend that they are entitled to qualified immunity.

"To determine in this case whether [Defendants] have lost their immunity, we must engage in a two step analysis. First, we must decide 'whether a constitutional right would have been violated on the facts alleged'.... Second, if we believe that a constitutional violation did occur, we must consider whether the right was 'clearly established.' " *Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Turning to whether Plaintiffs have pled a constitutional violation on the facts alleged, to state a "retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir.2006).

*9 But where the alleged retaliation is speech, the speaker's own First Amendment rights impact whether a plaintiff's retaliation claim is actionable. *See, e.g., Brennan v. Norton,* 350 F.3d 399, 419 (3d Cir.2003) (finding no actionable claim where "alleged retaliatory acts were criticism, false accusations, or verbal reprimands"). There is particular concern where a plaintiff sues a public official, alleging the defendant-official's speech constitutes retaliation for the plaintiff's exercise of her First Amendment Rights: "The nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech. Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 687 (4th Cir.2000); *McLaughlin v. Watson,* 271 F.3d 566, 573 (3d Cir.2001) (quoting *Suarez,* 202 F.3d at 678, in analysis of clearly established law). Accordingly, "a limitation on the retaliation cause of action based on [a public official's] speech is necessary to balance the [official's] speech interests with the plaintiff's speech interests." *Mun. Revenue Servs., Inc. v. McBlain,* 347 F. App'x 817, 825 (3d Cir.2009)) (quoting *The Baltimore Sun Co. v. Ehrlich,* 437 F.3d 410, 417 (4th Cir.2006)). The limitation is as follows: "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a [plaintiff's] First Amendment rights, even if defamatory." *McBlain,* 347 F. App'x at 825; *McLaughlin,* 271 F.3d at 573 (quoting *Suarez,* 202 F.3d at 687).

Plaintiffs here allege that Defendants, public officials, retaliated against Plaintiffs in the form of speech: Defendant Freeholder Melick allegedly sent a letter to the Governor implying that Plaintiffs' acts "challenged the public's trust"; and unidentified Freeholders made unspecified "derogatory remarks" about Plaintiffs at a Freeholder meeting. This mere criticism of Plaintiffs cannot support a First Amendment retaliation claim. *See Monn v. Gettysburg Area Sch. Dist.,* Civ. No. 12–2085,

2013 WL 1345501, at *5 (M.D.Pa. Apr. 2, 2013) (dismissing retaliation claim because "Plaintiffs do not allege that the School District officials' criticism and belittlement included any threat of punishment, of sanction, or equivalent adverse action.") aff'd, 553 F. App'x 120 (3d Cir.2014); *Morrison v. City of Reading*, Civ. No. 02–7788, 2007 WL 764034, at *9 (E.D.Pa. Mar.9, 2007) ("Disparaging comments alone cannot form the basis for a First Amendment retaliation claim."). Instead, the public official's own First Amendment speech—criticizing Plaintiff Trout without threat or coercion—is protected speech that cannot form the basis of a First Amendment claim. *See Citizens for a Better Lawnside, Inc. v. Bryant*, Civ. No. 04–1512, 2007 WL 4547496, at *3 (D.N.J. Dec. 18, 2007) (balancing plaintiff's First Amendment retaliation claim based on borough councilman's criticism of plaintiff with the councilman's right to civic dialogue and finding the speech not actionable absent implicit or explicit threats) (citing *X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68–71 (2d Cir.1999) (reversing denial of motion to dismiss on qualified immunity because, in the absence of threats, intimidation, or coercion, legislators' "disparaging, accusatory, or untrue statements about [plaintiff] fail to state a claim for violation of [plaintiff's] constitutional rights")); *Koren v. Noonan*, Civ. No. 12–1586, 2013 WL 5508688, at *2 (E.D.Pa. Oct.3, 2013) ("What Plaintiff alleges is hardball politics, or at most defamation, not retaliation as recognized in the case law."). Even accepting Plaintiffs' allegations as true and giving them the benefit of all favorable inferences, Plaintiffs have pled no facts—and made no argument—that either of these acts included "a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow." *McLaughlin*, 271 F.3d at 573 (reversing denial of motion to dismiss on qualified immunity).

*10 Plaintiffs also assert that Freeholder Mennen's call for an administrative review by the Board constitutes retaliation. This too is insufficient to state a claim for retaliation. First, the Amended Complaint does not plead that Mennen had the authority to initiate an administrative investigation, instead he is alleged to have urged the "freeholder board to administratively review the allegations against Plaintiffs." (Am.Compl.¶ 125). "[S]trongly urging or influencing, but not 'coercing' a third party to take adverse action affecting a plaintiff's speech," does not violate a plaintiff's constitutional rights. *McLaughlin*, 271 F.3d at 573 (citing *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir.1984)). Second, the Amended Complaint does not plead that any investigation was approved by the Board at Mennen's urging, nor that any administrative investigation ever

commenced. Third, "[g]enerally, an internal investigation alone does not constitute" retaliation. *Lakkis v. Lahovski*, Civ. No. 12–1024, 2014 WL 346986, at *6 (M.D.Pa. Jan. 30, 2014); *see Radolf v. Univ. of Conn.*, 364 F.Supp.2d 204, 224 (D.Conn.2005) ("[C]ounsel could not cite a single case in which a court had held that mere participation in an internal investigation—standing alone, without allegations of attendant material disadvantage in employment terms—could support a First Amendment retaliation claim."); *Martsolf v. Brown*, 2009 WL 5111767, at *4 (M.D.Pa. Dec.15, 2009) ("Plaintiff cannot persuade the court that mere [internal affairs] inquiry into the facts pertaining to [a] harassment complaint [filed against plaintiff] constitutes [First Amendment] retaliatory action.") aff' d, 457 F. App'x 167 (3d Cir.2012); *Bibbs v. Twp. of Kearney*, 2011 WL 765970, at *2 (D.N.J. Feb.25, 2011).

Finally, Plaintiffs allege that there is timely conduct because Defendants' acts are purportedly "ongoing." They plead—without any further factual basis—that the "retaliatory actions against Plaintiff[s] ... continues to date." (Am.Compl.¶¶ 40, 43). These general terms do not meet the *Iqbal* pleading standard of stating enough facts to suggest a plausible claim. Merely alleging the existence of "ongoing" violations, without any specificity as to what those violations include, is a legal conclusion that the Court must disregard. *See, e.g., Bailey v. Reed*, 29 F. App'x 874, 875 (3d Cir.2002) ("Although the complaint contains conclusory assertions of ongoing conduct there are no factual references to any events occurring [within the limitations period], conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss.") (internal quotation marks omitted); *Soppick v. Borough of W. Conshohocken*, 118 F. App'x 631, 636 (3d Cir.2004) (holding that plaintiff's allegation of an "ongoing pattern of misconduct" does not state a timely violation and affirming 12(b)(6) dismissal on statute of limitations).

*11 Other alleged actions, although styled as ongoing, are in fact untimely. Plaintiffs claim that Defendants refused to permit access to the Sheriff's Trust Fund throughout Trout's term, starting in 2008. (Am.Compl.¶ 131). In order to be considered timely, the alleged violation must be "occasioned by continual unlawful acts, not continual ill effects from an original violation." *Williams v. City of Trenton*, Civ. No. 11–6352, 2013 WL 3043603, at *4 (D.N.J. June 17, 2013) (quoting *Mata v. Anderson*, 635 F.3d 1250 (10th Cir.2011)). Here, Plaintiffs have not alleged any timely acts related to the Trust Fund since Plaintiffs took office in 2008 and were purportedly denied access to the Fund—which is beyond the limitations period. Defendants' alleged continuing failure to reverse

their decision about access to the Trust Fund does not make the act timely. *See Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d Cir.2001)* ("[T]he Township's refusal to remove the [municipal] lien [is not] an affirmative act of a continuing violation."); *Talbert v. Judiciary of N.J., 420 F. App'x 140, 142 (3d Cir.2011)* (finding that continuing failure to reassign plaintiff after allegedly retaliatory transfer does not make retaliation timely); *Greer v. Diguglielmo, 348 F. App'x 702, 704 (3d Cir.2009)* ("[A]ny alleged ongoing failure of prison officials to correct its course following the initial decision to deduct from Greer's prison account does not constitute a continuing violation.").

Even accepting the facts in the Amended Complaint as true, none of the purportedly retaliatory conduct—alone or in combination—is actionable as a matter of law. Consequently, Plaintiffs have failed to plead a constitutional violation within the limitations period. To be clear, the Court does not reach the issue of whether Defendants' conduct is too trivial for Plaintiffs to succeed. That question is beyond the Court's review on a motion to dismiss. Rather than pass on the merits of whether Defendants' conduct was wrongful, the Court is required to follow the legal rule in this Circuit that an alleged act of retaliation for a plaintiff's exercise of her First Amendment rights does not violate the constitution if it consists solely of another's speech, absent allegations of threats or coercion. Similarly, where the time limit for a plaintiff to file a complaint has long since passed, the Court is obligated to dismiss an action if it is clear that the plaintiff has failed to meet the deadline.

### (3) Whether Plaintiffs' Speech Was On A Matter Of Public Concern

Separately and independently, Defendants argue that all of Plaintiffs' First Amendment claims fail because Plaintiffs have not pled any facts to support an inference that Plaintiffs' speech was on a "matter of public concern."

A lawsuit by a public employee is not protected speech—and cannot form the basis of a First Amendment retaliation claim—unless it relates to a matter of "public concern." *See Borough of Duryea, Pa. v. Guarnieri,* ——U.S. ——, ——, 131 S.Ct. 2488, 2493, 180 L.Ed.2d 408 (2011). Accordingly, if a public employee did not "sp[eak] as a citizen on a matter of public concern ... [then] the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)* (internal citations omitted). Plaintiffs Trout and Russo pled that they sued

the County during their public employment, and that Defendants retaliated against each of the Plaintiffs because of this lawsuit. (Am. Compl. ¶ 20; Pls.' Opp'n Br. 25). Trout brought NJ LAD and CEPA claims for discrimination based on gender and Russo brought an employment discrimination claim. (*Id.*). But they did not assert any facts surrounding these claims; nor did they allege that the lawsuits involved a matter of public concern; nor did they plead facts upon which the Court could possibly infer a matter of public concern.

*12 Plaintiffs' only argument in response is that "[m]atters of public concern can include discrimination complaints." But to meet Plaintiffs' obligation to allege enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element, it is insufficient to merely plead that "Plaintiffs brought a discrimination claim." This Court has given the Plaintiffs numerous chances to file a factually sufficient set of pleadings, and they have not done so with respect to this cause of action and others. The absence of a better articulated set of factual allegations under these circumstances means that one does not exist. The Court cannot infer—solely from Plaintiffs' employment discrimination lawsuits and without any underlying factual averments—that their lawsuits related to a matter of public concern. *Campbell v. W. Pittston Borough, 498 F. App'x 186, 189 (3d Cir.2012)* (finding prior age discrimination lawsuit by public employee, without more, did not constitute speech on a matter of public concern). Because "there is nothing in [plaintiff's] Amended Complaint alleging that her complaints were made with any larger social purpose, Plaintiff has failed to plead a matter of public concern and her First Amendment retaliation claim fails." *Rearick v. Spanier,* Civ. No. 11–624, 2012 WL 1514916, at *7 (M.D.Pa. Apr. 30, 2012) *aff'd,* 523 F. App'x 198 (3d Cir.2013); *see Jackson v. Dallas Sch. Dist.,* 954 F.Supp.2d 304, 312 (M.D.Pa.2013) ("Plaintiff's complaint contains conclusory allegations that the speech is 'constitutionally protected' and that it 'implicated a matter of public concern' ... These averments are merely legal conclusions which do not have a presumption of truth, and they can be disregarded.").

### (b) Conspiracy Claim

Plaintiffs next attempt to revive all of their untimely claims on the theory that acts undertaken as part of an illegal conspiracy are actionable so long as the conspiracy continues. They argue that "plaintiffs filed the complaint within two years of the final overt act by these defendants. This overt act should make all previous conspiratorial conduct timely under the law." (Pls.' Opp'n

Br. 41–42).

In rejecting this argument—that the limitations period begins to run from the *last* overt act by a conspiracy—the Third Circuit has held that such a rule would "invite attempts to revive time-barred injuries by piggy-backing them onto actions occurring within the relevant period." *Wells v. Rockefeller,* 728 F.2d 209, 217 (3d Cir.1984). Instead, "[f]or each act causing injury, a claimant must seek redress within the prescribed limitations period ... In the civil case, actual injury is the focal point, not the illegal agreement per se, ..." *Id.* at 217. To be timely, a plaintiff must "allege[ ] that the defendants performed injurious acts in furtherance of the conspiracy within the limitations period" and may only "recover damages for the acts that occurred within the limitations period." *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 106 (3d Cir.2010) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Accordingly, the Court examines only the timely alleged conduct.

**\*13** To state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Not all illegal conspiracies are actionable: section 1985 "was not intended to provide a federal remedy for 'all tortious, conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.' " *Faber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir.2006) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Rather, only "invidious" conspiracies are actionable under § 1985(3). This includes conspiracies which discriminate on the basis of race, gender, and disability, *Lake v. Arnold,* 112 F.3d 682, 686–88 (3d Cir.1997), but not political affiliation, *Farber,* 440 F.3d at 138. "[A] plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Farber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir.2006). Moreover, the complaint must specifically allege "that a discriminatory animus be 'behind' the conspirators' actions. The conspiracy must be directed at the plaintiff because he belongs to a given class." *Hauptmann v. Wilentz,* 570 F.Supp. 351, 386 (D.N.J.1983). Thus, to allege a conspiracy against women actionable under § 1985(3), a

plaintiff must allege a conspiracy with "a purpose that focuses upon women *by reason of their sex.*" *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 270, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

Plaintiffs do not argue that the purported conspiracy was motivated by an invidious discriminatory animus against an identifiable class. In response to this Court's Order that Plaintiffs' state a specific "federal constitutional rights violation ... [and] the asserted factual grounds," (Docket No. 54), Plaintiffs explicitly stated that their § 1985(3) claim was based on a conspiracy motivated to retaliate against Plaintiffs for their previous lawsuits, not gender, race, or disability discrimination: "Conspiracy to commit class-based violations of plaintiffs' equal protection rights as follows: 1. *Retaliating against Trout for appointing Russo and Falat* in violation of her equal protection rights under the 14th Amendment. 2. *Retaliating against Trout and Russo for their prior lawsuits* in violation of their free speech rights under the 1st Amendment."[4] (Docket No. 57, at 3 (emphasis added)). But a conspiracy that does not involve class-based discrimination regarding gender, race, or disability, but is instead motivated to retaliate against individuals for bringing a civil lawsuit, is not actionable under § 1985(3). *See Slater v. Susquehanna Cnty.,* 465 F. App'x 132, 136 (3d Cir.2012) (affirming dismissal where plaintiff "failed to allege that the defendants conspired to retaliate against her because of her gender" rather than her "whistle-blowing activities"). Thus, the Court will "dismiss[ ] [plaintiff's] § 1985(3) conspiracy claim, as there are no allegations that the alleged conspiracy was motivated by a *class-based,* invidiously discriminatory animus." *Faylor v. Szupper,* 411 F. App'x 525, 530 (3d Cir.2011) (internal quotation marks omitted); *Bond v. Horne,* 553 F. App'x 219, 224 (3d Cir.2014) (same).

**\*14** Moreover, none of the timely acts alleged—Melick's letter to the Governor stating that Plaintiff Trout conducted herself "in a manner that challenged the public's trust"; Mennen's call for an administrative review; or unnamed individuals' "derogatory remarks and comments about Plaintiffs" that purportedly revealed personal matters like family circumstances and insurance programs—allege conduct that targets women by reason of their sex. Rather, as Plaintiffs plead in their Complaint, the purported conspiracy targeted specific individuals—one woman and two men—as retaliation for filing lawsuits against the County. (Am.Compl.¶ 28) ("It was the understanding and belief of Plaintiff Trout that these actions and the actions of the Defendants were in retaliation for the Plaintiffs Trout and Russo for previously filing lawsuits against Hunterdon County."). There are insufficient facts in the Complaint to plausibly infer that these acts were directed to women as a class.

See *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 270, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (holding that an alleged conspiracy to deprive women of family planning services did not state an actionable conspiracy "directed specifically at women as a class" rather than the subclass of individuals supporting such services); *Moffett v. Bryant,* 751 F.3d 323, 326 (5th Cir.2014) (affirming dismissal of § 1985 gender discrimination claim because the alleged "individual bias based upon a personal social relationship [is] a far cry from class-based discriminatory animus"); *Dornheim v. Sholes,* 430 F.3d 919, 925 (8th Cir.2005) ("[Plaintiffs] have failed to establish that the defendants' actions were directed at [plaintiff] because she was a woman, and the court properly dismissed the § 1985 claim.").

Separately and independently, the Court finds that the allegations in the Amended Complaint fall short of alleging an illegal agreement between two or more persons, as necessary to sustain a § 1985 or § 1983 conspiracy claim. "[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 178 (3d Cir.2010). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice ... [The allegations] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Here, Plaintiffs allege: "The Hunterdon County Freeholders and the Hunterdon County Counsel, in their individual and representative capacities, conspired with the other Defendants, in their individual and representative capacities, to harass, discriminate and/or retaliate against Plaintiffs Trout and Russo for exercising their right under the State and Federal Statutes and Civil Rights laws." (Am.Compl.¶ 41). But as for factual allegations, Plaintiffs rely solely on "communications" between the Defendants: "Upon information and belief, Defendants Rowe, DeFillippis [sic], DeSapio, the Defendant Freeholders, Yard, Simon, John Does 1–20 and ABC Corporations 1–20 had numerous conversations concerning Plaintiffs and her appointments in the Hunterdon County Sheriff's Office." (Am.Compl.¶ 61). "[F]ollowing *Twombly* and *Iqbal,* [pleading], in the conspiracy context, require[s] enough factual matter (taken as true) to suggest that an agreement was made, in other words, plausible grounds to infer an agreement." *Great W. Mining,* 615 F.3d at 178 (refusing to consider conclusory allegation that there was "an agreement"). But collectively alleging that all twelve Defendants had

"communications" is insufficient to plead facts from which an actual agreement can be inferred between any of the Defendants. *See In re Baby Food Antitrust Litig.,* 166 F.3d 112, 126 (3d Cir.1999) ( "[C]ommunications between competitors do not permit an inference of an agreement."). Plaintiffs fail to connect any action by any individual Defendant to any other specific individual Defendant. These bare and sweeping generalizations do not satisfy the notice requirement of informing each individual defendant of the factual basis of the acts charged against them. *See Great W. Mining,* 615 F.3d at 178–79; *see also Watson v. Sec'y Pa. Dep't of Corr.,* 436 F. App'x 131, 137 (3d Cir.2011) ("As the linchpin for conspiracy is agreement, ... concerted action, without more, cannot suffice to state a conspiracy claim."); *Capogrosso v. The Supreme Court of N.J.,* 588 F.3d 180, 184 (3d Cir.2009) ("The rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.").

**(c) Fourth Amendment Malicious Prosecution Claim**
\*15 Plaintiffs have asserted a malicious prosecution claim under the Fourth Amendment, which requires Plaintiffs plead "that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr,* 477 F.3d 75, 8182 (3d Cir.2007).

*1. Effect of Grand Jury Indictments Upon Probable Cause*
Defendants contend that Plaintiffs have failed to allege a lack of probable cause sufficient to overcome the effect of the grand jury's indictment of Plaintiffs. (Br. of Defs.' Rowe & DeFillippis 51–52, Docket No. 63–3). An essential element of Plaintiffs' claim is a lack of probable cause. *Wright v. City of Phila.,* 409 F.3d 595, 604 (3d Cir.2005). Thus, the "existence of probable cause is an absolute defense to a malicious prosecution claim brought either under § 1983 or pursuant to New Jersey law." *Moore v. Carteret Police Dept.,* 254 F. App'x 140, 142 (3d Cir.2007). Even where the indictment is later dismissed, a "grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute, ..." *Camiolo v. State Farm Fire and Cas. Co.,* 334 F.3d 345, 363 (3d Cir.2003) (quoting *Rose v. Bartle,* 871 F.2d 331, 353 (3d Cir.1989)). "[T]his presumption [of

grand jury regularity] will only be overcome by evidence that the presentment was procured by fraud, perjury or other corrupt means." *Woodyard v. Cnty. of Essex*, 514 F. App'x 177, 183 (3d Cir.2013). "At the pleading stage, 'this prima facie evidence may be rebutted by allegations that the presentment was procured by fraud, perjury or other corrupt means.' " *Palma v. Atl. Cnty.*, 53 F.Supp.2d 743, 756 (D.N.J.1999) (quoting *Rose*, 871 F.2d at 353 (holding that, absent allegations of fraud in procuring the indictment, "we agree with the district court that the plaintiffs' allegations are insufficient to survive dismissal")).

Here, "all three Plaintiffs were indicted on a total of 43 criminal counts in or around March of 2010." (Am.Compl.¶ 187). Nothing in the Amended Complaint plausibly avers that the indictments against them were procured by "fraud, perjury, or other corrupt means." At most, Plaintiffs plead that Defendants had unauthorized access to information. (Am. Compl ¶ 150(j) ("The 'false swearing' indictment was based in part upon an e-mail illegally taken from Russo's computer and provided by representatives of defendant The County of Hunterdon to the Hunterdon County Prosecutor's Office."); Am. Compl. ¶ 86 ("Defendant Rowe apparently did not believe it was inappropriate to quote the illegally obtained e-mail in his report ..."); Pls.' Opp'n Br. 8 (arguing that Defendants impermissibly demanded Sheriff's Office employment records)). Nor does the Amended Complaint contain any allegations that there was perjured testimony before the grand jury; that Defendants made false statements to the prosecutors; that the allegation of abnormal hiring practices was untrue; that the records Defendants allegedly provided to prosecutors were fraudulent; or that witnesses withheld or misrepresented evidence.[5] Instead, they argue only that, "[a]lthough a grand jury indictment is prima facie evidence of probable cause to prosecute, when the facts underlying it are disputed, the issue must be resolved by the jury." (Pls.' Opp'n Br. 14). This is not what *Iqbal* and *Twombly* require. Plaintiffs cannot survive a motion to dismiss simply by saying that the facts underlying a prior criminal indictment are disputed, as counsel well knows. This is exactly the type of general statement that first led Judge Chesler to demand that Plaintiffs articulate precisely their claims, and then this Court to demand a clear statement of the bases of the various causes of action.

*16 Under the *Iqbal* pleading standard, the mere legal conclusion that "there was a lack of probable cause for the criminal prosecution," (Am.Compl.¶ 182(q)), is insufficient to plead malicious prosecution. Plaintiffs' counsel is an experienced and agile practitioner; the persistent refusal to articulate a pleading that meets the

*Iqbal* standard, despite numerous opportunities to do so, means that there is no more that can be said to meet the factual and legal requirements of the cause of action for malicious prosecution.[6] Instead, Plaintiffs—who were indicted by a grand jury-must plead facts related to misconduct before the grand jury to raise a reasonable expectation that discovery will reveal evidence of the necessary element. In this case, repeated failure to plead "fraud, perjury, or other corrupt means" is grounds for dismissal. *Rose*, 871 F.2d at 353; *see Leone v. Twp. of Deptford*, 616 F.Supp.2d 527, 533 (D.N.J.2009) ("plaintiffs have not alleged that the presentment to the grand jury of the evidence to support the criminal indictments relating to the excessive force incident was corrupt. Thus, by failing to properly allege a necessary element of a Fourth Amendment malicious prosecution claim, plaintiffs have failed to state such a claim, and it will be dismissed."); *Lora–Rivera v. Drug Enforcement Admin. Dep't of Justice*, 800 F.Supp. 1049, 1052 (D.P.R.1992) (granting motion to dismiss because grand jury indicted defendants and plaintiffs failed to plead fraud); *Zargari v. United States*, Civ. No.13–23806, 2014 WL 1669968, at *5–6 (S.D.Fla. Apr.28, 2014) (dismissing complaint where plaintiff failed to "sufficiently allege [defendants] committed fraud, perjury, or otherwise acted improperly in the acquisition of [plaintiff's] indictment."); *cf. Mobilio v. Dep't of Law & Pub.Safety of N.J.*, Civ. No. 07–3945, 2008 WL 2704826, at *4 (D.N.J. July 7, 2008) (finding allegation in the complaint that defendant "fabricated and suppressed evidence in order to obtain an arrest warrant" was sufficient to state "fraud, perjury, or other corrupt means" and survive a motion to dismiss). Plaintiffs do not even plead that the evidence offered to the grand jury was untrue, much less even attempt to aver any other facts sufficient to suggest a plausible basis to believe that discovery will develop a cognizable cause of action for malicious prosecution. Plaintiffs fail to state facts in the Amended Complaint sufficient to state a malicious prosecution claim based on the Fourth Amendment.

*2. Initiation of Proceedings*
Raising a separate challenge, Defendants assert that Plaintiffs' malicious prosecution claim should also be dismissed because Plaintiffs purportedly failed to plead that Defendants "initiated the criminal proceeding" against Plaintiffs.

A malicious prosecution claim requires that a defendant initiate a criminal proceeding, *i.e.*, "proof that defendant took 'some active part in instigating or encouraging the prosecution' or 'advising or assisting another person to begin the proceeding, or by ratifying it when it is begun in

defendant's behalf, or by taking any active part in directing or aiding the conduct of the case.' " *Epperson v. Wal–Mart Stores, Inc.,* 373 N.J.Super. 522, 531, 862 A.2d 1156 (App.Div.2004) (quoting Prosser and Keeton, *The Law of Torts* § 119 at 872 (5th ed., 1984)) (internal alterations omitted)). On the other hand, an allegation that a defendant merely provided information to prosecutors is insufficient to plead the "initiated criminal proceedings" element. *See Campbell v. Yellow Cab Co.,* 137 F.2d 918, 921 (3d Cir.1943) (finding that identifying plaintiff as the perpetrator of a crime to police and testifying at trial does not constitute initiating a criminal proceeding). Thus, providing information regarding possible criminal activity—which is insufficient for a claim of malicious prosecution—is distinguishable from actively encouraging prosecution or misleading prosecutors, which may state the "initiated" element. *See Griffiths v. CIGNA Corp.,* 988 F.2d 457, 464 (3d Cir.1993) ( "[Restatement of Torts § 653] Comment g distinguishes between situations in which a private individual files a complaint or demands a prosecution and those in which he merely provides information to the police ... in the latter case a private individual who does not knowingly provide false information is not responsible for the institution of the proceedings ...."). Accordingly, "[a] person who tells law enforcement authorities that he or she thinks that a crime has been committed and does no more, does not thereby put him—or herself at risk of liability for malicious prosecution." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 217 (2d Cir.2000).

**\*17** Plaintiffs rely solely on these specific facts pled in the Amended Complaint: "[o]ne or more of the defendants also began leaking Grand Jury information to a local newspaper"; "defendant Rowe issued the initial subpoena on Falat to give testimony before the Grand Jury"; the "indictment was based in part upon an e-mail illegally taken from Russo's computer and provided by representatives of defendant Hunterdon County to the HCPO"; and "[D]efendants demanded that Trout provide resumes, organizational charts and job descriptions from her selection of undersheriffs, investigators and officers."⁶ (Pls.' Opp'n Br. 8–9). Corresponding with—or providing documents to—prosecutors, does not state a claim for malicious prosecution. *See Wiltz v. County of Middlesex Prosecutor,* 249 F. App'x 944, 950, (3d Cir.2007) (affirming dismissal where allegation that defendant had submitted invoices to prosecutors was "too minor and too removed from the prosecution to satisfy the 'instituted proceedings' prong."); *Miller v. City of Boston,* 297 F.Supp.2d 361, 367 (D.Mass.2003) (granting 12(b)(6) motion because defendant, by identifying the plaintiff as the perpetrator of a crime, did not actively participate as a matter of law); *see also Brenner v. Twp. of Moorestown,*

Civ. No. 09–219, 2011 WL 1882394, at \*16 (D.N.J. May 17, 2011) (finding that "calling 9–1–1 to report a plaintiff's behavior" *Livingston v. Borough of McKees Rocks,* because defendant's "involvement in Plaintiff's prosecution was relatively inconsequential"). Nor is there any allegation in the Amended Complaint that any Defendant "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *White v. Brommer,* 747 F.Supp.2d 447, 459 (E.D.Pa.2010).

Plaintiffs' contention—that unnamed Defendants "disclosed, or were involved in the disclosure of confidential Grand Jury information and/or confidential investigations by the Hunterdon County Prosecutor's Office," (Am.Compl.¶ 71), and that all twelve Defendants attempted to "involve [prosecutors] in an investigation"—are conclusory. *See Wiltz,* 249 F. App'x at 950 ("allegations that the private defendants urged PARSA to prosecute appellant ... were wholly conclusory"). Moreover, it does not set forth facts indicating that Defendants actively encouraged or instigated the Plaintiffs' indictment, nor that they misled prosecutors into indicting Plaintiffs. Finally, issuing a grand jury subpoena was part of an investigatory process, not the commencement of proceedings. *See Gallucci v. Phillips & Jacobs Inc. .,* 13 Pa. D. & C.4th 413, 426 (Com.Pl.1991) ("The grand jury subpoena was merely an investigative tool which permitted the FBI to gather information to determine the necessity for further inquiry in this matter. [It] in no way instituted criminal proceedings ... and does not qualify as formal prosecutorial action designed to obtain a criminal conviction."); *Rosen v. Am. Bank of Rolla,* 426 Pa.Super. 376, 382, 627 A.2d 190 (1993) ("The issuance or service of a subpoena does not constitute the initiation or commencement of a civil proceeding."). Defendants' participation in an investigation is insufficient involvement with the proceedings to allege "some active part in instigating or encouraging the prosecution." *See Pitt v. D.C.,* 491 F.3d 494, 505 (D.C.Cir.2007) (finding defendant's act of taking witness statements and investigating an alibi do not rise to the level of instituting proceedings as a matter of law). As a separate and independent ground for dismissal, the Amended Complaint fails to aver facts sufficient to plausibly show that Defendants herein "initiated the criminal proceeding."⁷

**\*18** Because Plaintiffs had prior notice of the deficiencies in their complaint from the first round of motions to dismiss; had opportunities to clarify these deficiencies through supplemental submissions (*see* Docket No. 57); and were previously permitted an amendment to their

complaint; the Court dismisses Plaintiffs' federal claims against the moving Defendants with prejudice.

**(d) State Law Claims**[4]
"Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, 387, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (citation and internal quotation marks omitted). Where a district court has original jurisdiction pursuant to 28 U.S.C. § 1331 over federal claims and supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367(a), the district court has discretion to decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1284–85 (3d Cir.1993). In exercising its discretion, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.' " *Growth Horizons,* 983 F.2d at 1284 (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Where the federal claims are dismissed at an early stage in the litigation, courts generally decline to exercise supplemental jurisdiction over state claims. *Gibbs,* 383 U.S. at 726; *Growth Horizons,* 983 F.2d at 1284–85.

In this case, the Court is dismissing every claim over which it had original subject matter jurisdiction at the motion to dismiss stage, and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3). The Court remands all state law claims to New Jersey Superior Court, Hudson County, Law Division. *See Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) ("While § 1367(c) does not specify what disposition the district court is to make of state claims it decides not to hear, ... we believe that in a case that has been removed from a state court, a remand to that court is a viable alternative to a dismissal without prejudice.") (internal citations omitted).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' federal claims are dismissed with prejudice and Plaintiffs' state law claims are remanded to New Jersey Superior Court. An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6611493

Footnotes

1    The Amended Complaint names "Edward DeFillipis." Elsewhere, this Defendant is referred to as "Edmund DeFilippis" and "Edward DeFillippis." The Court will refer to this Defendant as "Edmund DeFilippis," as used in his motion.

2    These Defendants include: the County of Hunterdon; Investigators Kenneth Rowe and Edmund DeFilippis; Hunterdon County Freeholders George Melick, William Mennen, Ronald Sworen, Matthew Holt, Erik Peterson, and Robert Walton (the "Freeholder Defendants"); and County Administrator Cynthia Yard. Defendant Donna Simon, who organized a 2009 recall campaign against Sheriff Trout, did not respond to the Complaint; clerk's entry of default has been entered against her.

3    Separately and independently, Plaintiff Trout's gender discrimination claim asserted under the Equal Protection Clause is untimely. Under the Equal Protection Clause, a gender discrimination plaintiff must plead that defendants "treated [Plaintiff] differently from other individuals similarly situated *and did so based upon her gender.*" *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir.1992) (emphasis added). At least one act within the limitations period must evidence a practice of gender discrimination. *See Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 165–66 (3d Cir.2013); *see also* section (b)(1) of this Opinion. None of Plaintiffs' timely alleged acts are pled as—or could be construed as—evidencing disparate treatment based on gender, (Am.Compl.¶¶ 118–120, 125–127, 129), rather they are pled as generic retaliation based on Plaintiff Trout's prior lawsuit. "[A] pure or generic retaliation claim simply does not implicate the Equal Protection Clause." *Thomas v. Independence Twp.,* 463 F.3d 285, 298 n. 6 (3d Cir.2006) (internal alterations omitted).

4    This Court ordered that Plaintiffs state the specific "federal constitutional rights violation ... [and] the asserted factual grounds," (Docket No. 54). Nowhere in Plaintiffs' response did Plaintiffs assert a gender motivated conspiracy in violation of § 1985, nor did Plaintiffs assert this claim in their opposition briefing, (Pls.' Opp'n Br. 35–37). Any claim based on a conspiracy motivated by

Falat v. County of Hunterdon, Not Reported in F.Supp.3d (2014)

gender is deemed abandoned based on Plaintiffs' failure to assert, legally support, or argue it.

5       Nor does the exhibit Plaintiffs relied upon allege fraud, perjury, or corrupt means, or the absence of probable cause.

6       If counsel chooses to proceed with this action in state court upon remand, one hopes that legal analysis will replace these "naked assertions devoid of further factual enhancement."

7       Plaintiffs allege that all twelve Defendants initiated the proceedings "both individually and collectively" against all Plaintiffs. (Am.Compl.¶ 180).

8       The Court defers to the New Jersey courts regarding the interpretation of Plaintiffs' state malicious prosecution claim. Accordingly, the Court does not address whether Plaintiffs' state law claim is barred for the reasons articulated above under federal law. For similar reasons, the Court remands Defendants' intertwined motion to compel production of grand jury materials, which may be relevant in defending the malicious prosecution claim if the state court determines that the claim survives.

9       Although entry of default has been filed against Defendant Simon, and Defendant DeSapio did not renew his motion to dismiss, because the Plaintiffs' federal claims are facially insufficient, the Court finds good cause to set aside entry of default against Simon and dismisses the federal claims as against Simon and DeSapio. See *Feliz v. Kintock Group,* 297 F. App'x 131, 137 (3d Cir.2008); *U.S. ex rel. Dattola v. Nat'l Treasury Emp. Union,* 86 F.R.D. 496, 500 n. 11 (W.D.Pa.1980).

---

End of Document                                         © 2018 Thomson Reuters. No claim to original U.S. Government Works

# EXHIBIT C

Killion v. Coffey, Not Reported in F.Supp.3d (2016)

2016 WL 5417193

KeyCite Yellow Flag - Negative Treatment
Distinguished by Mrazek v. Stafford Township, D.N.J., May 5, 2017

2016 WL 5417193
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey,
Camden Vicinage.

Michael Killion, et al., Plaintiffs,
v.
Chief John Coffey, et al., Defendants.

Civil No. 13-1808 (RMB/KMW)
|
Signed 09/27/2016

**Attorneys and Law Firms**

Katherine D. Hartman, Attorneys Hartman, Chartered,
505 S. Lenola Road, Suite 121, Moorestown, NJ
08057-1590, Attorney for Plaintiffs Michael Killion,
Michael Biazzo, William Hertline, Socrates Kouvatas,
and Erik Morton.

Francis X. Manning, Stradley, Ronon, Stevens & Young,
LLP, LibertyView, 457 Haddonfield Road, Suite 100,
Cherry Hill, NJ 08002, Attorney for Defendants John
Coffey and Michael Probasco.

Richard L. Goldstein, Marshall, Dennehey, Warner,
Coleman & Goggin, PA, Woodland Falls Corporate Park,
200 Lake Drive East, Suite 300, Cherry Hill, NJ 08002,
Attorney for Defendants Rick Taylor, Betsy McBride,
John Kneib, John Figueroa, Ed Growchowski, and the
Township of Pennsauken.

[Docket Nos. 92, 93]

**OPINION**

BUMB, United States District Judge:

*1 This matter comes before the Court upon two motions
to dismiss the Second Amended Complaint [Docket No.
81]: the Motion to Dismiss filed by Defendants John
Coffey ("Coffey") and Michael Probasco ("Probasco")
[Docket No. 92] and the Motion to Dismiss filed by
Defendants John Figueroa, Ed Growchowski, John Kneib,
Betsy McBride, Rick Taylor (collectively, the "Individual
Defendants"), and the Township of Pennsauken (together
with the Individual Defendants, the "Township
Defendants") [Docket No. 93]. As Coffey, Probasco, and
the Township Defendants (collectively, the "Defendants")
explicitly rely on each other's arguments, the motions will
be addressed jointly. For the reasons set forth below, the
motions to dismiss will be granted with prejudice.

**I. FACTUAL AND PROCEDURAL
BACKGROUND[1]**

The underlying facts of this suit are recited in the Court's
previous motion to dismiss opinion issued on November
19, 2015 [Docket No. 77] (the "November 2015
Opinion"). The Court incorporates the facts as set forth in
the November 2015 Opinion by reference to the extent
those facts have been restated in the Second Amended
Complaint. The Court will nevertheless provide an
overview of the relevant factual and procedural
background and will discuss the new allegations included
in the Second Amended Complaint. However, as the
Court writes only for the parties, it assumes the reader's
familiarity with the facts and recites only those relevant to
the decision herein.

Plaintiffs Michael Killion, Michael Biazzo, Socrates
Kouvatas, Erik Morton, and William Hertline (the
"Plaintiffs") are five police officers employed by the
Pennsauken Police Department.[2] The Plaintiffs are active
members of the Fraternal Order of Police ("FOP 3"), the
union that represents Pennsauken police officers. Second
Amended Complaint ¶ 24 [Docket No. 81] ("SAC"). They
are all vocal and outspoken supporters of the
implementation of twelve hour shifts at the Pennsauken
Police Department. SAC ¶ 25. Plaintiff Morton, for
example, joined the FOP 3 executive board in 2007 and
"immediately began to work actively to obtain twelve
hour shifts." SAC ¶ 162.

In 2010 and early 2011, the FOP 3 and the police
administration engaged in contract negotiations regarding
the implementation of twelve hour shifts. Plaintiffs
Killion, Biazzo, and Hertline were members of the FOP 3

Contractual Negotiation Committee, which was involved in these negotiations. SAC ¶¶ 31, 75, 112. According to Plaintiffs, Defendant Coffey was "angry with the negotiation surrounding the twelve hour shifts, and directly tried to interfere with the appointment of the members of the negotiation committee." SAC ¶ 196. The Second Amended Complaint, however, includes no allegations of specific instances of such interference. Plaintiffs allege only that when Plaintiff Hertline was running a union award banquet, "the Administration refused to participate in the issuance of joint awards with the Union as they had in the past." SAC ¶ 197. Likewise, Plaintiffs allege that "[s]ince Hertline's support for the twelve hour shifts, he has been denied administrative leave time to attend FOP meetings." SAC ¶ 115.

*2 Approximately twelve meetings regarding the twelve hour shifts took place. SAC ¶ 35. Defendant "Coffey repeatedly made his opposition to the imposition of twelve hour shifts known [at these meetings] and, at times, these meetings became quite heated." SAC ¶ 34. In the Second Amended Complaint, Plaintiffs briefly describe certain of these meetings. At a meeting on April 12, 2010, Plaintiffs Killion and Biazzo met with Captain Connors, Lieutenant Nichols, and Defendant Coffey regarding the adoption of twelve hour shifts. SAC ¶ 28a. The following week, Defendant Coffey sent Defendant Growchowski, the Township Administrator, a memorandum that included questions and concerns regarding the twelve hour shifts "indicating his opposition to their implementation." SAC ¶ 28b. On April 22, 2010, Biazzo, Killion, Coffey, Growchowski, and Captain Connor attended another meeting. SAC ¶ 28c. Plaintiffs do not set forth any allegations regarding the subject matter of that meeting. On April 28, 2010, Biazzo, Killion, and Coffey met once again to discuss the twelve hour shifts. SAC ¶ 28d.

In February 2011, the Pennsauken police department implemented twelve hour shifts "for the rank and file, in spite of Coffey's opposition." SAC ¶ 47.

At some point in 2011, certain of the Plaintiffs attended a union conference regarding their rights during internal affairs investigations. Defendant Coffey thereafter told "the Union members that they should not assert their rights" as taught at the conference. SAC ¶¶ 194-95.

On October 11, 2011, Biazzo and Killion once again met with Defendant Coffey and certain unidentified others, but the subject matter of the meeting is not pled in the Second Amended Complaint. SAC ¶ 28e. A few months later, on January 19, 2012, Defendant Coffey wrote a memorandum "complaining" about the twelve hour shifts,

to which Biazzo responded on behalf of the FOP 3. SAC ¶¶ 28f, 28g. Shortly thereafter, Killion and Biazzo attended another meeting during which Defendants Coffey and Probasco "complained about the shifts and claimed there were no 'pros' about the change." SAC ¶ 28h. The following week, certain unidentified union representatives met with Coffey, Probasco, Growchowski, Captain Connor, and the Public Safety Director. According to Plaintiffs, at this meeting, "Coffey refused to agree to any suggestions or recommendations to address his objections to the shifts." SAC ¶ 28i. Since the implementation of the twelve hour shifts, Plaintiff Kouvatas has "on numerous occasions pointed out that the problems Coffey has with twelve hours [sic] shifts could be remedied if the supervisors were also on twelve hour shifts." SAC ¶ 152. But "Coffey has repeatedly scorned Kouvatas's input." SAC ¶ 153.

On May 23, 2012, Coffey and Growchowski, as well as the Public Safety Director, met with Killion and Biazzo "to discuss Coffey's apparently punitive policy changes since the shifts were implemented." SAC ¶ 28j. A few months later, they met with the Chief Financial Officer to further discuss Coffey's purported policy changes. SAC ¶ 28k.

In Plaintiffs' view, "[t]he Defendants have consistently and systematically retaliated against the Plaintiffs for the exercise of their First Amendment rights." SAC ¶ 26. For example, Defendant Probasco has "made numerous derogatory comments" about Plaintiffs Killion and Biazzo. SAC ¶¶ 37-40, 56, 78-80. Defendant Coffey no longer speaks to Plaintiffs and does not even address them when they pass each other in the hall. See, e.g., SAC ¶¶ 64-65, 99, 130, 132, 155, 173-74.

Shortly after he became a Pennsauken police officer in 2001, Plaintiff Kouvatas "began to research the efficiency of twelve hour shifts" and "authored a position paper" in support of their implementation. SAC ¶¶ 143-45. A short time after he submitted the paper, Plaintiff Kouvatas "began to be harassed at work." SAC ¶ 148. Plaintiffs allege that "[o]ne supervisor routinely yelled and used obscenities to Kouvatas whenever the subject of twelve hour shifts came up." SAC ¶ 149.

In 2008, Plaintiff Morton's permission to take a day off was revoked, causing him to file a grievance. Defendant Coffey denied the grievance and made the denial available for the entire Police Department to see. SAC ¶ 166. Shortly thereafter, Coffey demanded that Morton write memoranda to explain log entries and other "minor issues." SAC ¶ 167. At some unspecified point thereafter, Morton requested a transfer to another Township because

"[t]hings became so unpleasant," but Coffey denied the transfer. SAC ¶ 169.

**\*3** Months after the implementation of the twelve hour shifts in 2011, Plaintiffs Killion, Biazzo, Hertline, and Kouvatas were involved in an altercation at Pinsetters Bowling Alley and Bar (the "Pinsetters Incident"). SAC ¶ 52. In the aftermath of the Pinsetters Incident, "Coffey ordered that no interviews be conducted and hand typed hundreds of questions directed to the officers." SAC ¶ 53. Killion, Biazzo, Hertline, and Kouvatas were charged and disciplined as a result of the Pinsetters Incident. SAC ¶¶ 81, 115, 118, 154.[3]

Plaintiffs claim that "[t]he way the discipline is served is retaliatory as well." SAC ¶ 68. For example, Plaintiffs contend that the investigation into the Pinsetters Incident "targeted only Union members who supported twelve hour shifts; and others who took the exact same actions, or inactions, but did not vocally support the twelve hour shifts, were not disciplined." SAC ¶ 54. Furthermore, Plaintiffs allege that "[i]f suspended, officers who were not proponents of the twelve hour shifts are afforded the opportunity to work during their suspension with a percentage of their regular pay withheld. This is not the case for those disciplined who were active proponents of the twelve hour shifts." SAC ¶ 69. Biazzo, for example, was not permitted to work during his suspension after the Pinsetters Incident with a percentage of his regular pay withheld, while "officers who were not vocal proponents of the twelve hour shifts" were permitted to do so. SAC ¶ 82.

At some point after the twelve hour shifts were implemented in February 2011, Defendant Coffey changed Plaintiff Killion's daily lineup and assigned him to a less attractive district. SAC ¶ 50. Then, in September 2011, Killion was removed from the Traffic Division. SAC ¶ 51.

In January 2012, Defendant Coffey wrote a memorandum to Defendant Growchowski and the Township Committee regarding Plaintiff Killion's use of sick time. Killion had not been notified that he was under investigation for his use of sick time and he ultimately received a written reprimand on March 15, 2012. SAC ¶¶ 55, 57.

On March 17, 2012, Plaintiff Biazzo received a disciplinary notice regarding his involvement in an off-duty incident at Bryson's Pub. SAC ¶ 84. As a result, he was suspended with pay. SAC ¶ 88. According to Plaintiffs, however, other officers who were also involved only received letters of reprimand. SAC ¶ 85.

On May 24, 2012, Plaintiff Killion received another written reprimand relating to an on-duty motor vehicle accident and was transferred to the nightshift by Defendant Coffey. SAC ¶¶ 58-62. In September 2012, Plaintiff Morton was disciplined by Coffey for failing to report for light duty. SAC ¶ 170-71. On August 20, 2013, Killion was disciplined again for abuse of sick time and insubordination. SAC ¶ 63. Then in September 2013, Defendant Probasco ordered that Plaintiff Hertline "be given a letter of counseling for a report which had been approved by his supervisor and which was in accordance with recent mandatory training." SAC ¶ 129. Two months later, Plaintiff Biazzo was also disciplined for failure to timely pay his country club dues in 2010 and 2013. SAC ¶ 104. Then, on May 12, 2014, Plaintiff Kouvatas was served with a disciplinary notice "from an event which occurred more than a year prior." SAC ¶ 157. On July 27, 2015, while Biazzo was working a road detail, Probasco made an announcement over the police radio that "suggest[ed] [Biazzo] was involved in a domestic violence incident on the street." SAC ¶ 106.

**\*4** Plaintiffs allege that the Township Defendants were aware of their concerns regarding retaliation against them due to their support for the implementation of twelve hour shifts. SAC ¶ 175. For example, on two occasions, Barbara Hertline, Plaintiff Hertline's wife, wrote to Defendant Taylor and the members of the Township Committee regarding Coffey's "apparent retaliation against officers since the implementation of twelve hour shifts," but received no response. SAC ¶¶ 176, 179. She later addressed the Township Committee in a public meeting. SAC ¶ 180. Plaintiffs' counsel also "inform[ed] the Committee of what [Plaintiffs] believed was Coffey's policy of discriminating against supporters of twelve hour shifts." SAC ¶ 177. A few months later, Coffey informed Ms. Hertline that an internal affairs investigation would be initiated, but no action was ever taken. SAC ¶¶ 181-82.

On March 22, 2013, the original seven plaintiffs filed this lawsuit against Chief Coffey, Lieutenant Probasco, the Township of Pennsauken, each of the Township Committee's members, and the Township Administrator, Ed Growchowski, alleging that the Defendants unlawfully retaliated against them for exercising their First Amendment rights and that the Growchowski and the Township Committee members failed to investigate their allegations of unlawful retaliation.[4] On November 19, 2015, the Court dismissed Plaintiffs' First Amended Complaint [Docket No. 27], upon Defendants' motions, without prejudice and granted Plaintiffs a final opportunity to amend their pleadings within twenty-one days [Docket Nos. 77, 78].

On January 11, 2016, the Plaintiffs filed the Second Amended Complaint. The Second Amended Complaint no longer names Deputy Mayor Jack Killion as a defendant and sets forth four claims: (1) retaliation in violation of Plaintiffs' right to freedom of speech under the First Amendment to the United States Constitution, in violation of Section 1983 (Count I); (2) retaliation in violation of Plaintiffs' right to freedom of association under the First Amendment, in violation of Section 1983 (Count II); (3) violation of the New Jersey Civil Rights Act (Count III); and (4) a punitive damages claim (Count IV). Defendants have moved to dismiss the Second Amended Complaint.

## II. MOTION TO DISMISS STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 663. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. Id. at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

*5 In reviewing a plaintiff's allegations, a district court should conduct a three-part analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Third, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (internal citations, quotations, and alterations omitted)

(quoting *Iqbal*, 556 U.S. at 675, 679).

Rule 12(b)(6) requires the district court to "accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi*, 696 F.3d 352, 358 n. 1 (3d Cir. 2012). Only the allegations in the complaint and "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" are taken into consideration. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994) (citing *Chester County Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990)).

## III. LEGAL ANALYSIS

### A. Section 1983 Claims

Plaintiffs assert two claims under Section 1983 of the Civil Rights Act, alleging retaliation in violation of Plaintiffs' First Amendment rights to freedom of speech (Count I) and freedom of association (Count II). Plaintiffs also bring a claim under the New Jersey Civil Rights Act, alleging similar violations (Count III). "This district has repeatedly interpreted [the New Jersey Civil Rights Act] analogously to § 1983." *Pettit v. New Jersey*, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) (collecting cases); accord *Borden v. Sch. Dist. Of Twp. Of E. Brunswick*, 523 F.3d 153, 164 n. 5 (3d Cir. 2008). Accordingly, the Court will consider Plaintiffs' New Jersey Civil Rights claim together with the claims under Section 1983.

To state a retaliation claim under Section 1983 for violation of the right to freedom of speech, the Plaintiffs must allege facts showing: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Similarly, to allege a Section 1983 retaliation claim for violation of the freedom of association, Plaintiffs "must show that they were engaged in constitutionally protected conduct, which conduct was a 'substantial' or 'motivating factor' in the government employer's [adverse employment] decision." *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3d Cir. 1988) (citing *Mt. Healthy City Sch.*

*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). As the claims share the same elements, the Court will address the freedom of speech and freedom of association claims together, as appropriate.

### i. Constitutionally Protected Conduct

**\*6** Public employees, including police officers, "do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The Court will first address the degree to which the requisite showings for constitutionally protected conduct may vary between Plaintiffs' two First Amendment claims. Generally, to establish that Plaintiffs have engaged in constitutionally protected conduct, Plaintiffs must allege (1) that they acted or spoke as private citizens, as opposed to pursuant to their official duties, regarding (2) a matter of public concern, and (3) that the police administration did not have an adequate justification for treating them differently from any other member of the general public as a result of their conduct. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing *Garcetti*, 547 U.S. at 417).

Plaintiffs contend that the Court need not engage in the *Garcetti* analysis described above for either of its First Amendment claims because "[u]nion activity is per se protected conduct." Pls. Opp. Br. at 12-13. In Plaintiffs' view, since the implementation of twelve hour shifts was an issue presented in the negotiations between the union and the police administration, it is per se a matter of public concern. *Id.* at 13 (citing *Crane v. Yurick*, 287 F. Supp. 2d 553, 560 (D.N.J. 2003)).

The Court begins with the freedom of association claim. There is a split between the federal Circuits as to whether the public concern requirement applies to First Amendment freedom of association retaliation claims. The Third Circuit has not yet definitively decided the question. See *LaPosta v. Borough of Roseland*, 309 Fed.Appx. 598, 603 (3d Cir. 2009) (recognizing that it "is an open question in this Circuit" "as to whether the public concern requirement applies equally to free association claims"); *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 400 (3d Cir. 1992) (recognizing Circuit split on this issue, but declining to decide the question).[8]

**\*7** The Third Circuit has, however, repeatedly applied the public concern requirement to freedom of association claims that are closely linked to or mere extensions of freedom of speech claims. For example, the Third Circuit in Bell v. City of Philadelphia expressed that, it has "no problem applying the public concern requirement" where the plaintiff's "associational claim is barely an extension of his free speech claim." 275 Fed.Appx. 157, 160 (3d Cir. 2008) (citing *Sanguigni*, 968 F.2d at 400; *Dible v. City of Chandler*, 502 F.3d 1040, 1050 (9th Cir. 2007) (finding that public employee cannot "resurrect fallen speech claims as privacy and associational claims")).

Likewise, in Sanguigni, the Third Circuit held that, while it was not "necessary to confront the issue whether Connick [and, therefore, the public concern requirement] generally applies to claims involving the freedom of association," it would apply the requirement in the case before it because the plaintiff's "associational claim was 'based on speech' and did not implicate associational rights 'to any significantly greater degree' than the speech at issue in the seminal Supreme Court free speech case that gave rise to the public concern requirement." *Id.* (citing *Connick v. Myers*, 461 U.S. 138 (1983)); see also *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009) (noting that plaintiff's "associational claim is linked closely enough with his free-speech claim to justify application of the citizen-speech and public-concern requirements."); *Beresford v. Wall Twp. Bd. of Educ.*, 2010 WL 445684, at \*7 (D.N.J. Feb. 3, 2010) (applying public concern requirement to freedom of association claim, reasoning that "Plaintiff's freedom of association claim mirrors his freedom of speech claim in that it relates to the same union speech and attendant circumstances.").

Here, the Defendants argue that "[i]n an attempt to get a second bite at the apple," Plaintiffs "repackage [their] freedom of speech claims as freedom of association claims." Coffey Br. at 23. The Court agrees. For example, Plaintiffs' freedom of speech claim comprises the first 191 paragraphs of the Second Amended Complaint. The freedom of association adds a mere seven paragraphs, two of which are bare-boned conclusions. See SAC ¶¶ 198-99. As will be discussed in further detail below, the remaining allegations do not support a claim for freedom of association. The core of Plaintiffs' freedom of association claim is the same as the freedom speech claim, namely that Plaintiffs were retaliated against for supporting the implementation of twelve hour shifts. In fact, Plaintiffs readily concede that they "were not involved in organizing a union" and instead argue that their advocacy for twelve hour shifts is union activity that merits unconditional protection as association. Pls. Opp. Br. at 16.

In the end, the Second Amended Complaint and the Plaintiffs' opposition brief make clear that the two claims are closely linked and mirror each other. Accordingly, the Court finds that Plaintiffs' freedom of association claim is "barely an extension" of their freedom of speech claim and, therefore, the Court has "no problem applying the public concern requirement in this context." See Bell, 275 Fed.Appx. at 160. The Court will evaluate the claims together, as appropriate, and will apply the public concern requirement.

The Court also rejects Plaintiffs' contention that they are excused from pleading these elements to establish even their freedom of speech claim because, in their view, all union activity is per se protected conduct. For this proposition, as the Court noted above, Plaintiffs rely upon Crane, 287 F. Supp. 2d at 560. Crane, however, is distinguishable. Crane involved speech regarding a union's negotiation of a new collective bargaining agreement and the defendant's interception and reading of a sealed letter regarding the agreement. Judge Irenas found that this speech and conduct was protected because it "directly implicates one of the most recognized First Amendment protections—union-related speech." 87 F. Supp. 2d at 560. As such, this speech and conduct, which interfered with union contract negotiations and union organization efforts, was "clearly a matter of public concern." Id. The defendant in Crane actually interfered with the union's ability to organize and communicate. There are no well-pled allegations of similar conduct in the Second Amended Complaint. The Plaintiffs' speech in support of twelve hours shifts may have been an issue that the FOP 3 supported, but it was not in and of itself "union-related speech."

*8 It bears noting that constitutional protection is not automatically granted to all speech and conduct by union members. Thomas v. Delaware State Univ., 626 Fed.Appx. 384, 388 (3d Cir. 2015) ("While it is true that union activities may sometimes touch on a matter of public concern, ... it is not the case that all union-related grievances do[.] [Plaintiff's] grievances related to 'working conditions and other issues in union members' employment' and [Plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community.").

Instead, courts generally engage in the aforementioned analysis to determine whether speech by union members is protected activity. For example, in Beresford, 2010 WL 445684, at *6, the court found that a union president's speech regarding raises, sick days, and overtime during union contract negotiations was not protected speech. The

Beresford court reasoned that:

> First, Plaintiff was not acting as a private citizen when engaging in speech as a public employee and President of the WITA union because such speech was performed while Plaintiff was in his official capacity as negotiator of his union. Second, Plaintiff was not speaking on a matter of public concern as his speech did not relate to 'any matter of political, social or other concern to the community.' In fact, Beresford's speech involved his own personal demands and complaints in addition to the grievances of a few members of his WITA union. Plaintiff admits that his contractual negotiations were related to his and the WITA members' employment, raises, sick days and overtime.... Although union-related speech is generally a matter of public concern, the union-related speech in this case does not rise to such a level as it relates only to the employee's generalized personal grievances and gain. Additionally, the speech was not engaged in with the purpose of informing the public that the government discharged its responsibilities or of bringing to light the government's breach of public trust. Without a finding that Plaintiff's speech was a matter of public concern and engaged in as a private citizen, the first prong for a violation of Plaintiff's First Amendment's right of freedom of speech is not satisfied.

Beresford, 2010 WL 445684, at *6; see also Hill v. City Of Philadelphia, 331 Fed.Appx. 138, 142 (3d Cir. 2009) (affirming district court's determination that plaintiff did not engage in protected speech because he "did not show that he was acting as a citizen in his union representation ... or that the speech he engaged in during that representation was a matter of public concern."); Lee v. the Cty. of Passaic, 2011 WL 3159130, at *4 (D.N.J. July 26, 2011) (finding that plaintiff did not engage in protected activity because, "[a]lthough these comments were made in connection to negotiations with the Union, concerns over personal salaries and benefits cannot be said to 'relat[e] to another matter of political, social, or other concern to the community.' ") (quoting Connick, 461 U.S. at 146).

Accordingly, the Court rejects Plaintiffs' position that all union-related speech is per se protected activity and will proceed with the Garcetti analysis described above to assess whether Plaintiffs engaged in constitutionally protected activity.

To determine whether a matter is of public concern, courts consider whether "it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." Zelinski v. Penn. State Police, 108 Fed.Appx. 700, 707 (3d Cir. 2004).

"Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 444 (2011)). "The inquiry turns on the 'content, form, and context' of the speech." Id. (quoting *Connick*, 461 U.S. at 147-48).

\*9 A public employee's speech regarding a matter of public concern is only protected, however, if the employee spoke as a private citizen, rather than pursuant to their official duties. *Gorum*, 561 F.3d at 185. In evaluating whether a police officer spoke as a private citizen, courts consider "whether the speech fell within the individual's job duties, whether it was related to special knowledge or experience acquired on the job, whether it was made inside or outside the work place, and whether it concerned the job's subject matter." *Houston v. Twp. of Randolph*, 2013 WL 1192579, at \*11 (D.N.J. Mar. 21, 2013); accord *Gorum*, 561 F.3d at 185-86 (holding that professor's advocacy on behalf of student in disciplinary proceedings was pursuant to his official duties because it was only due to his "special knowledge of, and experience with, the [school's] disciplinary code" and his position as a faculty member that he could assist the student in the first place).

### (a) Speech or Conduct

In its November 2015 Opinion, this Court found that "the Plaintiffs have neglected to identify what [they] actually did or said to display their support of the twelve hours shifts" and, therefore, that the First Amended Complaint failed to properly allege constitutionally protected conduct. November 2015 Opinion at 24-25.

The Court once again reiterates that "[p]laintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected, and, therefore, only if there actually was conduct." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 495 (3d Cir. 2002) (emphasis in original); accord *Berkery v. Wissahickon Sch. Dist. Bd. of Directors*, 628 Fed.Appx. 109, 112 (3d Cir. 2015) (affirming dismissal of First Amendment retaliation claim where plaintiff "does not specify what speech of hers caused her suspension"); *Fogarty v. Boles*, 121 F.3d 886, 891 (3d Cir. 2002) ("the absence of speech ... is fatal to the plaintiff's [First

Amendment retaliation] claim").

In the Second Amended Complaint, Plaintiffs attempt to remedy this deficiency by alleging that Plaintiffs Biazzo and Killion participated in meetings in 2010, 2011, and 2012 with Defendant Coffey and others regarding the implementation of twelve hour shifts. SAC ¶¶ 28, 35. Plaintiffs, however, do not set forth any allegations regarding their conduct or speech at these meetings. The Second Amended Complaint also alleges that Plaintiff Biazzo responded to a memorandum from Defendant Coffey, but does not set forth the substance or contents of his response. SAC ¶ 28g.

The Court remains unable to assess the nature of these two Plaintiffs' alleged support for twelve hour shifts from these sparse allegations regarding their participation in contract negotiations. The Plaintiffs have chosen to elaborate on Defendant Coffey's views and actions, stating, for example, that he "indicat[ed] his opposition to their implementation," that he "complain[ed] about the shifts," and "claimed that there were no 'pros' about the change." SAC ¶¶ 28b, 28f, 28h, rather than describe what Plaintiffs said or did. The Court agrees with the Defendants that Coffey's "conduct has no impact on Plaintiffs' obligation to identify what they did or said." Defendants Coffey and Probasco Brief ("Coffey Br.") at 7 [Docket No. 92-3] (emphasis in original).

The allegations set forth only that Killion and Biazzo attended the meetings as members of the FOP 3 negotiating committee and that twelve hour shifts were discussed, leaving the Court to speculate as to the form and content of Plaintiffs' speech or conduct. Additionally, mere "[m]embership in a union 'negotiating team' does not constitute conduct protected by the First Amendment" and "statements made by a public employee carrying out official duties, including negotiating terms of employment, are not entitled to First Amendment protection." *Garvey v. Barnegat Bd. of Educ.*, 2008 WL 2902617, at \*6 (D.N.J. July 24, 2008) (citing *Garcetti*, 547 U.S. at 421).

\*10 As for Plaintiff Kouvatas, the Second Amended Complaint now alleges that "[h]e has on numerous occasions pointed out that the problems Coffey has with twelve hour shifts could be remedied if the supervisors were also on twelve hour shifts." SAC ¶ 152. This is likewise inadequate to save the Second Amended Complaint. This allegation suffers from the same infirmities previously identified by the Court, namely that it fails to identify with even a minimal degree of specificity when the speech occurred. The Court remains unable to assess the relevance of this activity to Plaintiffs'

First Amendment claims. See November 2015 Opinion at 31. Additionally, it is merely a repackaging of an allegation in the First Amended Complaint, which pleads that "[v]irtually ... every one of [Coffey's] problems [with the twelve hour shifts] could be resolved if the supervisors reported on the same twelve hour schedule." Amended Complaint ¶ 135.

The Second Amended Complaint continues to allege that in or around 2001 and 2007, Plaintiff Kouvatas authored a position paper regarding the benefits of twelve hour shifts, which he circulated among his peers. The Court reiterates that "[g]iven the many years that passed between the publication of Plaintiff Kouvatas's position paper and the first actionable acts of alleged retaliation, [these allegations] cannot support a First Amendment retaliation claim." November 2015 Opinion at 26.

Notably, the Second Amended Complaint sets forth no well-pled allegations of speech or conduct on the part of Plaintiffs Hertline and Morton. The amended pleadings contain no allegations of protected activity by Plaintiff Hertline, other than the bald statement that he "remains an active and vocal proponent of the twelve hour shift," SAC ¶ 113, which the Court has already found to be insufficient. See November 2015 Opinion at 25. As for Plaintiff Morton, Plaintiffs allege only that he "served on the Executive Board of FOP Lodge 3 beginning in 2007" and that "[h]e immediately began to work actively to obtain twelve hour shifts." SAC ¶ 162. This, too, is insufficient to establish the required element of protected activity. Moreover, even if it could satisfy this element, as discussed further below, any protected activity that occurred in 2007 cannot support a timely First Amendment claim in light of the causation element.

Plaintiffs have also added a handful of allegations purporting to set forth union organizing efforts to support their freedom of association claim. These, too, have not been adequately pled. Rather, Plaintiffs set forth only conclusory allegations that are merely "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Such allegations cannot withstand a motion to dismiss. Id. ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' ") (quoting *Twombly*, 550 U.S. at 557).

For example, Plaintiffs baldly allege that Plaintiff Hertline "has been denied administrative leave time to attend FOP meetings," SAC ¶ 116, without any "further factual enhancement," as required by *Iqbal* and *Twombly*, such as pleading when or by whom or why. Likewise, the Second Amended Complaint alleges that certain of the

Plaintiffs attended a FOP conference on officers' rights during internal affairs investigations and that when unidentified union members, at some unspecified time, "insist[ed] on following proper due process and asserting their rights," Defendant Coffey became enraged. SAC ¶¶ 193-95. Plaintiffs additionally claim that Coffey "directly tried to intervene with the appointment of the members of the negotiating committee," yet fail to disclose when or how this occurred. SAC ¶ 196. Finally, Plaintiffs claim that Hertline ran a union banquet on some undisclosed date, but that the police "[a]dministration refused to participate in the issuance of joint awards." SAC ¶ 197. The Court agrees with the Defendants that "[n]ot only is there no indication when this occurred, but running an event does not rise to the level of constitutional protection." Coffey Br. at 24. For the reasons articulated by the Court above and in the November 2015 Opinion, the lack of specificity as to the form, timing, content, and context of any potentially protected speech or conduct is fatal to Plaintiffs' claims.

**\*11** For the foregoing reasons, the Court once again finds that Plaintiffs' First Amendment claims must fail, as they have failed to adequately plead conduct that allegedly resulted in retaliation.

### (b) Private Citizen

In any case, even if any of the amended pleadings could be considered well-pled allegations of conduct, Plaintiffs have failed to adequately plead that they were speaking or acting as private citizens, as opposed to pursuant to their official duties. This, too, is fatal to their claims. Plaintiffs claim that "[i]t is not part of the police officer's job to participate in the Union, negotiate a contract, or save municipality money or avoid layoffs of police officers." Pls. Opp. Br. at 17. Accordingly, Plaintiffs argue, their speech was protected because "[n]one of these things were part of the Plaintiffs' job duties." Id. at 18. The Court is not persuaded by Plaintiffs' argument.

"The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424-25. Accordingly, "a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." *Gorum*, 561 F.3d at 185. Plaintiffs' membership in the FOP 3 alone does not indicate that they were speaking as private citizens.

Killion v. Coffey, Not Reported in F.Supp.3d (2016)

2016 WL 5417193

Rather, to the extent that Plaintiffs spoke or acted regarding a matter of public concern, Plaintiffs did so to advance their positions as police officers. Plaintiffs were able and eager to advocate for the implementation of twelve hour shifts precisely because of their employment as police officers and the special knowledge and experience acquired through that employment. Accordingly, the Court finds that Plaintiffs have failed to allege that they were speaking as private citizens. See id. at 185-86; see also Beresford, 2010 WL 45684, at *6 ("Plaintiff was not acting as a private citizen when engaging in speech as a public employee and President of the WITA union because such speech was performed while Plaintiff was in his official capacity as negotiator for his union."); Hill v. City of Philadelphia, 2008 WL 2622907, at *6 (E.D. Pa. June 30, 2008), aff'd, 331 Fed.Appx. 138 (3d Cir. 2009) ("Any activity or related speech which allegedly led to retaliation against [plaintiff] was conducted pursuant to his official duties as a union delegate acting on behalf of employees of a municipal agency, and not as a citizen.").

### (c) Matter of Public Concern

In its November 2015 Opinion, "this Court question[ed], without making any determinations at th[at] juncture, whether support for the implementation of twelve hour shifts is truly a matter of public concern." November 2015 Opinion at 26 (citing Thomas, 626 Fed.Appx. at 388. The Court now takes the opportunity to squarely address this question.

Whether an exercise of speech is on a matter of public concern is a question of law. Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). "[T]he key to the 'public concern' inquiry is 'whether the expression of the kind at issue is of value to the process of self-governance.' " Montone v. City of Jersey City, 709 F.3d 181, 193 (3d Cir. 2013) (quoting Azzaro v. Cty. of Allegheny, 110 F.3d 968, 977 (3d Cir. 1997)). Generally, speech on a matter of public concern "addresses a social or political concern of the community" or "relates to broad social or policy issues, including expressing the desirability of assassinating the President or complaining about racial discrimination." Borden, 523 F.3d at 170. Likewise, speech may address an issue of public concern if it "implicat[es] the discharge of public responsibilities by an important government office, agency, or institution," such as government corruption, lowering of

academic standards, or "bring[ing] to light actual or potential wrongdoing or breach of public trust on the part of government officials." Id. (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993); Sanguigni, 968 F.2d at 397-98). "Finally, the content of speech is on a matter of public concern where it 'relate[s] primarily to the way in which a government office [i]s serving the public,' " such as a government "wasting taxpayer's money." Id. (quoting Sanguigni, 968 F.2d at 398; citing Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147.

*12 When a public employee speaks "upon matters only of personal interest," rather than "matters of public concern," a First Amendment claim does not lie. See id. Additionally, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Id. at 149. Accordingly, "[w]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." Abernethy, Jr. v. Mercer, 532 Fed.Appx. 160, 163 (3d Cir. 2013); accord Morris v. Philadelphia Hous. Auth., 487 Fed.Appx. 37, 40 (3d Cir. 2012) ("The Supreme Court has decided, however, that we should not constitutionalize management disputes between the government and its employees."). In light of this, the Third Circuit has explained that "internal workplace matters and personal grievances ... clearly fall outside the sphere of First Amendment protection." Garcia v. Newtown Twp., 483 Fed.Appx. 697, 703 (3d Cir. 2012). Likewise, where a plaintiff's speech or conduct does "not seek to communicate to the public or to advance a political or social point of view beyond the employment context," the Third Circuit has held that such activity does not address a matter of public concern. Emigh v. Steffee, 442 Fed.Appx. 660, 666 (3d Cir. 2011) (quoting Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 398 (2011)).

The Court has evaluated the content, form, and context of Plaintiffs' alleged speech to the best of its ability in light of the bare-boned pleadings. The Second Amended Complaint indicates that the Plaintiffs expressed their support for twelve hour shifts only in the context of the workplace, among coworkers and in contract negotiation meetings. There was no effort to inform the public about the issue or the benefits that Plaintiffs argue stem from the implementation of twelve hour shifts. In fact, there is no allegation in the Second Amended Complaint that the Plaintiffs even expressed their opinions about the collateral benefits of twelve hour shifts to the Defendants.

The Court has no information whatsoever about the specific form or content of Plaintiffs' speech or conduct regarding the twelve hour shifts. All that the Second Amended Complaint alleges is that Plaintiffs were in favor of the implementation of twelve hour shifts and that such support was apparently made exclusively within the police department and often, if not always, in contract negotiation meetings regarding the shifts.

The Court finds that, as alleged, Plaintiffs' support of twelve hour shifts related only to their working conditions and a management dispute about an internal workplace policy, namely the length and scheduling of the officers' shifts, and did "not seek to communicate to the public or to advance a political social point of view beyond the employment context." See *Garcia*, 483 Fed.Appx. at 703; *Emigh*, 442 Fed.Appx. at 666. Accordingly, assuming that Plaintiffs had adequately alleged speech or conduct as private citizens, which the Court has already held they have not, the Court also finds that Plaintiffs alleged support of twelve hour shifts did not address a matter of public concern.

The fact that Plaintiffs are union members does not change this Court's analysis.* In *Thomas*, the Third Circuit found that the plaintiff's "union grievances are not protected because they do not involve matters of public concern." 626 Fed.Appx. at 388. The court acknowledged that while "union activities may sometimes touch on a matter of public concern, ... it is not the case that all union-related grievances do." Id. The *Thomas* court found that the plaintiff's speech "related to working conditions and other issues in union members' employment, ... and [plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community," and, accordingly, that it was not protected. Id. at 389; see also *Harris v. Quinn*, 134 S. Ct. 2618, 2655 (2014) (Kagan, J., dissenting) ("Our decisions ... teach that internal workplace speech about public employees' wages, benefits, and such—that is, the prosaic stuff of collective bargaining—does not become speech of 'public concern' just because those employment terms may have broader consequence.") (citing *Duryea*, 564 U.S. 379, 391; *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996)).

**\*13** Here, too, the Plaintiffs' alleged speech or conduct, to the extent that any such speech or conduct has been adequately pled, also addressed their working conditions and the union members' terms of employment. Plaintiffs make no allegations that the purported benefits to the community regarding twelve versus eight hour shifts were ever communicated to the Defendants or the public. For this reason, the Court finds that Plaintiffs have not

properly alleged speech addressing a matter of public concern, as required to plead a First Amendment violation.

Plaintiffs remain unable to adequately plead constitutionally protected conduct, as required for both Plaintiffs' freedom of speech and freedom of association claims. Accordingly, the Plaintiffs' First Amendment retaliation claims under Section 1983 (Counts I and II) are dismissed with prejudice. For the same reasons, Plaintiffs' New Jersey Civil Rights Act claim (Count III) is also dismissed with prejudice.

## ii. Retaliatory Conduct

To adequately plead the retaliatory conduct prong, Plaintiffs must allege "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Thomas*, 463 F.3d at 296. The effect of the alleged retaliation on a plaintiff's freedom of speech "need not be great in order to be actionable but it must be more than de minimis." *Hogan v. Twp. of Haddon*, 278 Fed.Appx. 98, 103 (3d Cir. 2008) (internal citations and quotations omitted). "[E]ven an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights" may be sufficient to constitute retaliatory action for purposes of a First Amendment retaliation claim. See *Suppan v. Dadonna*, 203 F.3d 228, 234 (3d Cir. 2000) (quoting *Rutan v. Republican Party*, 497 U.S. 62, 76 n. 8 (1990)). "A First Amendment retaliation claim will lie for any individual act which meets this 'deterrence threshold,' and that threshold is very low[.]" *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006).

Applying this standard, the Court found, in its November 2015 Opinion, that "[w]hile the Amended Complaint is fatally lacking in other respects, it adequately pleads retaliatory conduct as required to state a First Amendment claim." November 2015 Opinion at 30. However, the Court found that any acts of alleged retaliation occurring prior to March 22, 2011 were barred by the two-year statute of limitations governing Section 1983 claims and dismissed any claims premised upon these acts with prejudice. Id. at 21-22.

The Second Amended Complaint restates the bulk, if not all, of the allegations of timely retaliatory conduct that the Court found sufficient in its November 2015 Opinion. For

example, Plaintiffs allege once again that, on May 24, 2012, Killion was transferred to "the nightshift to work in the Dispatch Room while on-duty" and that "[t]his is the first time in the history of the [Pennsauken Police] Department that [Defendant] Coffey transferred an officer on light-duty to the nightshift." SAC ¶ 62. The Second Amended Complaint also alleges that Hertline and several other officers were given permission to attend a training session in Texas, but that Defendant Coffey "changed every attendees' days off so they could attend the conference without financial penalty, except for Hertline." SAC ¶¶ 138-39. Plaintiffs also allege that Biazzo has been formally disciplined on several occasions by Defendant Coffey and suspended without pay, SAC ¶¶ 84-88, 104, and that Kouvatas was served with a Preliminary Notice of Disciplinary Action on May 12, 2014. SAC ¶ 157. Likewise, Morton has been charged and disciplined by Defendant Coffey. SAC ¶¶ 170-71.

**\*14** Given the allegations of formal discipline and other acts of retaliatory conduct in the Second Amended Complaint, the Court once against finds that Plaintiffs have adequately pled retaliatory conduct as required to state a First Amendment retaliation claim.[7]

### iii. Causal Link

To state a claim for First Amendment retaliation, the Plaintiffs must allege causation, namely that their protected activity was a substantial or motivating factor behind the Defendants' retaliation. *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006). The Plaintiffs must do more than allege the "mere possibility of misconduct." See *Iqbal*, 556 U.S. at 679. Additionally, the Third Circuit has directed courts to "be diligent in enforcing these causation requirements [in Section 1983 First Amendment cases] because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

"Because motivation is almost never subject to proof by direct evidence, [Plaintiffs] must rely on circumstantial evidence to prove a retaliatory motive. [Plaintiffs] can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that

suggests a causal link." *Watson v. Rozum*, ___ F.3d ___, 2016 WL 4435624, at \*2 (3d Cir. Aug. 23, 2016). Accordingly, a determination as to whether a causal link has been adequately pled requires an inquiry into the temporal proximity between the alleged protected activity and the alleged retaliation. See *Queer v. Westmoreland Cnty.*, 296 Fed.Appx. 290, 293 (3d Cir. 2008). "[A] suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). However, the temporal proximity of the alleged retaliation "must be unusually suggestive of retaliatory motive before a causal link can be inferred." Id. Where the temporal proximity alone is not "unusually suggestive," "timing plus other evidence may be an appropriate test[.]" Id. This other evidence may be "gleaned from the record as a whole," and may include, for example, a pattern of antagonism. See *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

In its November 2015 Opinion, the Court held that Plaintiffs' Amended Complaint failed to adequately plead the requisite causal link between their allegedly protected conduct and Defendants' allegedly retaliatory conduct. November 2015 Opinion at 30-33. The Court explained that "given the paucity of well-pled allegations of protected activity," the Court could not "make any determinations regarding the timing of said 'vocal support' or its temporal proximity to the alleged retaliatory actions." Id. at 31-32. Plaintiffs were well-aware of the need to remedy this deficiency and yet, by and large, did not do so. To the extent that the Second Amended Complaint once again fails to identify the timing and nature of specific instances of allegedly protected speech or conduct, the Court remains unable to assess the temporal proximity between Plaintiffs' allegedly protected activity and Defendants' alleged retaliation.

**\*15** As the Court noted above, however, the Plaintiffs have included some additional information regarding their speech in support of the twelve hour shifts, such as the meetings between FOP 3 members and the police administration. The Plaintiffs appear to concede that the temporal proximity between these instances of protected activity and any timely acts of alleged retaliation alone is insufficient to establish the requisite causal link. See Pls. Opp. Br. at 19-22. Instead, Plaintiffs argue that they "have alleged both temporal proximity and other evidence which together, in the light most favorable to the plaintiffs sets forth a plausible claim for causation." Id. at 22. Plaintiffs direct the Court to the long history of alleged retaliation, which Plaintiffs claim began only when

negotiations regarding the implementation of twelve hour shifts commenced.

While Plaintiffs may have met the "other evidence" prong of this test by alleging that they have a long history of being disciplined and retaliated against by the Defendants, the timing element is entirely lacking. See *Watson*, 2016 WL 4435624, at *4 ("Where the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is timing plus other evidence.") (emphasis added) (internal quotations and alterations omitted); see also *Scrip v. Seneca*, ___ Fed.Appx. ___, 2016 WL 3162695, at *4 (3d Cir. June 7, 2016) (finding that plaintiff "failed to show a 'pattern of antagonism,' which, coupled with timing would allege a plausible causal link" because "two unspecified disciplinary actions over a period of more than seventeen months do not create 'pattern of antagonism.' ") (emphasis added).

With regard to Plaintiffs Hertline and Morton, the Court cannot identify any well-pled allegations of protected speech from which to measure temporal proximity or infer a causal link. Where the Plaintiffs do not identify the allegedly protected conduct at all, as with Plaintiffs Hertline and Morton, or the date of their allegedly protected conduct, as in the case of Plaintiff Kouvatas "point[ing] out that the problems Coffey has with twelve hours [sic] shifts could be remedied if the supervisors were also on twelve hour shifts," SAC ¶ 152, the Court is unable to assess the temporal proximity or causal relationship between Plaintiffs' allegedly protected conduct and Defendants' alleged retaliation. See November 2015 Opinion at 31-32.

Additionally, as the Court found above and in its November 2015 Opinion, Plaintiff Kouvatas's authoring of a position paper regarding twelve hour shifts and his dissemination of that information, which occurred in or around 2001 and 2007, cannot support any timely claims of First Amendment retaliation due to the passage of several years. See November 2015 Opinion at 32 (citing *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004); *Estate of Smith v. Marasco*, 318 F.3d 497, 512-13 (3d Cir. 2003)); see also *Arneault v. O'Toole*, 513 Fed.Appx. 195, 198 (3d Cir. 2013) (holding that "[f]ive retaliatory actions, undertaken by several different defendants over the course of four years allegedly in response to complaints against several different defendants, are not sufficient in this case" to plead causation in retaliation claim).

Likewise, even if Plaintiffs Killion and Biazzo's attendance at various meetings in 2010, 2011, and 2012 were well-pled allegations of protected conduct, which

the Court has already ruled they are not, Plaintiffs have not pled a causal link between their participation in these meetings and any alleged retaliation. For example, the three April 2010 meetings that Plaintiffs Killion and Biazzo attended occurred over a year before the first timely allegation of retaliation in May 2011, after the Pinsetters Incident. The Court sees no temporal proximity whatsoever between these meetings and any timely alleged retaliation. See *Queer*, 296 Fed.Appx. at 293 ("taking into consideration [plaintiff's] 'timeline' of events, it is difficult to discern any temporal proximity between [plaintiff's] protected speech in March 2004 and the [defendant's] nonrenewal decision more than a year later[.]") (emphasis in original).

*16 As for the allegations regarding the 2012 meetings, which the Court has already found do not constitute well-pled allegations of protected conduct, a causal link cannot be inferred given the months that passed between the meetings and any actionable allegations of retaliation. Moreover, Plaintiffs' own pleadings establish that much of the alleged retaliation was actually justified discipline as a result of various infractions, such as the Pinsetters Incident.* The inference gleaned from the Second Amended Complaint as a whole, then, is that the discipline was justified by Plaintiffs' own infractions, for example, and not that it was retaliation for allegedly protected activity. See *Thomas*, 351 F.3d at 114 (finding that passage of three weeks between alleged protected activity and termination and allegations of "other evidence" was insufficient to establish causal link because "the chronology of events far more strongly suggests a situation in which a probationary employee was determined to be a poor risk as far as dependability was concerned," rather than illegal retaliation).

Additionally, the Second Amended Complaint repeats the errors of the Amended Complaint as it fails to allege when many acts of retaliation took place. See, e.g., SAC ¶ 43 (alleging that Defendant Coffey changed Plaintiff Killion's days off at some indeterminate time); ¶ 116 ("Since Hertline's support for the twelve hour shifts, he has been denied administrate leave time to attend FOP meetings."); ¶ 149 (alleging that, at some unspecified time, an unidentified supervisor "yelled and used obscinities to Kouvatas whenever the subject of twelve hour shifts came up."); ¶ 169 (alleging that, at some point, Morton requested a transfer, which Coffey denied). The Court reiterates that it cannot determine whether these acts are time-barred or causally linked to any allegations of speech. Because Plaintiffs have failed to remedy these defects, the allegations cannot support a First Amendment retaliation claim.

The Defendants note that Plaintiffs "seem to allege that their long-term support for this new work rule somehow imbues them with long-term protection.... That is not the law." Coffey Br. at 22. The Court agrees. Accordingly, Plaintiffs' claims fail because Plaintiffs have not adequately pled constitutionally protected activity or the requisite causal link between their conduct and Defendants' alleged retaliation.

### B. Qualified Immunity

Defendants argue that, even if Plaintiffs have adequately alleged a constitutional violation, Defendant Coffey and Probasco and the Individual Defendants are entitled to qualified immunity. As the Court dismisses the Plaintiffs' constitutional claims, it need not reach the issue of qualified immunity. Nonetheless, in an abundance of caution, the Court will address the question. For the foregoing reasons, the Court finds that, even if the Defendants had violated the Plaintiffs' constitutional rights, which the Court has already found they did not, qualified immunity would shield the Defendants Coffey and Probasco and the Individual Defendants from liability.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009); accord Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) ("An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct.").

*17 The question of whether these Defendants are entitled to qualified immunity requires this Court to answer two questions: "(1) whether the officer violated a constitutional right," and "(2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201-02 (2001). The questions may be answered in either order. Pearson, 555 U.S. at 242.

As to the first question, the Court reiterates that it has already found that the Defendants did not violate any constitutional rights. Moving to the second inquiry, Plaintiffs argue that their First Amendment "rights to free

speech and union activity are well established." Pls. Opp. Br. at 27. This misses the point. In determining whether Coffey, Probasco, and the Individual Defendants' actions or inactions violated a "clearly established right," the "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citing Saucier, 533 U.S. at 206). While the freedom of speech and freedom of association under the First Amendment, in the abstract, are certainly clearly established constitutional rights, that is not the correct inquiry. See id. The Court must instead assess the specific circumstances of the case.

Here, the relevant question is whether a police officer's conduct or speech in support of the implementation of twelve hour shifts is an exercise of a clearly established constitutional right, such that it would have been clear to the Defendants that their alleged retaliation for that conduct, in the case of Coffey and Probasco, or their failure to investigate such retaliation, in the case of the Individual Defendants, was unlawful. In the context of this case, the Court cannot find that Plaintiffs' speech and conduct, as alleged in the Second Amended Complaint, constituted an exercise of a clearly established constitutional right. Accordingly, the Court finds that qualified immunity is appropriate.

As the Court has already detailed, the form, content, and context of Plaintiffs' support for twelve hour shifts, as well as the relevant legal precedents, indicate that such support did not address a public concern and was made pursuant to the Plaintiffs' official duties, not as private citizens. See supra sections III.A.i.(b)-(c). It would not have been clear to a reasonable officer or committee member, confronted with Plaintiffs' support for twelve hour shifts, that the Plaintiffs were exercising any clearly established First Amendment rights and, therefore, that any retaliation or failure to investigate that retaliation would be unlawful.[9] Accordingly, even if Plaintiffs had adequately pled a constitutional violation in the Second Amended Complaint, which the Court has already found, for several reasons, they have not, qualified immunity would nonetheless shield Defendants Coffey and Probasco and the Individual Defendants from liability.[10]

### C. Punitive Damages

*18 Plaintiffs once again set forth a separate count alleging punitive damages. In its November 2015

Opinion, this Court dismissed the punitive damages claim with prejudice against Defendant Township of Pennsauken because "no punitive damages may be awarded against a municipality in Section 1983 actions." November 2015 Opinion at 33 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). The claim was otherwise dismissed without prejudice against the remaining Defendants.

The Court will now dismiss the punitive damages claim (Count IV) with prejudice against all Defendants. Punitive damages are a remedy, not a substantive cause of action. *Taylor v. Lincare, Inc.*, 2016 WL 3849852, at *8 (D.N.J. July 15, 2016); *In re Paulsboro Derailment Cases*, 2015 WL 4914397, at *10 (D.N.J. Aug. 18, 2015). Accordingly, since the Plaintiffs' constitutional claims will be dismissed with prejudice by this Opinion and the accompanying Order, the punitive damages claim must also be dismissed with prejudice. A request for punitive damages cannot stand in the absence of underlying substantive claims. *Taylor*, 2016 WL 3849852, at *8 (quoting *Smith v. Whitaker*, 160 N.J. 221, 235 (1999) ("As a rule, a claim for punitive damages may lie only where there is a valid underlying cause of action.")).

### D. Dismissal With Prejudice

Defendants urge this Court to dismiss Plaintiffs' Second Amended Complaint in its entirety with prejudice. Federal Rule of Civil Procedure 15(a)(2) provides that "court[s] should freely give leave [to amend] when justice so requires." The Supreme Court has held, and the Third Circuit has reiterated, that while "the grant or denial of an opportunity to amend is within the discretion of the District Court, ... outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962); accord *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

"[E]ven when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile.... Dismissal without leave to amend is justified only on the ground of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004).

Dismissal with prejudice, however, may be an appropriate exercise of discretion where the court has previously provided the plaintiffs with "a detailed roadmap for curing the deficiencies in their claims" and the plaintiffs still fail to remedy those deficiencies in the amendment. See *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 166 (3d Cir. 2004) (affirming district court's dismissal of second amended complaint with prejudice where district court had previously dismissed first amended complaint with leave to amend and "provided Plaintiffs with a detailed blueprint of how to remedy the defects in their claims" but plaintiffs "utterly failed to comply with the District Court's directives.").

This Court's November 2015 Opinion dismissing the Plaintiffs' First Amended Complaint addressed the Plaintiffs' allegations and identified the numerous deficiencies therein, yet permitted the Plaintiffs an opportunity to remedy those deficiencies. For example, the Court explained to the Plaintiffs the need to identify the specific allegedly protected speech or conduct in which the Plaintiffs engaged, as well as the acts of alleged retaliation by Defendants. See, e.g., November 2015 Opinion at 22, 25. The Court also explicitly and methodically addressed each of the "required elements to provide guidance to the parties." See id. at 28. In this Court's view, its November 2015 Opinion served as "a detailed roadmap for curing the deficiencies in [Plaintiffs'] claims." See *Chubb Corp.*, 394 F.3d at 166.

*19 The Second Amended Complaint is the Plaintiffs' third bite at the proverbial apple. The Court cautioned Plaintiffs that no further amendments would be permitted. November 2015 Opinion at 1 ("The Plaintiffs, however, will be granted leave to amend their complaint one final time to cure the deficiencies identified herein.") (emphasis added). Yet, the Second Amended Complaint suffers from the same infirmities as the First Amended Complaint, as outlined above. Plaintiffs remain unable or unwilling to allege specific instances of protected activity or the requisite causal link between such activity and Defendants' alleged retaliation, despite having received three opportunities to do so. The Court notes, in particular, the "stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings" under the requirements set forth in Iqbal and Twombly. See *Chubb Corp.*, 394 F.3d at 164. Additionally, the Court has now resolved the question it left open in the November 2015 Opinion, namely whether the implementation of twelve hour shifts is a matter of public concern — it is not.

Accordingly, the Court finds that any further amendment

**Killion v. Coffey, Not Reported in F.Supp.3d (2016)**

2016 WL 5417193

would be futile in light of the ample opportunities already granted to the Plaintiffs. The Court also notes the lengthy history of this action, which has been stalled in the pleadings stage for over three years. Defendants have been required to defend against three complaints. In this Court's view, it would be inequitable to permit the Plaintiffs to file yet another complaint and subject the Defendants to further litigation. For these reasons, the Second Amended Complaint will be dismissed with prejudice and no further leave to amend will be granted.

For the foregoing reasons, the Court grants the Defendants' Motions to Dismiss the Second Amended Complaint with prejudice [Docket Nos. 92, 93]. The Second Amended Complaint is dismissed with prejudice in its entirety. An appropriate Order shall issue on this date.

Dated: September 27, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 5417193

## IV. CONCLUSION

Footnotes

1    The facts recited herein are derived from Plaintiffs' Second Amended Complaint. The Court must accept these facts as true for the purpose of these motions to dismiss. See *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ("In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them.") (internal quotations and citations omitted).

2    This action was originally filed by seven Pennsauken police officers. Two of the original plaintiffs, Douglas Foster and Mark Bristow, are no longer named as plaintiffs in the Second Amended Complaint. All allegations pertinent only to Douglas Foster and Mark Bristow have been removed from the Second Amended Complaint.

3    Their suspensions were affirmed on appeal by the Superior Court of New Jersey, Appellate Division on September 22, 2016. See Opinion, Docket No. A-3537-13T1 [Docket No. 105, Ex. A]; *In the Matter of Michael Biazzo, Douglas Foster, William Hertline, III, Vito Moles, Michael Killion & Michael Hutnan, Twp. of Pennsauken Police Dep't*, No. A-3537-13T1, 2016 WL 5173411, at *5 (N.J. Super. Ct. App. Div. Sept. 22, 2016). The Court considers and takes judicial notice of the Appellate Division's decision, as a matter of public record and as a document whose accuracy cannot reasonably be questioned. See *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (a court may consider, in evaluating a motion to dismiss, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.").

4    Defendants argue again that "Plaintiffs' claims against the Township of Pennsauken Police Department must be dismissed, because the police department is not a separate legal entity subject to suit or having the ability to sue." Township Defendants Brief ("Twp. Br.") at 18 [Docket No. 93-4]. Plaintiffs respond that they do not seek to bring any claims against it. Plaintiffs' Opposition Brief ("Pls. Opp. Br.") at 28 [Docket No. 98]. The Court reaches the same conclusion regarding this argument as it did in its November 2015 Opinion. The Pennsauken Police Department is not listed as a defendant or in the case caption. The Plaintiffs clearly do not intend to sue the Pennsauken Police Department separately. The Court nonetheless reminds the parties that "a police department is not a 'person' subject to suit under 42 U.S.C. § 1983 pursuant to *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 688-90 (1978)." *Hannah v. Bridgewater Police Dep't*, 2014 WL 4272759, at *2 (D.N.J. Aug. 28, 2014).

5    The Court notes, however, that the majority of Circuits apply the public concern requirement to freedom of association claims. See, e.g., *Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1085 (10th Cir. 2011) (applying private citizen and public concern requirements to freedom of association claim); *Hudson v. Craven*, 403 F.3d 691, 698 (9th Cir. 2005) (applying public concern requirement to hybrid freedom of association and speech claims); *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) ("We agree with the defendants and, joining the Fourth, Sixth and Seventh circuits, hold that a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern."); *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999) ("In this circuit, a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern."); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249 (4th Cir.

1999) ("Logically, the limitations on a public employee's right to associate are 'closely analogous' to the limitations on his right to speak."); *Boals v. Gray*, 775 F.2d 686, 691-93 (6th Cir. 1985) (finding that public concern and private citizen requirements must be applied to freedom of association claim and holding that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law"); but see *Coughlin v. Lee*, 946 F.2d 1152, 1158 (5th Cir. 1991) (finding that its "conclusion that plaintiffs' speech did not raise matters of public concern does not foreclose their" freedom of association claim); *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cty.*, 809 F.2d 1546, 1558 (11th Cir. 1987) ("In short, application of a requirement that associational activity relate to a matter of public concern in order to be constitutionally protected would overturn Supreme Court and Eleventh Circuit jurisprudence and exact a substantial toll upon first amendment liberties.").

6    Plaintiffs argue that union organization activities and efforts are unconditionally matters of public concern. The cases cited by Plaintiffs, however, directly involved union organization efforts, not just speech made by union members. See *Perna v. Twp. of Montclair*, 2006 WL 2806276, at *8 (D.N.J. Sept. 28, 2006) (finding that plaintiff alleged a matter of public concern because she alleged "involve[ment] in union organizational and representational efforts"); *Schlichter v. Limerick Twp.*, 2006 WL 2381970, at *8 (E.D. Pa. Aug. 14, 2006) ("a public employee's attempt to unionize would always be considered a matter of public concern") (emphasis added); *Hinshillwood v. Cty. of Montgomery*, 2002 WL 253940, at *4 (E.D. Pa. Feb. 20, 2002) ("[s]peech arising in the context of union organization efforts") (emphasis added). Yet Plaintiffs concede that they were not involved in any union organization efforts. Pls. Opp. Br. at 16.

7    As the Court ultimately finds that the Second Amended Complaint fails to adequately plead a claim under Section 1983, the Court does not reach the Township Defendants' argument that Plaintiffs have failed to allege a custom or policy by the Township of Pennsauken, as required for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). See Twp. Br. at 10-11.

8    While the Court's findings do not rely solely on this, the Court nonetheless notes that after Killion, Hertline, and Biazzo appealed the discipline received as a result of the Pinsetters Incident, the Superior Court of New Jersey, Appellate Division affirmed the suspensions. See *In the Matter of Michael Biazzo, Douglas Foster, William Hertline, III, Vito Moles, Michael Killion & Michael Hutnan, Twp. of Pennsauken Police Dep't*, No. A-3537-13T1, 2016 WL 5173411, at *5 (N.J. Super. Ct. App. Div. Sept. 22, 2016).

9    In addition, the Court observes, without making any findings as to this question, that if the Defendants "reasonably believed that the [Plaintiffs'] [speech] had involved personal matters, not matters of public concern, and [Defendants] had [retaliated against] the [Plaintiffs] because of that mistaken belief, the [retaliation] did not violate the First Amendment." *Waters v. Churchill*, 511 U.S. 661, 679-80 (1994). In light of the case law discussed above, such belief would likely be reasonable.

10   The Individual Defendants also contend that they cannot be sued in their official capacities and that Plaintiffs have failed to plead with specificity any conduct outside the scope of their official duties such that individual liability may be appropriate. Twp. Br. at 11-15. Even if Plaintiffs had properly alleged a constitutional violation and qualified immunity did not attach, the claims against the Individual Defendants in their official capacities must be dismissed as redundant of the claims against the Township of Pennsauken. See *Cuvo v. De Biasi*, 169 Fed.Appx. 688, 693 (3d Cir. 2006) ("We will affirm the District Court's dismissal of the claims against the officers in their official capacities because a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them. Because Cuvo is suing Palmer Township, the suit against the officers in their official capacities is redundant.") (internal citations omitted); *Lue v. Borough of Collingdale*, 2015 WL 70931, at *7 (E.D. Pa. Jan. 6, 2015) (collecting cases). Additionally, the Court agrees that the claims against the Individual Defendants in their individual capacities must be dismissed because the Second Amended Complaint includes no allegations of "individual conduct that results in liability" that would render them amenable to suit in their individual capacities. See *Gerber ex rel. Gerber v. Springfield Bd. of Educ.*, 328 N.J. Super. 24, 40 (App. Div. 2000) ("The Board may be liable to suit as an entity, but in the absence of individual conduct that results in liability, the Board members are shielded from suit.").

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Killion v. Coffey, Not Reported in F.Supp.3d (2016)

2016 WL 5417193

# EXHIBIT D

Johnson v. Bally's Atlantic City, 147 Fed.Appx. 284 (2005)

2005 WL 2141269

147 Fed.Appx. 284
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Third Circuit LAR, App. I,
IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Daniel JOHNSON, Appellant
v.
BALLY'S ATLANTIC CITY.

No. 05-1180.
|
Submitted Under Third Circuit LAR.34.1(a) Sept.
2, 2005.
|
Decided Sept. 7, 2005.

**Synopsis**
**Background:** African-American former employee
brought employment discrimination action against
employer, alleging violation of Title VII. The United
States District Court for the District of New Jersey, Freda
L. Wolfson, J., granted summary judgment to employer.
Former employee appealed.

**Holdings:** The Court of Appeals held that:

[1] genuine issue of material fact existed as to whether
African-American employee was subjected to hostile
work environment, precluding summary judgment, and

[2] genuine issue of material fact existed as to whether
African-American employee was discharged in retaliation
for engaging in protected activity, precluding summary
judgment.

Vacated and remanded.

West Headnotes (2)

[1]    **Federal Civil Procedure**
       Employees and Employment Discrimination,
       Actions Involving

       Genuine issue of material fact existed as to
       whether African-American employee was
       subjected to hostile work environment,
       precluding summary judgment in Title VII
       action. Civil Rights Act of 1964, § 701 et seq.,
       42 U.S.C.A. § 2000e et seq.

       Cases that cite this headnote

[2]    **Federal Civil Procedure**
       Employees and Employment Discrimination,
       Actions Involving

       Genuine issue of material fact existed as to
       whether African-American employee was
       discharged in retaliation for engaging in
       protected activity, precluding summary
       judgment in Title VII action. Civil Rights Act of
       1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

       Cases that cite this headnote

**\*285** On Appeal from the United States District Court for
the District of New Jersey. (Civ. No. 03-cv-3126). District
Judge: Honorable Freda L. Wolfson.

**Attorneys and Law Firms**

Daniel R. Johnson, Absecon, NJ, pro se.

James R. Birchmeier, Powell, Birchmeier & Powell,
Tuckahoe, NJ, for Bally's Atlantic City.

Before VAN ANTWERPEN, GREENBERG and
NYGAARD, Circuit Judges.

**Opinion**

OPINION

PER CURIAM.

**\*\*1** Daniel Johnson filed this employment discrimination suit *pro se* under Title VII of the Civil Rights Act of 1964, against his former employer, Bally's Atlantic City ("Bally's"). Johnson, who is African-American, was employed as a part-time dealer in one of Bally's' casinos. Johnson alleges that he was regularly subjected to racist comments by casino customers using the racial slur "monkey" in reference to him and shouting phrases such as "Come on, monkey," "You, monkey," and "Big monkey," while he gambled at his table. Johnson asserts that, although he complained, Bally's failed to take remedial action and his supervisors intentionally assigned him to tables with verbally abusive customers. Johnson also alleges that he was physically harassed by Bally's staff, who touched him without his permission and directed customers and cleaning staff to block his path and bump into him. Johnson asserts that these conditions caused him distress and that he was discharged in retaliation for complaining. Johnson seeks reinstatement, back pay, and damages.

In its motion for summary judgment, Bally's argued that Johnson failed to establish a prima facie claim under the framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Bally's also asserted that Johnson was discharged for misconduct, not in retaliation. Johnson filed a letter motion responding to Bally's' summary judgment motion, to which he attached a number of supporting documents. The District Court granted Bally's' motion. Johnson appeals the District Court's order, again proceeding *pro se.*

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and apply the same test that the District Court should have used. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). The party moving for summary judgment under Federal Rule of Civil Procedure 56(c) bears the burden of identifying the **\*286** portions of the record which it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is any evidence in the record from any source from which a reasonable inference may be drawn in favor of the nonmoving party, the moving party is not entitled to summary judgment. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996) (internal citations omitted).

[1] We must read Johnson's *pro se* pleadings liberally and apply the correct law regardless of whether he has mentioned it by name. *See Holley v. Dep't of Veteran Affairs,* 165 F.3d 244, 247-48 (3d Cir.1999). Bally's argues that Johnson fails to make out a prima facie case of discrimination under *McDonnell Douglas.* Bally's misperceives the nature of Johnson's first claim, which is a hostile work environment claim. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to establish a hostile work environment claim based on racial discrimination, a plaintiff must show that (1) he suffered intentional discrimination because of race, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of respondeat superior liability. *Aman* at 1081 (internal citations omitted). An employer may be liable under Title VII for the harassing conduct of third parties if the employer was aware of the conduct and failed to take reasonable remedial action in response. *See Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1073-74 (10ᵗʰ Cir.1998); *cf. Weston v. Pennsylvania,* 251 F.3d 420, 427-28 (3d Cir.2001).

**\*\*2** In his summary judgment response, Johnson provided copies of complaints he sent to Bally's' Labor Relations Department, sick call slips, and a memorandum from his floor manager describing two incidents of unwanted touching. Bally's neither filed a reply to Johnson's response to address this evidence nor addressed Johnson's hostile environment claim in any of its pleadings. Bally's thus failed to show an absence of material fact as to the hostile environment claim and was therefore not entitled to summary judgment on this claim. *See Celotex* at 323, 106 S.Ct. 2548.

[2] Johnson's second claim is that he was discharged in retaliation for complaining about the hostile work environment. In order to state a claim of retaliatory discharge, Johnson must show that (1) he engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) a causal link exists between the protected activity and the discharge. *See Aman* at 1085 (citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989)). The parties do not dispute that Johnson engaged in protected activity or that he was subsequently discharged. Bally's argues that Johnson cannot establish a causal link because he was discharged for making threatening remarks to Frank Campbell, a fellow employee. Bally's submitted written statements from Campbell, as well as Sonia Reyes and H. Yacaub (Bally's employees and witnesses to the incident

between Johnson and Campbell) in support.

Johnson does not dispute that he spoke with Campbell. He argues, however, that his remarks were not threatening and that the misconduct charge is pretextual. In his summary judgment response, Johnson submitted copies of the same witness **287** statements supplied by Bally's. Johnson argues that Campbell's statement is consistent with his own version of events-that Johnson merely told Campbell that he should not call him names while he is working and should do so only "outside" of work. Johnson contends that Campbell's notation that he had felt threatened was added after Johnson was terminated and that Reyes' and Yacaub's statements inaccurately twist his use of the word "outside" and are inconsistent with Campbell's statement. Johnson also points out that none of the witnesses' statements are sworn and that Reyes' statement is dated two days *after* Johnson was terminated. Again, as Bally's did not file a reply to Johnson's response, it did not address Johnson's evidence or arguments. In addition to considering temporal

proximity, the District Court should have considered Johnson's circumstantial evidence of pretext in evaluating his retaliation claim. *See* Jalil at 707.

For the foregoing reasons we will vacate the District Court's order granting summary judgment to Bally's and will remand for further proceedings. If the District Court determines on remand that the issues are sufficiently complex or involve credibility determinations, the court may wish to consider appointing counsel under 28 U.S.C. § 1915(e). *See Tabron v. Grace,* 6 F.3d 147, 156-57 (3d Cir.1993).

**All Citations**

147 Fed.Appx. 284, 2005 WL 2141269

Footnotes

1     As the parties are familiar with the facts, we recite them here only as necessary to our discussion.

     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

1989 WL 4956
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Michael P. REDFIELD, Plaintiff,
v.
CITY OF JERSEY CITY, a political subdivision,
Jersey City Police Dept., and Richard Harrison
and Walter Adams, Directors of the Jersey City
Police Department, Defendants.

CIV. No. 86–3869.
|
Jan. 23, 1989.

OPINION

SAROKIN, District Judge.

*1 Before the court is defendants' motion for reconsideration of the court's order of July 29, 1988. After reconsideration, the court vacates its conclusion that plaintiff is entitled to summary judgment on Count One of his Complaint. The court also has reconsidered the issue of qualified immunity, and now concludes that defendants Harrison and Adams have properly asserted the defense. The court also grants defendants' motion for summary judgment on plaintiff's equal protection claim.

BACKGROUND
This is an action under 42 U.S.C. Sec. 1983 by Michael Redfield, a police officer for the City of Jersey City. Defendants are the City of Jersey City, the Jersey City Police Department, and Richard Harrison and Walter Adams, the directors of the Jersey City Police Department. The lawsuit arises out of the defendants' change of plaintiff's job status in October 1984.

In April 1979, plaintiff joined the Jersey City Police Department and has been employed with the department ever since. In 1980, plaintiff was "promoted" or "re-assigned" to the position of detective in April of 1980. This change entailed a salary increase. Plaintiff performed off-duty uniformed security work to supplement his income. On October 7, 1984, plaintiff was working for a

nightclub in Jersey City. That night, a fellow Jersey City police officer was involved in a fight outside the nightclub. The officer who had been involved in the fight accused plaintiff of failing to come to his aid and of being derelict in his duties. On October 11, 1984, defendant Police Director Harrison issued a directive "demoting" or "re-assigning" plaintiff from detective to patrolman and reducing his salary. The directive also transferred plaintiff to a new geographical division, which precluded any further off-duty work at the nightclub where the incident had occurred. Plaintiff was not afforded any type of hearing or opportunity in which to explain the events of October 7, 1984, nor did defendants offer any explanation for the job change.

On October 1, 1986, plaintiff filed this action. He made three claims: 1) defendants deprived him of property without due process (Count One); 2) defendants denied him equal protection under the laws (Count Two); and 3) defendants deprived him of liberty without due process (Count Three).[1] Plaintiff and defendants cross-moved for summary judgment. In an opinion filed July 29, 1988, the court granted summary judgment in favor of plaintiff on his claim that he had been denied procedural due process with respect to his property interest in the position of detective. The court granted summary judgment in favor of defendants on plaintiff's claim that he had been deprived of a liberty interest without due process. The court denied both motions with respect to plaintiff's equal protection claim, since neither party had seriously pursued the issue. The court also rejected the individual defendants' argument that they are entitled to qualified immunity from this suit.

*2 On August 17, 1988, individual defendants Harrison and Adams appealed to the United States Court of Appeals for the Third Circuit from the order of July 29, 1988 denying them the defense of qualified immunity. On November 7, 1988, defendants moved in this court for reargument, reconsideration, and for summary judgment in their favor on Count One. Defendants also renewed their motion for summary judgment. On January 11, 1989, the case was remanded to this court in accordance with the procedures outlined in *Venen v. Sweet,* 758 F.2d 117, 123 (3rd Cir.1985).

In the July 29, 1988 opinion, this court reviewed the due process implications of a government employer's decision to terminate or otherwise change an employee's employment without a hearing. Under *Board of Regents v. Roth,* 408 U.S. 564, 576–77 a person seeking procedural due process must assert a legitimate claim of entitlement to specific benefits that have already been acquired.

Case 3:17-cv-12300-BRM-TJB   Document 67-1   Filed 09/13/18   Page 60 of 66 PageID: 1444

Redfield v. City of Jersey City, Not Reported in F.Supp. (1989)

Property interests are created and defined by "existing rules and understandings that stem from an independent source such as state law." *Id.* at 577. Codified state law is not the only source of entitlement, as determined by the Supreme Court in *Perry v. Sindermann,* 408 U.S. 593, 601. In *Perry,* the Court described property interests as arising out of "rules or mutually explicit understandings that support [a] claim of entitlement to the benefit and that [one] may invoke at a hearing." *Id.*

The opinion summarized defendants' argument as follows: Redfield's property interest was limited to his permanent appointment as a police officer, and did not encompass his elevation to the position of detective. The change in Redfield's position from patrolman to detective and the resultant increase in salary were nothing more than a temporary "reassignment," terminable at will. The court noted that defendants' argument is supported by New Jersey's civil service laws, which recognize a fundamental distinction between tenured, permanent employees, who have obtained their jobs pursuant to civil service procedures, and non-tenured, temporary employees. Redfield's elevation to detective was preceded by neither the requisite test nor selection from a certified list of eligible candidates. Most significantly, for the purposes of this motion for reconsideration, the opinion stated as follows:

The defendants conclude their argument with *Jersey City v. Babula,* 56 N.J.Super. 533 (App.Div.1959), in which the Appellate Division upheld a determination by the Civil Service Commission that "in order for the appointment to the rank of detective to be permanent, it must be made from a list of eligibles established pursuant to a promotional examination." 56 N.J.Super. at 539.

The defendants' reliance on *Babula,* however, is misplaced, for they do not read the case in its entirety. The facts in *Babula* were essentially the same as those before the court. A large group of Jersey City patrolmen were promoted to detective, then "reassigned" to patrol duty upon the access to power of a new local government. The court upheld the action, but, in a section of the opinion crucial to the issue before this court, noted that

\*3 there was nothing in the nature of appellants' appointment to indicate they thereby succeeded to permanent assignments as detectives.... The personnal action forms, filed with the Department of Civil Service, reveal that the appellants had been merely "detailed" to serve as detectives. In one such form the word "Promotion" was crossed out and the word "Detail" inserted in its place, as indicating the particular personnel action desired by the appointing authority. And the

transitory nature of the assignment is further indicated by the notation on the form that additional compensation was provided by ordinance "when so detailed as a Detective." Thus neither the police department nor the Civil Service Department ever approved these details as permanent positions, and nothing has been submitted on this appeal to impel us to a contrary conclusion.

56 N.J.Super. at 538.

Exactly the opposite is true in this case. Plaintiff was notified of his elevation to detective in 1980 by receipt of a "Personnel Action" form emblazoned across the top with the heading "Department of Civil Service Local Government Services." *See* Exhibit "A" to plaintiff's affidavit. At the top of the form, in the center, was typed "Promotion to Detective." Boxes on the form were checked for "Promotion," "Title Change," and "Salary Change." Most importantly, in the spot on the form where the appointing authority was required to indicate whether the appointment was "permanent," "provisional," or "temporary," the "permanent" box was checked. A certification by the appointing authority was signed, stating that "[c]ertification is hereby made that this appointment has been made in accordance with all legal requirements and that the position has been legally established in accordance with ordinance or resolution."

Unlike in *Babula,* then, the plaintiff's personnel action form clearly indicated that the promotion to detective was just that: a permanent promotion. Moreover, plaintiff's subjective understanding of his elevation to detective in 1980 conforms with the personnel form's clear meaning. The court thus finds uncontradicted evidence that both employer and employee understood the 1980 promotion to be a permanent appointment to the position of detective.

The Supreme Court has made clear that "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or *mutually explicit understandings* that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. at 601. The mutually explicit understanding of employer and employee in this case was that plaintiff was a permanent detective. As such, he enjoyed a property interest in that position by virtue of N.J.S.A. 40A:14–147. The defendants deprived him of that interest without due process of law. Plaintiff is therefore entitled to summary judgment on the first count of his complaint.

\*4 The opinion also included a footnote that stated as follows:

Case 3:17-cv-12300-BRM-TJB    Document 67-1    Filed 09/13/18    Page 61 of 66 PageID: 1445

Redfield v. City of Jersey City, Not Reported in F.Supp. (1989)

The court rejects the individual defendants' argument that they are entitled to qualified immunity from this suit. While it is true that government officials are entitled to qualified immunity from liability for damages if their conduct does not violate clearly established constitutional rights of which a reasonable person should have known, *Bennis v. Gable,* 823 F.2d 723 (3rd Cir.1987), the court concludes that the individual defendants should reasonably have recognized that their handling of plaintiff was unconstitutional. *Babula* is not new law; it is a case from 1959. The defendants therefore cannot claim that they could not have known that the civil service forms effected a permanent promotion of plaintiff, rather than a mere reassignment.

In reaching its decision on both Count One and on the issue of qualified immunity, the court relied heavily on the *Babula* decision, particularly the significance of the personnel forms indicating that the promotion was permanent in Redfield's case. Defendants now urge reconsideration of the court's decision, based upon the recent discovery of two additional personnel forms and a related note from a representative of the New Jersey Department of Personnel.

Under General Rule 12I, motions for reconsideration must be filed within 10 days of judgment. Defendants invoke F.R.C.P. 6(b)(2), which allows the court for cause shown to enlarge time within which motions must be filed. F.R.C.P. 60(b) authorizes motions for relief from a judgment or order on grounds of excusable neglect. Such motions must be made "within a reasonable" time, and not more than one year after the order is entered.

Defendants' counsel represents that he discovered the three additional exhibits while preparing this case for appeal. Apparently, both parties relied upon personnel forms which were incomplete, containing only the top half of each form. This motion for reconsideration was filed approximately three months after the order was filed, well within the year limit in F.R.C.P. 60(b). Plaintiff argues that defendants' error does not constitute "excusable neglect," and that the motion is untimely.

The court accepts the representations of defendants' counsel that his attempt to correct the record is made in good faith. The court is satisfied that Rule 60(b) authorizes reconsideration and that such reconsideration is appropriate here. The court relied on the content of the personnel forms in reaching its earlier decision. Apparently, the copies of forms relating to Redfield's job changes that were relied upon by the court omitted an entire section. The copies of the forms now offered

include additional opportunities to identify the job action as "permanent." Significantly, these additional spaces were not marked by state or city officials.

Defendants also offer the affidavits of two Jersey City officials, both of whom state that the box in the upper half of the form that was checked "permanent" refers to Redfield's appointment as a police officer only and not as a detective. (McGuire Affidavit, para. 4; Cottmon Affidavit, para. 4). The city officials state that the term "detective" refers simply to a work assignment, indistinguishable from the general term "police officer." (McGuire Affidavit, para. 3; Cottmon Affidavit, para. 4). Defendants offer an undated note from Marie Giordano, an employee of the New Jersey Department of Personnel, returning the form which had recorded Redfield's "demotion" and requesting that the form be corrected to read "assignment." (*See* Exhibit to Cottmon Affidavit). Defendants submit the affidavit of Morris Farinella, the Regional Administrator of the Department of Personnel, who states that there is no job title for the position of detective under the civil service system. The State of New Jersey does not conduct examinations for the position of detective in municipal police departments and does not certify any person for permanent appointment as a detective. (Farinella Affidavit, paras. 2–3).

*DISCUSSION*
*\*5 Based on the additional submissions to the record, defendants conclude that it is a factual and legal impossibility for plaintiff to ever have been appointed to a "permanent" detective position. The New Jersey Department of Personnel, which has filed an *amicus* brief, concurs in defendants' argument. The Department of Personnel, together with the Merit System Board (formerly the Civil Service Commission), oversees and enforces the civil service system. The system was created to ensure that governmental appointments are made according to merit and fitness. N.J. Const. Art. VII, Sec. 1, para. 2 (1947); N.J.S.A. 11A:1–1 *et seq.* According to the Department of Personnel, a public employee can obtain permanent status in a job title only by passing a test for the title, being appointed from the resulting certification, and passing the five year working period of probation. Redfield did none of these prior to his job change to detective.

The Department cites several cases in which a person whose apparently permanent appointment was subsequently voided for failure to comply with civil service procedures. The Department emphasizes the decision in *Thomas v. McGrath,* 145 N.J.Super. 288 (App.Div.1976), *rev'd,* 75 N.J. 372 (1978). In *Thomas,* a

Case 3:17-cv-12300-BRM-TJB   Document 67-1   Filed 09/13/18   Page 62 of 66 PageID: 1446

Redfield v. City of Jersey City, Not Reported in F.Supp. (1989)

county prosecutor attempted to appoint plaintiff to the position of "sergeant of county detectives." Although the prosecutor indicated on a personnel form that the appointment was permanent, he failed to notify the Department of Civil Service as required by statute. Shortly thereafter a new prosecutor took office. He appointed another candidate instead. The New Jersey Supreme Court adopted the opinion of Judge Morgan, who had dissented at the appellate level. Judge Morgan concluded that plaintiff had not obtained a permanent appointment because of the prosecutor's failure to obtain the Department's formal approval. The Department argues that Redfield has an even weaker claim to the position, since he has not taken a civil service test or obtained certification for the position of detective. The Department also makes a policy argument. To hold that a public employee may obtain permanent status in any way other than through civil service procedures, the Department warns, would undermine the merit-based civil service system.

Plaintiff maintains that his interest in the position of detective constitutes "property" such that due process applies. Plaintiff relies upon N.J.S.A. 40A:14–147, which prohibits demotions from rank unless just cause is shown, as well as New Jersey case law, provisions of the collective bargaining agreement governing the Jersey City police force, and the police department's internal rules and regulations. Plaintiff insists that "the rights of a detective, irrespective of Civil Service recognition, are absolutely protected." (Appellee's Brief, at 14).[2] Plaintiff contends that there was a mutual understanding among the parties, based upon established practice and policy within the Jersey City Police Department, that the job change was permanent.

*Procedural Due Process.*

*6 In reconsidering the opinion and order of July 29, 1988, the court again finds that the Supreme Court's decisions in *Roth* and *Perry* provide the general parameters in deciding whether the interest asserted by Redfield constitutes "property" under the due process clause. In *Roth,* the plaintiff was hired to teach at a state university for a term of one year. After he was informed without explanation that his contract would not be renewed, Roth sued to require the university to state its reasons for nonrenewal and to afford him a hearing. The Supreme Court held that Roth had not been deprived of "property." The Court determined that his interest was based solely on the terms of his appointment as a university professor. Those terms secured his interest in employment until a specific date of termination, with no provision for renewal. The Court deemed it significant

that there was "no state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it." 408 U.S. at 578.

In *Perry,* decided on the same day as *Roth,* a college professor raised a similar claim, with better results. In his tenth year of employment at a state college, under a succession of one-year contracts, Sindermann was notified that his contract would not be renewed. Unlike Roth, Sindermann alleged that his college had a *de facto* tenure program, and that he had gained tenure under that program. The Supreme Court found that an explicit contractual provision was not required to create a property interest. The Court observed that "agreements, though not formalized in writing, may be 'implied.' " The Court allowed that "there may be an unwritten 'common law' in a particular university that certain employees have the equivalent of tenure." *Id.* at 602. In the Court's view, a property interest may arise "if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* at 601.

At the outset, this court deems it necessary to reconsider its "uncontradicted" finding that "both employer and employee understood the 1980 promotion to be a permanent appointment to the position of detective." (Opinion, at 12). The recent submission of complete personnel forms, together with the explanations offered by Jersey City personnel officials, makes clear that this finding is disputed. Accordingly, the court will vacate its earlier finding that the personnel forms, confirmed by plaintiff's subjective understanding, result in an uncontradicted finding of a permanent appointment. Instead, the court concludes that a genuine issue of fact has been presented as to this issue.

The court must now address defendants' argument that they are entitled to summary judgment in their favor on this claim. Defendants reiterate their arguments that plaintiff could not have been permanently appointed to the detective position because the New Jersey Department of Personnel does not recognize any such position. Even if such a position existed, defendants maintain, Redfield could not claim any entitlement to it because he did not obtain the position through the steps required by the civil service system. Defendants warn that a finding that Redfield obtained a permanent appointment without having gone through the required procedures would undermine the civil service system, harming those who have completed the certification process and who have not been chosen for permanent positions.

*7 There is no question that the New Jersey Department

of Personnel does not now recognize the position of detective as a permanent one. However, this fact does not end the court's inquiry, for plaintiff may have other grounds upon which to base his claim that his interest in the position of detective constitutes "property." Plaintiff attempts to ground the interest in state decisional law which, in plaintiff's view, "unequivocally establish[es] 'detective' as a 'rank,' 'title,' or 'position,' which mandate[s] due process to one reduced in rank." (Appellee's Brief, at 11). The cases cited by plaintiff, however, do not support this claim.

The court in *D'Ippolito v. McGuire*, 33 N.J.Super. 477, 490 (App.Div.1954) does not even mention the word "detective," holding only that a police officer may be suspended during an investigation of his suspected misconduct without formal charges being brought. The *Babula* decision affirmed a determination by the Civil Service Commission itself that "the position of 'detective' is a rank in Jersey City; that the rank of detective is a higher rank than that of patrolman and, by reason of the differential in pay, is a promotion." 56 N.J.Super. at 536.[5] However, the court concluded that "there was nothing in the nature of appellant's appointments to indicate they thereby succeeded to permanent assignments as detectives." *Id.* at 538. Plaintiff also relies upon *City Council of Garfield v. Perrapato*, 117 N.J.Super. 184, 194 (App.Div.1971), in which the court predicted that "the separate position of detective, having been established by ordinance, will be recognized by the Civil Service Commission," relying upon *Babula*. However, the court went on to note that although the appointments were valid, they were only temporary, with permanent appointments contingent upon successful completion of the civil service examination and the certification process. Thus, the state's case law is clear: to obtain a permanent appointment to a position recognized by the civil service system, a person must complete the civil service examination and certification procedures. Since Redfield did not complete such procedures prior to his job change to detective, he cannot base his asserted interest on the above line of cases.

The *Perry* decision may provide plaintiff with an adequate basis. In that case, the professor could not rely upon any state law creating or recognizing a specific right of tenure. He relied instead upon an official faculty guide referring to an informal commitment on the part of the university to a tenure principle. The guide stated as follows:

Teacher Tenure: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as

his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work.

\*8 Sindermann also relied upon guidelines governing the university, which appeared to offer a person, like himself, with more than seven years of employment "some form of job tenure." 408 U.S. at 600. He offered to prove that a teacher with his employment history was entitled to a procedural due process right to a statement of reasons and a hearing before being released from employment. The Supreme Court held that he "must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' " 408 U.S. at 603 (citation omitted).

Redfield argues that the policies and practices of the Jersey City Police Department were such that there was an implied understanding that he would be afforded at least a statement of reasons prior to any reduction from his position as detective. He points to the department's internal rules and regulations, which state:

Any permanently employed officer or employee who receives a fixed annual salary from the municipality shall not be suspended, removed, fined *or reduced from office or employment* therein except for just cause and then only after written charges and complaint shall have been preferred.

(Appellee's Brief, at 26a) (emphasis added). Plaintiff also points to the following provision of the Department's collective bargaining agreement:

No Police Officer shall be discharged, disciplined, reprimanded, *reduced in rank, compensation, position,* or deprived of any employment advantage or given an adverse evaluation of his service without just cause. Any such actions asserted by the City, or any agent or representative thereof, shall be subject to the grievance procedure herein set forth, including binding grievance arbitration. Grievants shall elect arbitration or pursuit of civil service remedies but not both.

(Appellee's Brief, at 27a) (emphasis added).

The parties dispute whether and to what extent these provisions represented established custom or policy. Defendants' counsel represented at oral argument that the Department has never given a hearing to a police officer who has been reassigned from detective to patrolman. Defendants argue that it is the Department's custom and practice to assign and reassign police officers to the position of detective and patrolman on a regular basis,

without any understanding that such assignments are permanent.

Drawing inferences in favor of the non-moving party, *see Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3rd Cir.1987), the court is unable to determine whether these provisions reflected actual practice and policy in the Jersey City Police Department. These provisions may fairly be read as creating an entitlement to continued employment, ensuring that a police officer may not be reduced in rank or compensation absent cause. This entitlement is, however, ultimately a matter of state law. *Bishop v. Wood*, 426 U.S. 341, 345 (1976).

It is clear that, under New Jersey law, a course of dealing may result in an implied contract. *Raul Intern. Corp. v. Sealed Power Corp.*, 586 F.Supp. 349, 359 (D.N.J.1984) (Sarokin, J.); *Kozlowski v. Kozlowski*, 164 N.J.Super. 162, 174 (Ch.Div.1978), *aff'd*, 80 N.J. 378 (1979). Plaintiff's assignment to the detective position entailed a salary increase, along with other emoluments. There is nothing to indicate that the assignment was provisional. Indeed, Redfield asserts that he had been assigned as a provisional detective on several prior occasions, without any increase in benefits. The increase in salary provides support for plaintiff's argument that the assignment was a promotion. *See City Council of Garfield v. Perrapato*, 117 N.J.Super. at 193 (salary increase accompanying assignment to detective position indicates job change was in the nature of a promotion). Defendants concede that many persons within the Jersey City Police Department referred to assignments to the detective position as promotions.

**\*9** The course of dealing would include the length of his service as a detective. Redfield had been serving as a detective, and receiving an increased salary, for more than four years before he was reduced in position. Although this four years of service is not dispositive on the nature of the understanding between employer and employee, it serves to distinguish cases such as *Thomas v. McGrath*, *supra*, in which the plaintiff never actually received the benefits of the higher position.

The record does not yet resolve the dispute between the parties as to their course of dealing and their mutual understanding of the nature of plaintiff's interest in the position of detective. Plaintiff has offered objective evidence—a salary increase, provisions of the collective bargaining agreement, and internal departmental rules—sufficient to overcome defendants' motion for summary judgment on Count One. The nature of the understanding between plaintiff and defendants, specifically whether that understanding rose to the level of an implied contract, is one to be determined at trial.

Defendants have established that Redfield's interest in the position of detective did not extend to an interest recognized or protected by the New Jersey Department of Personnel and civil service laws. Under the Supreme Court's holding in *Perry,* if it is the law of New Jersey that a police officer in Redfield's position has no contractual or other claim to job tenure, his claim would be defeated as a matter of law. 408 U.S. at 602, n. 7. Under *Perry,* plaintiff must show that the police department's alleged practices and policies are valid and do not conflict with state law. *See, e.g., Genesco Entertainment v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1986) (Weinfeld, J.) (mutual understanding and <mark>custom</mark> cannot create a <mark>property interest</mark> for due process purposes if they are contrary to express provision of statute or regulation).

It is clear and indeed undisputed that plaintiff is not a "permanent" employee as a detective under state law. State law does not now recognize such a position and accordingly, plaintiff has not qualified for it by virtue of existing state law. Defendants have not offered any express provision of state law that prohibits the practice as alleged by plaintiff. Rather, defendants and the state-intervenor argue that to require that plaintiff be accorded procedural due process in connection with his return to the designation of patrolman contravenes state policy since it confers permanent status upon a position not recognized or approved as such by the civil service. It is argued that plaintiff and others who have been designated "detective" will thus be accorded permanent status and all of the rights incident thereto. The court disagrees. No such broad conclusion is warranted or necessitated.

The court concludes that plaintiff should be allowed to establish at trial that, based upon custom and practice, as well as existing regulations and agreements, those appointed as detectives in the Jersey City Police Department considered the designation to be a promotion carrying with it certain benefits, prestige and expectations. Among those expectations may have been the understanding that loss of the designation of detective for purported disciplinary purposes would entitle the individual involved to a hearing. It does not necessarily follow that all rights and benefits to which the plaintiff would be entitled under a recognized civil service classification necessarily must be accorded to plaintiff. He is not a permanent employee for civil service purposes. His property right may be sufficient, however, to require a hearing before he can be deprived of it.

**\*10** The characterization of the personnel action as a

"promotion" or "reassignment" is not dispositive. The designation may have conferred a property right, by reason of the conduct of the employer. Withdrawal or reduction of that right may entitle the plaintiff to a hearing where the alleged basis is some misconduct on the part of the employee. The dire consequences of such a conclusion as predicted by the defendants do not necessarily follow and are not encompassed or intended by this opinion.

In sum, state law does not recognize the permanent designation of persons as detectives, because the position of detective does not exist under state law. However, state law does not prohibit granting a hearing to such persons if local practice has created such an entitlement based on the benefits entailed by such designation.

*Qualified Immunity.*
As this lengthy opinion indicates, the question presented is difficult and not easily resolved by following clear precedent. Indeed, the court is mindful that other courts have held that personnel decisions short of termination do not constitute a deprivation of a property interest under the due process clause. *See Wargat v. Long,* 590 F.Supp. 1213, 1215 (D.Conn.1984); *see also Brown v. Brienen,* 722 F.2d 360, 364–365 (7th Cir.1983). As such, the issue lends itself to conflicting conclusions reached in good faith. Therefore, individual defendants Harrison and Adams are entitled to the defense of qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), *Mitchell v. Forsyth,* 472 U.S. 511 (1985), and *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034 (1987).

*Equal Protection.*
Defendants renew their motion for summary judgment, this time supported by legal argument. Defendants argue that plaintiff has not alleged or established that any city policy invidiously discriminated against him. Defendants

contend that the issues presented in this case are not related in any way to a suspect classification; plaintiff therefore has improperly invoked the equal protection clause.

The court agrees. Plaintiff does not suggest that defendants created a suspect classification. Plaintiff therefore bears the burden of showing that the defendants' actions "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *Rogin v. Bensalem Township,* 616 F.2d 680, 688 (3rd Cir.1980), *cert. denied,* 450 U.S. 1029 (1981). Plaintiff does not even attempt to meet this burden. Accordingly, defendants are entitled to summary judgment in their favor on this claim. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

*CONCLUSION*
Upon reconsideration, the court vacates its earlier order granting summary judgment in favor of plaintiff on Count One. The court finds that neither party is entitled to summary judgment and that the case should proceed to trial to establish whether the custom and practice of the Jersey City Police Department was such that plaintiff obtained a property interest in the position of detective sufficient to entitle him to a due process hearing in the event he was returned to the status of patrolman. The court has reconsidered its prior determination with respect to qualified immunity. Individual defendants Harrison and Adams are entitled to such immunity in this case. The court also grants summary judgment in favor of defendants on the issue of equal protection.

**All Citations**

Not Reported in F.Supp., 1989 WL 4956

Footnotes

1   The court's determination of Count Three was not raised by defendants' motion for reconsideration and will not be disturbed.

2   Both plaintiff and defendants have incorporated into their arguments briefs and exhibits submitted to the Court of Appeals.

3   The position now taken by the Department of Personnel with respect to recognition of a separate detective position is inconsistent with its determination in *Babula* that a job change from patrolman to detective may constitute a promotion. Neither party has reconciled these conflicting positions.

**Redfield v. City of Jersey City, Not Reported in F.Supp. (1989)**

End of Document
© 2018 Thomson Reuters. No claim to original U.S. Government Works.